**BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE:  PRETERM INFANT NUTRITION PRODUCT LIABILITY LITIGATION** | **MDL DOCKET NO. _____** |

**BRIEF IN SUPPORT OF ABBOTT LABORATORIES AND ABBOTT LABORATORIES, INC.'S MOTION TO TRANSFER RELATED CASES FOR CONSOLIDATED PRETRIAL <u>PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407</u>**

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ...................................................................................1

II.    BACKGROUND .....................................................................................2

III.   LEGAL STANDARD..........................................................................11

IV.    ARGUMENT.......................................................................................11

    A.    Transfer to a Single District for Centralized Pretrial Proceedings Is Appropriate Under 28 U.S.C. § 1407 ......................................11

        1.    The Actions Involve Common Questions of Fact.........................12

        2.    Centralization Will Serve "The Convenience of the Parties and Witnesses" and "Promote the Just and Efficient Conduct of the Actions." ...............................................................13

    B.    The Actions Should Be Transferred to the Hon. Stefan R. Underhill in the District of Connecticut.............................................17

V.     CONCLUSION....................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Page**

CASES

*Brown, et al., v. Abbott Laboratories, Inc., et al.*,
    3:21-cv-00687-SDD-EWD (M.D. La., Filed 11/28/2021) ............................................ 6, 8, 9

*Cluck v. IKON Office Sols., Inc.*,
    No. 11-05027-JSW, 2012 WL 1610789 (N.D. Cal. May 8, 2012).........................................14

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)...................................................................................................12

*Crawford v. Abbott Laboratories, et al.*,
    1:21-cv-00201-AW-GRJ (N.D. Fla.) .................................................................................8, 9

*Davis v. Abbott Laboratories, Inc., et al.*,
    5:21-cv-00481-JGB-KK (C.D. Cal.)...................................................................................7, 9

*Davis v. Abbott Labs*,
    ___ F. Supp. 3d ___, No. EDCV 21-481 JGB (KKX), 2021 WL 4902187 (C.D. Cal. Oct. 1,
    2021) ..................................................................................................................10

*Ferry v. Mead Johnson & Co., et al.*,
    3:20-cv-00099-SRU (D. Conn.)...........................................................................5, 6, 9, 18

*George v. Abbott Laboratories, Inc.*,
    1:20-cv-02537-APM (D.D.C.)............................................................................................7, 9

*Gschwend, et. al v. Abbott Laboratories, et. al*,
    1:22-cv-00197 (N.D. Ill.) .................................................................................................7

*Hall v. Abbott Laboratories, Inc.*,
    1:22-cv-00071 (N.D. Ill.) .................................................................................................7

*Hunte v. Abbott Laboratories, Inc.*,
    ___ F. Supp. 3d. ___, No. 3:20-CV-1626 (SRU), 2021 WL 3679303 (D. Conn. Aug. 19,
    2021) ..................................................................................................................10

*Hunte v. Abbott Laboratories, Inc.*,
    ___ F. Supp. 3d. ___, No. 3:20-CV-1626 (SRU), 2021 WL 5039130 (D. Conn. Oct. 29,
    2021) ..................................................................................................................10

*Hunte, et al. v. Abbott Laboratories, Inc.*,
   3:20-cv-1626-SRU (D. Conn.)..................................................................6, 9, 10, 15, 18, 19

*In re: Aggrenox Antitrust Litig.*,
   11 F. Supp. 3d 1342 (J.P.M.L. 2014)..................................................................17, 18

*In re Air Crash near Peixoto De Azevada, Brazil on Sept. 29, 2006*,
   493 F. Supp. 2d 1374 (J.P.M.L. 2007)..................................................................18

*In re Bayer Healthcare LLC, Merial Limited Flea Control Products Marketing & Sales Practices Litigation*,
   844 F. Supp. 2d 1369 (J.P.M.L. 2012)..................................................................17

*In re Broiler Chicken Grower Antitrust Litig.*,
   509 F. Supp. 3d 1359 (J.P.M.L. 2020)..................................................................18

*In re Digital Advert. Antitrust Litig.*,
   No. MDL 3010, 2021 WL 3523450 (J.P.M.L. Aug. 10, 2021) ..............................................14

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
   196 F. Supp. 2d 1375 (J.P.M.L. 2002)..................................................................13

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
   681 F. Supp. 2d 141 (D. Conn. 2009)..................................................................18

*In re Generic Pharm. Pricing Antitrust Litig.*,
   No. MDL 2724, 2017 WL 4582710 (J.P.M.L. Aug. 3, 2017) ..........................................14, 15

*In re Helicopter Crash Near Wendle Creek, Brit. Columbia on Aug. 8, 2002*,
   485 F. Supp. 2d 47 (D. Conn. 2007)..................................................................18

*In re Ins. Brokerage Antitrust Litig.*,
   360 F. Supp. 2d 1371 (J.P.M.L. 2005)..................................................................12

*In re Int'l House of Pancakes Franchise Litig.*,
   374 F. Supp. 1406 (J.P.M.L. 1974)..................................................................15

*In re Jamster Marketing Litigation*,
   427 F. Supp. 2d 1366 (J.P.M.L. 2006)..................................................................17

*In re Oxycontin Antitrust Litig.*,
   314 F. Supp. 2d 1388 (J.P.M.L. 2004)..................................................................15

*In re Paraquat Prod. Liab. Litig.*,
   ___ F. Supp. 3d. ___, No. MDL 3004, 2021 WL 2369295 (J.P.M.L. June 7, 2021) ..............17

*In re PepsiCo, Inc., Bottled Water Mktg. & Sales Practices Litig.*,
   560 F. Supp. 2d 1348 (J.P.M.L. 2008)...................................................................................19

*In re Pineapple Antitrust Litig.*,
   342 F. Supp. 2d 1348 (J.P.M.L. 2004)...................................................................................14

*In re Preferential Drug Products Pricing Antitrust Litigation*,
   429 F. Supp. 1027 (J.P.M.L. 1977)........................................................................................17

*In re Schnuck Markets, Inc., Customer Data Sec. Breach Litig.*,
   978 F. Supp. 2d 1379 (J.P.M.L. 2013)...................................................................................16

*In re Starmed Health Pers. FLSA Litig.*,
   317 F. Supp. 2d 1380 (J.P.M.L. 2004)...................................................................................13

*In Re: Tasigna (Nilotinib) Prods. Liab. Litig.*,
   ___ F. Supp. 3d. ___, No. MDL 3006, 2021 WL 3520612 (J.P.M.L. Aug. 10, 2021)............16

*In re Trade Partners, Inc., Inv'rs Litig.*,
   493 F. Supp. 2d 1381 (J.P.M.L. 2007)...................................................................................12

*In re Viagra Products Liability Litigation*,
   414 F. Supp. 2d 1357 (J.P.M.L. 2006)...................................................................................17

*In re Zyprexa Prods. Liab. Litig.*,
   314 F. Supp. 2d 1380 (J.P.M.L. 2004)...................................................................................13

*Jupiter v. Mead Johnson & Company, LLC*,
   2021-L-000560 (Ill. S. Ct.) .....................................................................................................5

*Kelton v. Abbott Laboratories, Inc.*,
   5:21-cv-2145-JGB-KK (C.D. Cal.).........................................................................................7

*Littles v. Abbott Laboratories, Inc., et al.*,
   5:21-cv-2146-JGB-KK (C.D. Cal.).....................................................................................7, 9

*Mar ex rel. Estate of Railee Mar v. Abbott Laboratories*,
   1:22-CV-00232 (N.D. Ill.) ......................................................................................................8

*Monzon v. Abbott Laboratories, Inc.*,
   3:21-cv-01703-SMY (S.D. Ill.)...............................................................................................8

*Rhodes ex rel. Rhodes v. Abbott Laboratories*,
    1:22-CV-00239 (N.D. Ill.) ................................................................................8

*Richardson v. Abbott Laboratories, Inc., et al.*,
    2:21-cv-9932-JGB-KK (C.D. Cal.) ..............................................................7, 9

*Rinehart, et. al v. Abbott Laboratories, et. al*,
    1:22-cv-00192 (N.D. Ill.) ...............................................................................8

*Sanchez Juan v. Abbott Laboratories, Inc., et al.*,
    6:21-cv-502-RBD-EJK (M.D. Fla.) .........................................................6, 9, 10

*Stuper, et. al v. Abbott Laboratories*,
    1:22-cv-00204 (N.D. Ill.) ...............................................................................8

*Taylor, et. al v. Abbott Laboratories, et. al*,
    1:22-cv-00203 (N.D. Ill.) ...............................................................................8

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ......................................................................................12

**STATUTES**

28 U.S.C. § 1407 ......................................................................................... passim

Connecticut Unfair Trade Practices Act ........................................................10

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 .........................................................................................12

Illinois Supreme Court Rule 384 ....................................................................5

J.P.M.L Rule 6.2 ............................................................................................1

U.S. District Courts–Median Time Intervals From Filing to Disposition of Civil Cases
    Terminated, by District and Method of Disposition, During the 12-Month Period Ending
    September 30, 2021 .....................................................................................19

## I.      INTRODUCTION

Abbott Laboratories and Abbott Laboratories, Inc. (together, "Abbott") are defendants in 17 substantially similar cases pending in federal courts throughout the country. The pace of new filings is accelerating, and an ongoing national advertising campaign by plaintiffs' counsel is designed to generate additional claims. The likely burdens and challenges of conducting duplicative discovery and litigating materially similar issues have reached the stage where transfer under 28 U.S.C. § 1407 and JPML Rule 6.2 is necessary and appropriate.

These cases are about infants who were born too early—before 37 weeks of gestation— and developed necrotizing enterocolitis (NEC). NEC is an umbrella term for an inflammatory disease of the gastrointestinal tract occurring in up to 8% of infants in neonatal intensive care units (NICUs), and is a leading cause of death among premature, very low birth-weight infants (those born weighing under 1500 grams or 3.3 pounds).

NEC's causes are both complex and multifactorial, meaning that it has many known contributing factors. Among these many risk factors, there are only two reliable prognostic parameters: gestational age and birth weight. The younger the infant's gestational age and the less an infant weighs, the greater the risk that the infant will develop NEC. This is because infants born prematurely and who are small for their gestational age have underdeveloped or maldeveloped gastrointestinal systems; these premature infants' systems are not prepared to receive nutrition outside of their mother's womb. These infants also lack the muscle coordination to simultaneously breathe, suck, and swallow, so they cannot breast or bottle feed in their first days or weeks of life, requiring nutrition through their veins ("parenteral" feeding) or through a tube directly to their intestines or stomach ("enteral" feeding). Accordingly, administering nutrition to these premature infants is a daunting medical challenge, and NEC is an inherent risk. Neonatologists and healthcare professionals constantly monitor all infants under their care in the NICU for early signs of NEC,

1

regardless of how their nutrition is administered or whether they are receiving their own mother's breastmilk, human donor milk, formula or fortifier, or some combination. Indeed, even infants who are fed only their own mother's breastmilk or nothing at all develop NEC.

Notwithstanding these inherent risks and the complex and multifactorial etiology of NEC, the 17 federal lawsuits against Abbott (as well as 43 state lawsuits) allege that formula and fortifier products selected by neonatologists for administration in NICUs to premature infants *caused* the infants in those cases to develop NEC—allegations Abbott vehemently denies. These suits satisfy the requirements of Section 1407, as they involve common questions of fact and law, and centralization would significantly reduce discovery burdens and duplicative litigation and avoid inconsistent rulings. Abbott therefore moves for an order centralizing the 17 federal cases listed in the Schedule of Actions filed herewith (collectively, the "Actions"), as well as any tag-along cases involving similar facts or claims, before the Hon. Stefan R. Underhill in the U.S. District Court for the District of Connecticut. Chief Judge Underhill is an experienced jurist who has managed multidistrict litigation and has presided over these sensitive and complex cases against Abbott since December 2019. As explained more fully below, the District of Connecticut is the appropriate Transferee Court.

## II.    BACKGROUND

Infants born prematurely account for a majority of infant deaths in the United States. The short- and long-term health challenges premature infants face are particularly severe for those with "extremely low" (<1,000 grams or 2.2 pounds) and "very low" (<1,500 grams or 3.3 pounds) birth weights. These premature infants require unique nutritional care to increase their chance at survival and their long-term health outcomes. In many cases, these tiny, underdeveloped infants start their lives in a NICU—an intensive care unit with advanced technology and professionals trained to give specialized care to the tiniest of patients. Neonatologists, neonatal nurses, dietitians, clinical

staff, and other experts coordinate round-the-clock care to give these premature infants the best odds of survival as they confront the medical challenges of being born long before they develop fully in the womb. These medical challenges include underdevelopment or in some cases maldevelopment of the systems that control breathing, heart and brain function, temperature control, gastrointestinal health, blood flow, metabolism, and the immune system.

A critical component of the 24/7 care these infants receive in the NICU relates to their exceptional nutritional challenges. Neonatologists—in consultation with NICU dieticians and nurses—assess multiple variables to determine the appropriate nutritional treatment in light of the condition and needs of a specific premature infant under their care, including: how to administer feedings (parenteral, enteral, or eventually, a bottle); timing of feedings (continuous or periodic); how much nutrition to provide, in calories and volume; and the source or sources of the nutrition— the mother's own breastmilk, donor breastmilk, formula and/or fortifiers, or intravenous nutrients. The use of the preterm formulas and fortifiers targeted by plaintiffs in these cases has long been an established and critical part of these NICU professionals' standard of care when treating these premature infants, so that the infants are in the best position for survival in the short term, and optimal neurodevelopment in the long term.

In many cases, the neonatologists determine that a premature infant's nutritional needs will be best satisfied by administering specialized preterm infant formulas and fortifiers that contain protein derived from cow's milk to deliver essential calories and nutrients. These preterm formulas and fortifiers are not only the standard of care, but are essential for ensuring the survival of these premature infants. In many cases, including where human milk is not available or insufficient in quantity, the neonatologists determine that a premature infant's nutritional needs will be best satisfied by administering specialized preterm infant formulas and fortifiers that contain protein

3

derived from cow's milk to deliver the essential calories and nutrients an infant requires.

To put the extraordinary nutritional requirements of premature infants in context, between gestational weeks 30 and 36, a fetus *doubles* in size while in the womb. There is no known way to replicate this exponential growth and development outside the womb, and breastmilk alone does not support this level of growth. The specialty products have evolved over decades, with input from numerous medical professionals and nutritionists, to specifically address the challenges associated with prematurity. The Food and Drug Administration reviews all such products for safety and suitability for premature infants, and, as described above, neonatologists exercise their medical judgment to decide whether and when to administer formulas and/or fortifiers to premature infants depending on their particular circumstances and medical conditions.

For decades, Abbott has researched, developed, tested, and produced these specialized preterm nutrition products, including Similac Special Care 20, Similac Special Care 24, and Similac Special Care 30 (referring to the number of calories per ounce of each product, respectively), Similac Human Milk Fortifier (which can be added to supplement human milk) and Neosure (which includes increased protein, calcium, phosphorus, and other nutrients to support important catch-up growth) to help give premature infants a chance to survive, grow, and thrive. These products are administered every day, by highly trained medical professionals across the country in the nation's leading NICUs.

The cases at issue all involve death or injury of premature infants who allegedly were administered preterm nutrition products under a medical team's supervision, and experienced NEC—which, again, is consistently described by medical professionals and researchers as a "multifactorial disease" that develops due to the immaturity or malformation of the gastrointestinal tract and immune system in premature infants. The plaintiffs in these cases allege, however, that

being administered a formula and/or fortifier that contains protein derived from cow's milk and was manufactured by Abbott (and, in some cases, by another company) caused the infant at issue to develop NEC.

Plaintiffs first filed a case on this theory two years ago, in the District of Connecticut, in *Ferry v. Mead Johnson & Co., et al.*, 3:20-cv-00099-SRU (D. Conn. Filed 12/20/2019 (Conn. Sup. Ct), Removed 1/21/2020), which was assigned to Chief Judge Stefan R. Underhill. Numerous plaintiffs' firms have since pursued similar claims, engaging in widespread advertising that solicits bereaved parents to pursue these theories and filing cases across the country. The attorney who filed *Ferry* joined with others to form "the first Law Firm in the country dedicated to the pursuit of Baby formula claims."[1] Over the past year, 64 new cases were filed against Abbott on these theories, including 11 filed directly in federal court and six originally filed in state court but removed, for a total of 17 federal cases in the past year, plus 47 state cases. Twenty-three different law firms have now brought 17 federal cases, and 43 state cases, of which 41 are in Illinois state courts, brought by a total of 296 individual claimants with claims relating to a 146 premature infants.

The Illinois state court plaintiffs recently moved to centralize many of the cases pending there.[2] Many of those cases have no relationship to Illinois, however, and Abbott has moved to dismiss them on the basis of *forum non conveniens*. If dismissed and presumably re-filed, these

---

[1]  *See* Levin, Rojas, Camassar, and Reck, LLC website *available at* https://www.babyformulalawyers.com/ (last visited January 14, 2022). *Ferry* itself was ultimately dismissed by the plaintiff, but only after 15 months of litigation, including Judge Underhill's ruling on Abbott's motion to dismiss.

[2]  *Cf.* 1/14/2022 Defendant Abbott Laboratories' Unopposed Motion for Leave To File Instanter Its Limited Consent to Plaintiffs' Motion To Transfer and Consolidate Cases for Pretrial Purposes Only Under Illinois Supreme Court Rule 384, *Jupiter v. Mead Johnson & Company, LLC*, 2021-L-000560 (Ill. S. Ct.).

suits would likely be either filed in or removable to federal court on diversity grounds.

In the past two months alone, there have been 24 new cases filed, of which seven were filed directly in federal court and five filed in state court but removed to federal court for a total of 12 of these newly-filed cases currently pending in federal court.

Further, plaintiffs' counsel in these suits have been explicit about their "strategy" of filing cases with the aim of forming an MDL. As one such firm recently advertised for a webinar on "infant formula litigation": "Come learn about this litigation and where it is headed. This webinar will address the liability story, the causes of action, *and the MDL strategy*."[3] Indeed, the clerk in one of these recently filed cases quickly recognized the suitability of the case for centralization in an MDL, issuing a notice *sua sponte* to this Panel stating: "This is a potential multi-district litigation case."[4] Meanwhile, plaintiffs' counsel's advertising for new plaintiffs through television, radio, print, and internet vehicles continues in force, including the plaintiffs' counsel's hosting the most recent of its "Webinars" on filing strategy in these cases just last week.

Today, there are 17 federal lawsuits pending against Abbott, spanning eight federal districts, including:

        **a.**      **District of Connecticut**

     **i.**    *Hunte, et al. v. Abbott Laboratories, Inc.*, 3:20-cv-1626-SRU (D. Conn. Filed 10/28/2020), *assigned to* Hon. Stefan R. Underhill. **Status:** Trial set for May 2023; a Case Management Order has been entered, and discovery has commenced. On October 29, 2021, the Court certified questions to the Connecticut Supreme Court. (On April 1, 2021, following 15 months of litigation in the first-filed *Ferry* case, the *Ferry* plaintiff filed a notice of voluntary dismissal.)

---

[3] *See* "Mass Torts Made Perfect" website, *available at* https://mtmp.com/webinars/infant-baby-formula/ (last visited January 14, 2022).

[4] *See* 12/1/2021 Ltr. from M. McConnell to J. Nichols, Clerk of JPML re *Brown, et al v. Abbott Laboratories, Inc., et al*, 3:21-cv-00687-SDD-EWD (M.D. La.) (Ex. A).

      **b.**        **Middle District of Florida**

**i.**    *Sanchez Juan v. Abbott Laboratories, Inc., et al.*, 6:21-cv-502-RBD-EJK (M.D. Fla. Filed 3/18/2021), assigned to Hon. Roy B. Dalton, Jr. ***Status***: The court denied the defendants' motion to dismiss on August 2, 2021. Trial set for January 2023; a Case Management Order has been entered, and discovery has commenced.

      **c.**        **District for the District of Columbia**

**i.**    *George v. Abbott Laboratories, Inc.*, 1:20-cv-02537-APM (D.D.C. Filed 8/3/2020 (D.C. Super. Ct.), Removed 9/11/2020), *assigned to* Hon. Amit P. Mehta. ***Status***: Trial set for March 2023; a Case Management Order has been entered, and discovery has commenced; Abbott's Motion to Dismiss is pending.

      **d.**        **Central District of California**

**i.**    *Davis v. Abbott Laboratories, Inc., et al.*, 5:21-cv-00481-JGB-KK (C.D. Cal. Filed 3/18/2021), assigned to Hon. Jesus G. Bernal. ***Status***: Court granted Abbott's motion to dismiss in part. No trial date has been set. No Case Management Order has been entered. Discovery has not commenced.

**ii.**    *Kelton v. Abbott Laboratories, Inc.*, 5:21-cv-2145-JGB-KK (C.D. Cal. Filed 12/27/2021), assigned to Hon. Jesus G. Bernal. ***Status***: Complaint has not been served on Defendant. No trial date has been set. No Case Management Order has been entered. Discovery has not commenced.

**iii.**    *Littles v. Abbott Laboratories, Inc., et al.*, 5:21-cv-2146-JGB-KK (C.D. Cal. Filed 12/27/2021), assigned to Hon. Jesus G. Bernal. ***Status***: Complaint has not been served on Defendant. No trial date has been set. No Case Management Order has been entered. Discovery has not commenced.

**iv.**    *Richardson v. Abbott Laboratories, Inc., et al.*, 2:21-cv-9932-JGB-KK (C.D. Cal. Filed 12/27/2021), assigned to Hon. Jesus G. Bernal. ***Status***: Complaint has not been served on Defendant. No trial date has been set. No Case Management Order has been entered. Discovery has not commenced.

      **e.**        **Northern District of Illinois**

**i.**    *Hall v. Abbott Laboratories, Inc.*, 1:22-cv-00071 (N.D. Ill., Filed 1/5/2022), *assigned* to Hon. John J. Tharp, Jr. ***Status***: No trial date has been set. No Case Management Order has been entered. Discovery has not commenced.

**ii.**    *Gschwend, et. al v. Abbott Laboratories, et. al*, 1:22-cv-00197 (N.D. Ill., Filed 1/10/2022 (Cir. Ct. Cook Cty., Ill.), Removed 1/12/2022), *assigned* to Hon. Rebecca R. Pallmeyer. ***Status***: Complaint was not served on Defendant. No trial date has been set. No Case Management Order has been entered. Discovery has not commenced.

iii.    *Rinehart, et. al v. Abbott Laboratories, et. al*, 1:22-cv-00192 (N.D. Ill., Filed 1/10/2022 (Cir. Ct. Cook Cty., Ill.), Removed 1/12/2022), *assigned* to Hon. John J. Tharp, Jr. . **Status**: Complaint was not served on Defendant. No trial date has been set. No Case Management Order has been entered. Discovery has not commenced.

iv.    *Stuper, et. al v. Abbott Laboratories*, 1:22-cv-00204 (N.D. Ill., Filed 1/10/2022 (Cir. Ct. Cook Cty., Ill.), Removed 1/12/2022), *assigned* to Hon. Robert Gettleman. **Status**: Complaint was not served on Defendant. No trial date has been set. No Case Management Order has been entered. Discovery has not commenced.

v.    *Taylor, et. al v. Abbott Laboratories, et. al*, 1:22-cv-00203 (N.D. Ill., Filed 1/10/2022 (Cir. Ct. Cook Cty., Ill.), Removed 1/12/2022), *assigned* to Hon. Sharon Johnson Coleman. **Status**: Complaint was not served on Defendant. No trial date has been set. No Case Management Order has been entered. Discovery has not commenced.

vi.    *Mar ex rel. Estate of Railee Mar v. Abbott Laboratories*, 1:22-CV-00232 (N.D. Ill., Filed 1/14/2022), *assigned* to Hon. Marvin E. Aspen. **Status**: Complaint has not been served on Defendant. No trial date has been set. No Case Management Order has been entered. Discovery has not commenced.

vii.    *Rhodes ex rel. Rhodes v. Abbott Laboratories*, 1:22-CV-00239 (N.D. Ill., Filed 1/14/2022), *assigned* to Hon. Marvin E. Aspen. **Status**: Complaint has not been served on Defendant. No trial date has been set. No Case Management Order has been entered. Discovery has not commenced.

**f.    Middle District of Louisiana**

i.    *Brown, et al., v. Abbott Laboratories, Inc., et al.*, 3:21-cv-00687-SDD-EWD (M.D. La., Filed 11/28/2021), *assigned to* Hon. Shelly D. Dick. **Status:** Court clerk issued letter *sua sponte* alerting Panel that case is a candidate for MDL. No Case Management Order has been entered. Discovery has not commenced. Trial date has not been set.

**g.    Northern District of Florida**

i.    *Crawford v. Abbott Laboratories, et al.*, 1:21-cv-00201-AW-GRJ (N.D. Fla., Filed 12/10/2021), *assigned to* Hon. Allen C. Winsor. **Status:** No Case Management Order has been entered. Discovery has not commenced. Trial date has not been set.

**h.    Southern District of Illinois**

i.    *Monzon v. Abbott Laboratories, Inc.*, 3:21-cv-01703-SMY (S.D. Ill., Filed 12/15/2021), *assigned to* Hon. Staci M. Yandle. **Status**: Plaintiffs filed Motion to Remand on 1/10/2022. No Case Management Order has been entered. Discovery has not commenced. No trial date has been set.

These cases are listed in the attached Schedule of Actions.

These suits substantially overlap in many ways. All the complaints name Abbott as a defendant, and five actions also name Mead Johnson & Company, LLC.[5] The legal theories and causes of action asserted in the various complaints also extensively overlap. All allege state common-law torts and/or product liability claims or their statutory equivalents. And all center around the same or closely related operative theories of alleged wrongdoing: that preterm infant formula and fortifier products that contain cow's milk protein are unreasonably dangerous, that those products caused the NEC of the premature infants at issue, and that Abbott failed to adequately warn of the relevant risks.

Finally, all of these actions are in the early stages. There are only three cases in which preliminary motions have been decided (*Hunte*, *Sanchez-Juan*, and *Davis*), and case management orders have been entered and limited discovery has begun in only three cases (*Hunte*, *Sanchez-Juan* and *George*). Even the discovery that has commenced has been limited: initial sets of interrogatories, requests for production, and requests for admission have been served, but no depositions have yet been taken in any of the cases. By contrast, 13 of the 17 cases are newly filed, having been filed since November 28, 2021, and nine of those have not even been served on Abbott.

Chief Judge Underhill has been actively managing these sensitive, complex cases for just over two years now. In addition to presiding over the *Ferry* case noted above for more than 15 months before it was voluntarily dismissed, the initial complaint in the *Hunte* case was filed in the District of Connecticut in October 2020, and was also assigned to Chief Judge Underhill. Abbott

---

[5] *Brown, et al.*, Compl. at 1 (Ex. 17); *Crawford*, Compl. at 1 (Ex. 8); *Littles*, Compl. at 1 (Ex. 3); *Richardson*, Am. Compl. at 1 (Ex. 4); *Sanchez Juan*, Compl. at 1 (Ex. 7).

moved to dismiss the *Hunte* case, which was granted in part in August 2021. Specifically, Chief Judge Underhill determined that plaintiff's claims of failure to warn, design defect, and negligence could proceed, but dismissed claims based on negligent misrepresentation, intentional misrepresentation, breach of warranty, and the Connecticut Unfair Trade Practices Act. *See Hunte v. Abbott Laboratories, Inc.*, ___ F. Supp. 3d. ___, No. 3:20-CV-1626 (SRU), 2021 WL 3679303 (D. Conn. Aug. 19, 2021). In addition, Chief Judge Underhill certified to the Connecticut Supreme Court questions about the applicability of the learned intermediary doctrine to preterm nutritional products administered by NICU medical personnel, and the viability under Connecticut law of a cause of action for loss of filial consortium. *See Hunte v. Abbott Laboratories, Inc.*, ___ F. Supp. 3d. ___, No. 3:20-CV-1626 (SRU), 2021 WL 5039130 (D. Conn. Oct. 29, 2021).

Other federal cases are in their early stages. In *Sanchez-Juan*, Judge Dalton denied the defendants' motion to dismiss and initial discovery has begun. *See* No. 6:21-cv-00502-RBD-EJK, Doc. No. 38 (M.D. Fla. Aug. 2, 2021). In *Davis*, Judge Bernal granted, without prejudice, Abbott's motion to dismiss two of plaintiff's claims: breach of the implied warranty of merchantability, and negligent misrepresentation. *Davis v. Abbott Labs*, ___ F. Supp. 3d ___, No. EDCV 21-481 JGB (KKX), 2021 WL 4902187 (C.D. Cal. Oct. 1, 2021).

Plaintiffs have also moved the Illinois Supreme Court for pretrial consolidation of 33 actions involving 103 claimants that had been filed in Illinois state courts as of December 14, 2021. On January 14, 2022, Abbott consented to the requested consolidation for pre-trial purposes only. Since plaintiffs' request was filed last month, plaintiffs filed an additional nine actions in Madison County, Illinois, involving an additional 45 claimants. All told, 41 actions are pending against Abbott in Illinois state courts, involving 253 claimants. Like the federal complaints, each state-court claimant alleges that NICU professionals administered an infant Abbott's preterm

nutritional products; the infant developed NEC; Abbott's preterm products caused the infant to develop NEC; and Abbott's labeling and/or marketing fails to warn that its preterm products cause NEC.

### III.   LEGAL STANDARD

Transfer and consolidation is appropriate when actions pending in different judicial districts involve similar questions of fact such that consolidating pretrial proceedings would "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). In relevant part, Section 1407 provides:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions.

28 U.S.C. § 1407(a).

### IV.   ARGUMENT

**A.   Transfer to a Single District for Centralized Pretrial Proceedings Is Appropriate Under 28 U.S.C. § 1407**

Neonatologists caring for premature infants in NICUs around the country use the products at issue as part of their care and treatment of their patients every day. These cases target critical, life-saving products employed daily by highly trained medical professionals to care for the most vulnerable of infants. Allowing the cases to proceed in an uncoordinated manner will be harmful not only to judicial economy but to the public health. Section 1407 provides the path to centralizing these disparate cases. Centralization of pretrial proceedings in an MDL is appropriate if (1) actions pending in different federal courts involve "one or more common questions of fact"; and (2) centralization "will be for the convenience of parties and witnesses and will promote the just

and efficient conduct of such actions." 28 U.S.C. § 1407(a). Both factors strongly favor centralization of the pretrial proceedings of these actions.

1.    **The Actions Involve Common Questions of Fact.**

Section 1407 requires that the cases to be centralized raise "one or more common questions of fact."[6] It does not require "a complete identity or even majority of common factual issues as a prerequisite to transfer." *In re Ins. Brokerage Antitrust Litig.*, 360 F. Supp. 2d 1371, 1372 (J.P.M.L. 2005). Here, although some aspects of the cases are necessarily individualized—such as which products were administered to a specific infant and the issue of specific causation of NEC in light of each infant's circumstances—there are significant commonalities such that the actions at issue plainly satisfy this requirement.

All of these actions are brought by the estates or representatives of premature infants who allege that preterm products that include protein derived from cow's milk caused premature infants' NEC. Plaintiffs' complaints are strikingly similar, many with nearly identical allegations. Specifically, the plaintiffs in these 17 cases allege that: preterm products that contain protein derived from cow's milk cause NEC; neonatologists selected preterm products manufactured by Abbott for administration to the infants; the premature infant contracted NEC; and the labeling and/or marketing on the products administered fails to warn that the preterm products cause NEC. The allegations about purported Abbott conduct in the complaints are substantially the same. Accordingly, these actions present "one or more common question of fact." 28 U.S.C. § 1407(a).

---

[6] This inquiry is very different from the class-certification inquiry required by Rule 23. *See, e.g.*, *In re Trade Partners, Inc., Inv'rs Litig.*, 493 F. Supp. 2d 1381 (J.P.M.L. 2007) (centralization under section 1407 appropriate even where individual questions of fact and law predominate for class-certification purposes). Abbott reserves all of its defenses to class certification, including, but not limited to, the absence of common questions susceptible to common answers (*see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)), and the fact that common questions do not predominate over individualized questions. *See* Fed. R. Civ. P. 23(b)(3); *Comcast Corp. v. Behrend*, 569 U.S. 27, 41 (2013).

2.      Centralization Will Serve "The Convenience of the Parties and Witnesses" and "Promote the Just and Efficient Conduct of the Actions."

Centralization pursuant to Section 1407(a) also would be more convenient for the parties and more efficient for the Court for several reasons. Specifically, centralization will reduce both fact and expert discovery burdens on both sides by, among other things, streamlining what are likely to be substantially overlapping document productions and avoiding the need for the same witnesses to be deposed multiple times. Centralization will also avoid the potential for inconsistent rulings between these cases, and ensure efficiency, including by providing a vehicle for incorporating the additional actions plaintiffs' counsel has signaled will be filed in the coming weeks and months. Equivalent benefits cannot be accomplished solely through informal coordination or by transferring individual cases under Section 1404.

a.      Centralization will reduce discovery burdens.

Litigating these cases separately would impose substantial and duplicative discovery burdens. The Panel has consistently held that transfer under Section 1407 is intended to prevent such duplication. *See, e.g.*, *In re Starmed Health Pers. FLSA Litig.*, 317 F. Supp. 2d 1380, 1381 (J.P.M.L. 2004) (consolidating two actions in part because transfer was necessary to "eliminate duplicative discovery" and "conserve the resources of the parties").[7]

Because all the actions concern the same critical, life-saving products, allege similar conduct by Abbott, and seek the same relief, discovery in the 17 current federal actions will

---

[7] *See also In re Zyprexa Prods. Liab. Litig.*, 314 F. Supp. 2d 1380, 1382 (J.P.M.L. 2004) ("[T]ransfer under Section 1407 will offer the benefit of placing all actions in this docket before a single judge who can structure pretrial proceedings to consider all parties' legitimate discovery needs while ensuring that common parties and witnesses are not subjected to discovery demands that duplicate activity that will occur or has already occurred in other actions."); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 196 F. Supp. 2d 1375, 1376–77 (J.P.M.L. 2002) (consolidating multiple actions because of the cases' strong connection to Southern District of Texas, where Enron was headquartered, witnesses were located, and auditors performed their work).

necessarily overlap, including many of the same witnesses and much of the same documentary evidence. Duplicative discovery is occurring already in these cases: duplicative deposition testimony has been sought simultaneously in two different cases. "Allowing the witnesses to appear once in a single venue is more convenient than requiring them to appear multiple times in multiple venues." *Cluck v. IKON Office Sols., Inc.*, No. 11-05027-JSW, 2012 WL 1610789, at *2 (N.D. Cal. May 8, 2012). As the Panel has recognized, only centralization can achieve this goal: "informal coordination and cooperation among the parties and courts" is not "sufficient to eliminate the potential for duplicative discovery, inconsistent pretrial rulings, and conflicting discovery obligations." *In re Generic Pharm. Pricing Antitrust Litig.*, No. MDL 2724, 2017 WL 4582710, at *2 (J.P.M.L. Aug. 3, 2017).

### b.   Centralization will avoid inconsistent rulings.

Centralization will eliminate the risk of inconsistent pretrial rulings on discovery, dispositive motions, and other pretrial matters. *See, e.g.*, *In re Pineapple Antitrust Litig.*, 342 F. Supp. 2d 1348, 1349 (J.P.M.L. 2004) (consolidating cases to "prevent inconsistent pretrial rulings").

These actions involve a significant number of overlapping factual allegations and legal claims. For example, all of the cases include claims (which Abbott strongly denies) that Abbott had a duty to warn that its products placed infants at risk of NEC, that Abbott's products were unreasonably dangerous, and that those products were in fact responsible for the NEC of the infants at issue. Allowing them to proceed separately through the pretrial process would create a significant risk of inconsistent pretrial rulings on a wide range of issues that could directly lead to inconsistent outcomes. Centralization would prevent such inconsistency. *See, e.g., In re Digital Advert. Antitrust Litig.*, No. MDL 3010, 2021 WL 3523450, at *2 (J.P.M.L. Aug. 10, 2021) ("Centralization will promote the just and efficient conduct of the litigation by eliminating

duplicative discovery and avoiding the risk of inconsistent rulings on pretrial matters, particularly on discovery disputes, *Daubert* issues, and dispositive motions.").

Transfer is particularly appropriate because these actions are still in the very early stages. As noted above, 13 of the cases were filed in the last six weeks, and nine of those have not even been served. No motion practice has taken place in these newly filed cases and discovery has not begun. None of the 17 cases has progressed beyond the early stages of discovery. The most progressed of any of the cases is the *Hunte* case pending in the District of Connecticut before Chief Judge Underhill. As discussed in more detail in Section IV(B) *infra*, Chief Judge Underhill is the most familiar with the litigation since the case pending before him is the most advanced. Chief Judge Underhill has ruled on a motion to dismiss, entered a case management order, and the parties are undertaking the initial stages of discovery. Thus, although limited discovery has taken place and a motion to dismiss has been partially heard in *Hunte*, "significant discovery . . . remains." *In re Generic Pharm.*, 2017 WL 4582710, at *2. There is therefore "ample scope to eliminate duplication and enhance the convenience of the parties, the witnesses, and the courts through coordinated proceedings in the MDL," and there are "benefits to coordinating pretrial motions, as none of the actions has advanced beyond motions to dismiss." *Id.*; *see also, e.g.*, *In re Int'l House of Pancakes Franchise Litig.*, 374 F. Supp. 1406, 1407 (J.P.M.L. 1974) (noting that transfer is appropriate where discovery is not well-advanced).

c.    **Establishing an MDL now is the most efficient way to advance the litigation.**

It is appropriate to grant centralization now, given the efficiencies that would be gained, the ongoing filing of new actions, and the high likelihood of multiple tag-along actions being filed in the coming weeks or months. *In re Oxycontin Antitrust Litig.*, 314 F. Supp. 2d 1388, 1390 (J.P.M.L. 2004) ("Given that the number of related actions continues to grow, along with the

15

potential need for additional motions to transfer venue, we find that transfer under Section 1407 is warranted.").

Thirteen of the 17 federal lawsuits against Abbott were filed within the last six weeks. There are also 38 cases pending in state courts, including 37 actions pending against Abbott in Illinois state courts. *See In Re: Tasigna (Nilotinib) Prods. Liab. Litig.*, ___ F. Supp. 3d. ___, No. MDL 3006, 2021 WL 3520612, at *1 (J.P.M.L. Aug. 10, 2021) (considering the pendency and number of state cases in holding that consolidation was appropriate, and noting that, "Centralization also facilitates coordination of the federal and state court actions."). And the plaintiffs' bar is actively encouraging the filing of additional lawsuits through extensive online advertisements (including websites, Facebook pages, YouTube videos, and paid-Google search traffic directions).[8] Moreover, because cases are pending in several different districts and are likely to be followed by additional actions, there is no "reasonable prospect" that Section 1404 transfer would "eliminate the multidistrict character of the litigation," and transfer under Section 1407 is appropriate. *In re Schnuck Markets, Inc., Customer Data Sec. Breach Litig.*, 978 F. Supp. 2d 1379, 1380–81 (J.P.M.L. 2013). Further, the number of federal cases already pending is comparable to other recent circumstances in which the Panel has recognized the benefits of centralization. *See, e.g., In Re: Tasigna (Nilotinib)*, 2021 WL 3520612, at *1 (18 actions at time of consolidation

---

[8] *See e.g.*, https://www.drugwatch.com/baby-formula/lawsuits/ (presenting supposedly "fact checked" information repeating plaintiffs' legal theories, and directing visitors to "SEE IF YOU CAN FILE" and "GET A FREE CASE REVIEW"; Facebook pages https://www.facebook.com/BabyFormulaLawsuits/ directing visitors to "Gomez Trial Attorneys" website *and* https://m.facebook.com/Levin-Rojas-Camassar-Reck-LLC-619039565404790/posts/?ref=page_internal&mt_nav=0 (advertising Levin, Rojas, Camassar & Reck's as lawyers for new cases in this area); YouTube videos such as https://youtu.be/iltQ72zWxQA, linked from the Reck firm's website; and Google search for "baby formula lawsuits" returns first four paid search results labeled "Ad," directing users to plaintiff lawyer sites.

motion); *In re Paraquat Prod. Liab. Litig.*, ___ F. Supp. 3d. ___, No. MDL 3004, 2021 WL 2369295, at *1 (J.P.M.L. June 7, 2021) (14 actions at time of motion).

**B.      The Actions Should Be Transferred to the Hon. Stefan R. Underhill in the District of Connecticut.**

In selecting an appropriate transferee district, the Panel generally considers multiple factors, including the number of cases pending in the jurisdiction, whether the district is in an accessible metropolitan location, the caseload of the transferee district, and the experience in management of class actions and complex litigation. *See, e.g.*, *In re Bayer Healthcare LLC, Merial Limited Flea Control Products Marketing & Sales Practices Litigation*, 844 F. Supp. 2d 1369, 1370 (J.P.M.L. 2012) (noting the "experience of [the assigned judge] to guide this litigation on a prudent course" as a factor); *In re Viagra Products Liability Litigation*, 414 F. Supp. 2d 1357, 1358 (J.P.M.L. 2006) (in deciding among several potential districts, the Panel selected one with "a jurist experienced in complex multidistrict litigation" and "with the capacity to handle this litigation"); *In re Jamster Marketing Litigation*, 427 F. Supp. 2d 1366, 1368 (J.P.M.L. 2006) (transferring to district that offered "an accessible metropolitan location"); *In re Preferential Drug Products Pricing Antitrust Litigation*, 429 F. Supp. 1027, 1029 (J.P.M.L. 1977) (considering the caseload of potential transferee districts and transferring to the district with the shorter median time from filing to disposition).

In light of these factors, Chief Judge Underhill is best suited as the transferee judge and the District of Connecticut is the most appropriate venue for centralization of the Actions. First, this Panel has recognized that Judge Underhill is "a jurist well versed in the nuances of complex and multidistrict litigation," who can be relied upon "to steer [a] matter on a prudent course," *In re: Aggrenox Antitrust Litig.*, 11 F. Supp. 3d 1342, 1343 (J.P.M.L. 2014)—a critical feature for any jurist presiding over numerous cases involving deceased or injured preterm infants and products

17

vital to the public health.[9] Second, Judge Underhill has the most familiarity with the subject matter of the Actions of any federal judge, and he has already issued key rulings that may guide the progress of this litigation. *See In re Broiler Chicken Grower Antitrust Litig.*, 509 F. Supp. 3d 1359, 1362 (J.P.M.L. 2020) (selecting transferee judge who "has the most familiarity with the subject matter of this litigation"). Judge Underhill presided over the very first of these cases, *Ferry*, which was filed in December 2019, and is currently managing *Hunte*, which is the most procedurally advanced.

Chief Judge Underhill has already ruled on motions to dismiss in *Hunte* and has certified questions to the Connecticut Supreme Court regarding the applicability of the learned intermediary doctrine in Connecticut. A case management order has been entered, discovery has commenced, and a trial date has been set for May 2022. In addition, Chief Judge Underhill ruled on a motion to dismiss and presided over 15 months of litigation in *Ferry v. Mead Johnson & Co., et al.*, 3:20-cv-00099-SRU (D. Conn.) before the plaintiff voluntarily dismissed his case. These proceedings are significant because the legal and factual issues involved in the Actions overlap in the manner described above, and Chief Judge Underhill has necessarily become familiar with many such issues through his rulings on the motions to dismiss and his management of the cases.

In contrast, many of the other cases are at their very inception, including nine that have not even been served on Abbott. This Panel has often considered the procedural advancement of the pending cases when selecting a transferee district. For example, in *In re Air Crash near Peixoto De Azevada, Brazil on Sept. 29, 2006*, 493 F. Supp. 2d 1374 (J.P.M.L. 2007), the Panel selected a transferee district where the first-filed case was pending and where the pending actions were "more

---

[9] Judge Underhill's MDL experience includes the *Aggrenox* cases; *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141 (D. Conn. 2009); and *In re Helicopter Crash Near Wendle Creek, Brit. Columbia on Aug. 8, 2002*, 485 F. Supp. 2d 47 (D. Conn. 2007).

procedurally advanced than the actions pending elsewhere." *Id.* at 1376. Here, that district is the District of Connecticut, where the *Hunte* action was filed, and where Chief Judge Underhill has ruled on a motion to dismiss and certified questions to the Connecticut Supreme Court, and where the parties have begun discovery, including that plaintiffs have noticed the first set of depositions.

Further, given that plaintiffs are spread across multiple jurisdictions, there is no district that has a comparative advantage regarding discovery to be taken from plaintiffs. The same is true of the expert discovery that is likely to be a critical focus of these cases. The location of witnesses is a similarly neutral factor here because the majority of Abbott personnel with knowledge of the issues in this case are not located in Illinois, at the Company's headquarters, but rather in Columbus, Ohio and elsewhere, but no federal cases are pending in any district in Ohio.

Further, Chief Judge Underhill's location in Bridgeport, Connecticut is conveniently located for travelers, in close proximity to New York's major airports and minutes from Amtrak rail service. The District of Connecticut has effectively managed its caseload through the COVID-19 pandemic and is near the national average for mean time to disposition of its cases.[10] In addition, although the Panel also considers the districts where the actions are pending, *see, e.g.*, *In re PepsiCo, Inc., Bottled Water Mktg. & Sales Practices Litig.*, 560 F. Supp. 2d 1348, 1349 (J.P.M.L. 2008), this factor does not lead to another venue here. The Northern District of Illinois currently has the most cases (seven), but those actions were each filed in the last two weeks. In contrast, this litigation began over two years ago in the District of Connecticut, and, as discussed above, Judge

---

[10] *See* U.S. District Courts–Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending September 30, 2021, *available at* https://www.uscourts.gov/sites/default/files/data_tables/jb_c5_0930.2021.pdf.

Underhill has the most experience with the complexities presented by these cases of any federal judge.

## V.      CONCLUSION

For the foregoing reasons, the centralization and transfer of these actions under the multidistrict litigation procedure would further "the convenience of parties and witnesses and will promote the just and efficient conduct of [the] actions." 28 U.S.C. § 1407(a). Abbott respectfully requests that this Panel enter an order transferring the actions listed on the attached Schedule of Actions for centralized pretrial proceedings before Chief Judge Stefan R. Underhill in the District of Connecticut.

Dated: January 18, 2022

Respectfully submitted,


By: /s/ *Stephanie E. Parker*

Stephanie E. Parker
JONES DAY
1221 Peachtree Street NE
Suite 400
Atlanta, GA 30361
404.581.8522
404.581.8330 (fax)
Email: separker@jonesday.com

Meir Feder
JONES DAY
250 Vesey Street, Floor 34
New York, NY 10281
212.326.7870
212.755.7306 (fax)
Email mfeder@jonesday.com

Bridget K. O'Connor
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
202.879.3869
202.626.1700 (fax)
Email: boconnor@jonesday.com

Stephen V. D'Amore
Linda T. Coberly
Bryce A. Cooper
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600
(312) 558-5700 (fax)
Email: sdamore@winston.com
Email: lcoberly@winston.com
Email: bcooper@winston.com

Attorneys for Defendants ABBOTT
LABORATORIES and ABBOTT
LABORATORIES, INC.