```
 1                  IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3

 4   IN RE:  ABBOTT LABORATORIES,    )   MDL No. 3026
     et al., PRETERM INFANT          )
 5   NUTRITION PRODUCTS LIABILITY    )   Master Docket No. 22 C 71
     LITIGATION.                     )
 6                                   )
                                     )   Chicago, Illinois
 7   _____)   May 19, 2022
                                     )   10:00 a.m.
 8

 9                  TRANSCRIPT OF PROCEEDINGS - Status
        BEFORE THE HONORABLE CHIEF JUDGE REBECCA R. PALLMEYER
10

11   APPEARANCES:

12
     For the Plaintiffs:        JOHNSON BECKER PLLC
13                              BY:  MR. TIMOTHY BECKER
                                     MS. STACY HAUER
14                                   MR. JACOB RUSCH
                                444 Cedar Street, Suite 1800
15                              St. Paul, Minnesota  55101

16                              DiCELLO LEVITT GUTZLER
                                BY:  MR. MARK A. DiCELLO
17                                   MR. ADAM J. LEVITT
                                     MR. MARK M. ABRAMOWITZ
18                                   MS. DIANDRA (Fu) DEBROSSE ZIMMERMANN
                                     MR. ELI HARE
19                              Ten North Dearborn Street, Sixth Floor
                                Chicago, Illinois  60602
20
                                RUBENSTEIN LAW
21                              BY:  MS. MIRIAM F. AGRAIT
                                9130 South Dadeland Blvd.
22                              Miami, Florida  33156

23                              DIXON, DIAB & CHAMBERS LLP
                                BY:  MS. DEBORAH S. DIXON
24                              600 West Broadway, Suite 1540
                                San Diego, California  92101
25
```

APPEARANCES (Continued):

BOWERSOX LAW FIRM P.C.
BY:  MR. JEFFREY A. BOWERSOX
385 1st Street, Suite 215
Lake Oswego, Oregon  97034

FREESE & GOSS, PLLC
BY:  MS. YVETTE DIAZ
3500 Maple Avenue, Suite 1100
Dallas, Texas  75219

LEVIN PAPANTONIO RAFFERTY
BY:  MS. SARA T. PAPANTONIO
     MR. C. ANDREW CHILDERS
     MR. STEPHEN LUONGO
316 South Baylen Street
Pensacola, Florida  32502

 THE DIAZ LAW FIRM, PLLC
BY:  MR. JAMES (Tripp) R. SEGARS
     MR. JOEY DIAZ
208 Waterford Square, Suite 300
Madison, Mississippi  39110

BEN CRUMP LAW, PLLC
BY:  MR. BEN CRUMP
     MS. NABEHA SHAER
368 West Huron Street, Suite 2N
Chicago, Illinois  60654

FULMER SILL, PLLC
BY:  MR. CURTIS M. BRUEHL
1101 North Broadway Avenue
Oklahoma, Oklahoma  73103

DeGARIS LAW, LLC
BY:  MR. ANNESLEY H. DeGARIS
2 North 20th Street, Suite 1030
Birmingham, Alabama  35203

ROMANUCCI & BLANDIN, LLC
BY:  MR. ANTONIO M. ROMANUCCI
     MR. STEPHAN D. BLANDIN
     MR. DAVID A. NEIMAN
321 North Clark Street, Suite 900
Chicago, Illinois  60654

```
1    APPEARANCES (Continued):

2                              COHEN MILSTEIN SELLERS & TOLL
                               BY:  MS. LESLIE M. KROEGER
3                                   MS. CAROL V. GILDEN
                               11780 US Highway One, Suite 500
4                              Palm Beach Gardens, Florida  33408

5                              KAVENY KROLL, LLC
                               BY:  MS. ELIZABETH A. KAVENY
6                              130 East Randolph Street, Suite 2800
                               Chicago, Illinois  60601
7
                               KELLER POSTMAN LLC
8                              BY:  MR. ASHLEY C. KELLER
                                    MR. BENJAMIN J. WHITING
9                                   MS. AMELIA FRENKEL
                               150 North Riverside Plaza, Suite 4100
10                             Chicago, Illinois  60606

11                             HART McLAUGHLIN & ELDRIDGE
                               BY:  MR. STEVEN A. HART
12                                  MR. ROBERT J. McLAUGHLIN
                               22 West Washington Street, Suite 1600
13                             Chicago, Illinois  60602

14                             BRANSTETTER STRANCH & JENNINGS, PLLC
                               BY:  MR. BENJAMIN A. GASTEL
15                             223 Rosa L. Parks Avenue, Suite 200
                               Nashville, Tennessee  37203
16
                               THE HYMAN LAW FIRM, P.A.
17                             BY:  MS. KELLY A. HYMAN
                               515 North Flagler Drive, Suite P-300
18                             West Palm Beach, Florida  33401

19                             COLSON HICKS EIDSON
                               BY:  MS. JULIE B. KANE
20                             255 Alhambra Circle, Penthouse
                               Coral Gables, Florida  33134
21
                               GOLDENBERGLAW, PLLC
22                             BY:  MR. NOAH C. LAURICELLA
                               800 LaSalle Avenue, Suite 2150
23                             Minneapolis, Minnesota  55402

24

25
```

```
 1    APPEARANCES (Continued):

 2                            FERRER POIROT & WANSBROUGH
                              BY:  MS. YVETTE FERRER
 3                                 MS. ELLEN A. PRESBY
                              2603 Oak Lawn Avenue, Suite 300
 4                            Dallas, Texas  75219

 5                            PAULSON & NACE, PLLC
                              BY:  MR. CHRISTOPHER T. NACE
 6                            1025 Thomas Jefferson Street NW, Suite 810
                              Washington, DC  20007
 7
                              LEVIN ROJAS CAMASSAR & RECK, LLC
 8                            BY:  MR. PAUL LEVIN
                                   MR. STEPHEN M. RECK
 9                            391 Norwich-Westerly Road
                              North Stonington, Connecticut  06359
10
                              LEVIN ROJAS CAMASSAR & RECK, LLC
11                            BY:  MR. JOSE M. ROJAS
                              40 Russ Street
12                            Hartford, Connecticut  06106

13                            MATTHEWS & ASSOCIATES
                              BY:  MR. DAVID P. MATTHEWS
14                            2905 Sackett Street
                              Houston, Texas  77098
15
                              NAPOLI SHKOLNIK, PLLC
16                            BY:  MR. HUNTER J. SHKOLNIK
                              270 Munoz Rivera Avenue, Suite 201
17                            Hato Rey, Puerto Rico  00918

18                            NAPOLI SHKOLNIK, PLLC
                              BY:  MS. SHAYNA SACKS
19                            360 Lexington Avenue, 11th Floor
                              New York, New York  10017
20
                              PHEIFFER WOLF CARR KANE CONWAY & WISE LLP
21                            BY:  MS. ASHLIE C. SLETVOLD
                                   MS. JESSICA SAVOIE
22                            1422 Euclid Avenue, Suite 1610
                              Cleveland, Ohio  44115
23
                              ROMANO LAW GROUP
24                            BY:  MR. JOHN ROMANO
                                   MS. MARJORIE H. LEVINE
25                            1601 Belvedere Road, Suite 500-S
                              West Palm Beach, Florida  33406
```

```
1    APPEARANCES (Continued):

2                              WATTS GUERRA LLP
                               BY:  MIKAL C. WATTS
3                              4 Dominion Drive, Suite 100
                               San Antonio, Texas  78257
4
                               THE DUGAN LAW FIRM
5                              BY:  MR. MEKEL SMITH
                               365 Canal Place, Suite 1000
6                              New Orleans, Louisiana  70130

7                              ANAPOL WEISS
                               BY:  MR. JAMES R. RONCA
8                              130 North 18th Street, Suite 1600
                               Philadelphia, Pennsylvania  19103
9
                               IRPINO AVIN HAWKINS
10                             BY:  MS. LOUISE C. HIGGINS
                               2216 Magazine Street
11                             New Orleans, Louisiana  70130

12                             WAGSTAFF & CARTMELL LLP
                               BY:  MS. DIANE K. WATKINS
13                             4740 Grand Avenue, Suite 300
                               Kansas City, Missouri  64112
14
                               SCHLICHTER BOGARD & DENTON, LLP
15                             BY:  MS. JULIA SANTALUCIA
                               100 South Fourth Street, Suite 1200
16                             Saint Louis, Missouri  63102

17

18   For the Defendants:       JONES DAY
                               BY:  MS. STEPHANIE E. PARKER
19                             1221 Peachtree Street NE, Suite 400
                               Atlanta, Georgia  30361
20
                               JONES DAY
21                             BY:  MR. MEIR FEDER
                               222 East 41st Street
22                             New York, New York  10017

23                             JONES DAY
                               BY:  MS. BRIDGET K. O'CONNOR
24                             51 Louisiana Avenue, NW
                               Washington, DC  20001
25
```

1   APPEARANCES (Continued):

2                                  STEPTOE & JOHNSON LLP
                                   BY:  MS. RACHEL M. CANNON
3                                       MR. WILLIAM R. ANDRICHIK
                                        MS. JAMIE M. WITTE
4                                  227 West Monroe Street, Suite 4700
                                   Chicago, Illinois  60606
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   Court Reporter:              FRANCES WARD, CSR, RPR, RMR, FCRR
                                   Official Court Reporter
24                                 219 S. Dearborn Street, Suite 2524A
                                   Chicago, Illinois  60604
25                                 (312) 435-5561
                                   frances_ward@ilnd.uscourts.gov

 1          (The following proceedings were had via

 2     videoconference:)

 3          THE COURT:  First of all, I want to say good

 4     morning and welcome to all of you in this initial status

 5     conference with respect to the MDL that was assigned to me

 6     recently.

 7          I want to apologize profusely for making you stand

 8     by for so long last Thursday when we had a technical glitch

 9     here at the court.  I take personal blame for it basically

10     because I have a hate-hate relationship with tech.  Tech did

11     not cooperate as it should have.

12          Anyway, we are here this morning.  What I would

13     like to do, recognizing that this is going to be a bit of a

14     challenge, is get your appearances.

15          I know my court reporter is on board.  She has got

16     most of the information she needs, but we will need to get

17     your appearances.  I'm not entirely clear on what the best

18     way to do that is because you won't know kind of when to drop

19     in.

20          So why don't I ask that -- we will begin with,

21     say -- to make things a little easier, we will begin with the

22     defendant's attorneys and then ask for attorneys who

23     represent plaintiffs to introduce themselves.

24          But first I am going to ask my courtroom deputy to

25     call the case so we have that part of the process underway.

1          THE CLERK:  22 CV 71, Hall versus Abbott

2    Laboratories for status.

3          THE COURT:  Okay.  Good morning.

4          So we are going to begin with appearances.  Again,

5    if we can begin with attorneys -- why don't we say attorneys

6    for Abbott and then attorneys for Mead.

7          MS. PARKER:  I'll jump in.

8          Good morning, your Honor.

9          This is Stephanie Parker, and I'm here for Abbott.

10   Meir Feder and Bridget O'Connor are also here with me for

11   Abbott.

12         Good morning, everyone.

13         MR. FEDER:  Good morning, your Honor.

14         THE COURT:  Good morning.

15         And do we have attorneys for Mead?

16         MS. CANNON:  We do, your Honor.  Good morning.

17         Rachel Cannon on behalf of Mead Johnson.  And here

18   with me is Bill Andrichik and also Jamie Witte.

19         THE COURT:  Okay.  Good morning.

20         Now, unless some lawyer has a better idea about how

21   to do this, why don't we -- why don't we begin by asking

22   lawyers whose names begin with -- last names begin with A

23   through D to introduce themselves.  And we will do that.

24   That might help a little bit.

25         MR. BECKER:  Good morning, your Honor.

1          Tim Becker from Johnson Becker on behalf of

2   plaintiffs.  With me are Stacy Hauer and Jacob Rusch.

3          THE COURT:  Good morning.

4          MS. DEBROSSE ZIMMERMANN:  Good morning, your Honor.

5          Diandra Debrosse Zimmermann -- I'll take the

6   "Debrosse" in my name -- with DiCello Levitt Gutzler on

7   behalf of the plaintiffs.  Also on are my partners Mark

8   Abramowitz; Adam Levitt; Mark DiCello; Eli Hare is on from

9   our firm; and Grant Patterson, who is a 3L student trying to

10  learn the ropes.

11         Good morning, your Honor.

12         And good morning to everyone present.

13         THE COURT:  Good morning.

14         Any other --

15         MS. AGRAIT:  Good morning, your Honor.

16         THE COURT:  -- lawyers A through D?

17         Go ahead.

18         MS. AGRAIT:  Good morning, your Honor.

19         Miriam Agrait on behalf of the plaintiffs from

20  Rubenstein Law here on my own.

21         THE COURT:  Okay.  Good morning.

22         MS. DIXON:  Good morning, your Honor.

23         Deborah Dixon also on behalf of the plaintiffs.

24         MR. BOWERSOX:  Your Honor, Jeffrey Bowersox --

25  Portland, Oregon -- here on behalf of plaintiffs.

1            MS. DIAZ:  Good morning, your Honor.

2            Yvette Diaz with Freese & Goss on behalf of

3 plaintiffs.

4            MR. CHILDERS:  Good morning, your Honor.

5            Andrew Childers from Levin Papantonio Rafferty on

6 behalf of plaintiffs.  With me is Sara Papantonio and Steve

7 Luongo also from Levin Papantonio Rafferty.

8            MR. SEGARS:  Good morning, your Honor.

9            This is Tripp Segars from the Diaz Law Firm.  I've

10 also got Joey Diaz, or Joe Diaz, in here with me as well.

11            THE COURT:  Okay.

12            MR. CRUMP:  Good morning, your Honor.

13            Ben Crump on behalf of the plaintiffs.  I have with

14 me attorney Nabeha Shaer.

15            THE COURT:  Okay.  Good morning.

16            Anybody else whose last name begins with A through

17 D?

18            MR. BRUEHL:  Good morning, your Honor.

19            Curtis Muskrat Bruehl with the Fulmer Sill law firm

20 on behalf of the plaintiffs.

21            THE COURT:  Okay.

22       (Multiple speakers simultaneously.)

23            THE COURT:  All right.

24            MR. DeGARIS:  Annesley DeGaris, your Honor, on

25 behalf of the plaintiffs.

 1          THE COURT REPORTER:  Excuse me.  There were

 2   multiple speakers.

 3          MR. DeGARIS:  It's Annesley, your Honor.  It's

 4   probably my Southern drawl.  It makes it hard to understand.

 5   It's Annesley.

 6          THE COURT:  The best thing about the MDLs is we get

 7   to see and hear lawyers from all over the nation.  So that's

 8   great.

 9          MR. DeGARIS:  I wish I could have subtitles with my

10   accent, but it doesn't work that way.

11          MR. BLANDIN:  Your Honor, this is Stephan Blandin

12   with the final Chicago accent for the plaintiffs.

13          THE COURT:  Why don't we then move on to, let's

14   say, E through K.

15          MS. KROEGER:  Good morning, your Honor.

16          This is Leslie Kroeger from Cohen Milstein.  With

17   me is my partner Carol Gilden.

18          MS. KAVENY:  Good morning, your Honor.

19          Elizabeth Kaveny from Kaveny & Kroll in Chicago.

20          MR. KELLER:  Good morning, your Honor.

21          This is Ashley Keller from Keller Postman on behalf

22   of certain removed plaintiffs.  I'm with my colleagues

23   Benjamin Whiting and Amelia Frenkel.

24          MR. HART:  Good morning, your Honor.

25          This is Steven Hart, Hart McLaughlin & Eldridge,

1    for the plaintiffs.

2              MR. GASTEL:  Good morning, your Honor.

3              Ben Gastel from Branstetter Stranch & Jennings in

4    Nashville on behalf of certain removed plaintiffs.

5              MS. HYMAN:  Good morning, your Honor.

6              Kelly Hyman from The Hyman Law Firm P.A. for the

7    plaintiff.

8              MS. KANE:  Good morning, your Honor.

9              Julie Braman Kane from Miami, Florida, on behalf of

10   the plaintiffs.

11             THE COURT:  Are we done with E through K?

12             Why don't we say L through P.

13             MR. LAURICELLA:  Good morning, your Honor.

14             Noah Lauricella from GoldenbergLaw in Minneapolis

15   on behalf of the plaintiffs.

16             MS. PRESBY:  Good morning, your Honor.

17             This is Ellen Presby from Ferrer Poirot Wansbrough

18   Feller & Daniel in Dallas, Texas, on behalf of the

19   plaintiffs.

20             MR. NACE:  Good morning, your Honor.

21             Christopher Nace with Paulson & Nace in Washington,

22   D.C., on behalf of the plaintiffs.

23             MR. McLAUGHLIN:  Good morning, your Honor.

24             Robert McLaughlin from Hart McLaughlin & Eldridge

25   on behalf of the plaintiffs.

13

 1          MR. LEVIN:  Good morning, your Honor.

 2          Attorney Levin from Levin Rojas Camassar & Reck

 3  based here in Connecticut.  And several of my colleagues who

 4  are appearing on the screen will introduce themselves

 5  separately.

 6          Nice to meet you all.

 7          MR. MATTHEWS:  Good morning, your Honor.

 8          David Matthews of Matthews & Associates on behalf

 9  of plaintiffs.

10          THE COURT:  Okay.  It sounds like we might be done

11  with that tranche.

12          How about attorneys whose last names start with Q

13  through V.

14          MR. SHKOLNIK:  Hunter Shkolnik from Napoli

15  Shkolnik.  My partner Shayna Sacks is on the line as well for

16  plaintiffs.

17          Good morning, your Honor.

18          THE COURT:  Good morning

19          MR. ROMANUCCI:  Good morning, your Honor.

20          Antonio Romanucci from Romanucci & Blandin here in

21  Chicago along with attorney David Neiman and also 3L student

22  Mr. Parker -- Parker Caramel.

23          MR. ROJAS:  Good morning, your Honor.

24          José Rojas on behalf of the plaintiffs from the

25  firm of Levin Rojas Camassar & Reck.  Steve Reck is also on

1   the line, and you have already heard an appearance from my

2   other partner Paul Levin.

3              MS. SLETVOLD:  Good morning, your Honor.

4              Ashlie Case Sletvold from Peiffer Wolf in Cleveland

5   on behalf of the plaintiffs along with my colleague Jessica

6   Savoie.

7              MR. ROMANO:  Good morning, your Honor.

8              John Romano on behalf of the plaintiffs.

9              MR. WATTS:  Good morning, your Honor.

10             It's Mikal Watts from Watts Guerra on behalf of the

11  plaintiffs.

12             MS. SMITH:  Mekel Smith of The Dugan Law Firm in

13  New Orleans on behalf of plaintiffs.

14             MR. RONCA:  Your Honor, Jim Ronca from Anapol Weiss

15  in Philadelphia on behalf of plaintiffs.

16             MS. HIGGINS:  Your Honor, Louise Higgins on behalf

17  of plaintiffs from New Orleans.

18             THE COURT:  All right.  Anybody W through Z?

19             MS. WATKINS:  Diane Watkins from Wagstaff &

20  Cartmell on behalf of plaintiffs.

21             MS. SANTALUCIA:  Your Honor, Julia SantaLucia from

22  Schlichter Bogard & Denton on behalf of plaintiff with my

23  colleague Kristine Kraft.

24             THE COURT:  All right.  Is there anybody who didn't

25  get a chance to introduce themselves earlier and would like

1    to do so now?

2              MS. LEVINE:  Good morning, your Honor.

3              Marjorie Levine for plaintiffs from Romano Law

4    Group.

5              THE COURT:  Marjorie what?  I'm sorry.

6              MS. LEVINE:  Levine.

7              THE COURT:  All right.

8              MS. FERRER:  Good morning, your Honor.

9              Yvette Ferrer with Ferrer Poirot Wansbrough for the

10   plaintiffs.

11             MR. BOWERSOX:  Your Honor, you may have gotten my

12   name earlier.  Jeffrey Bowersox from Portland.

13             I'm sorry.  There was just a lot of people speaking

14   at the same time, and I'm not sure if I got my name before

15   the Court.

16             THE COURT:  Okay.  Great.

17             Well, let me begin by telling you that I am always

18   honored to be assigned to work on an MDL because it's my

19   experience that the lawyers -- (audio interference).  I'm

20   expecting that that will be the case in this case as well.

21             We are getting some interference.  If you wouldn't

22   mind muting yourselves when you are not speaking, that would

23   be great.

24             It's not my first MDL.

25             We have a number of things on the agenda for today,

1    some proposed by me and others proposed by the lawyers.

2            I know as well a significant and kind of threshold

3    issue is who is going to be handling the case on behalf of

4    plaintiffs either as liaison counsel and ultimately lead

5    counsel.

6            We are still getting some feedback -- I'm not sure

7    where that's coming from -- or some interference.  I don't

8    think it's us, but who knows.

9            Anyway, if you can do your best to keep things

10   quiet on your end, that would be great.

11           I know that there are now some competing proposals

12   regarding plaintiffs' counsel -- at least two different

13   groups that have proposed appointment as plaintiffs' liaison

14   or lead counsel.

15           I wonder whether in the time since those motions

16   have been filed there has been any contact between those two

17   groups or any further effort to see if you can reach an

18   agreement?

19           MS. KAVENY:  Your Honor, this is Elizabeth Kaveny.

20           I'm going to be speaking today in answer to some of

21   your questions to what we will refer to as Slate 1.

22           You are going to also be hearing from Tim Becker

23   from Johnson Becker in Minnesota; Andy Childers from Levin

24   Papantonio Rafferty in Florida and Georgia; Wendy Fleishman

25   from Lieff Cabraser -- they have offices in California and

1    New York -- José Rojas in Connecticut; and last but not

2    least, Jim Ronca from Anapol Weiss in Pennsylvania.

3           We have had communications between our slate and

4    the slate which I believe has named itself RDC or RCD.

5           I'm going to turn it over to Andy Childers to

6    discuss what those conversations have been.

7           MR. ROMANUCCI:  Your Honor, if I may?  It's Antonio

8    Romanucci.

9           Before introducing who is going to be speaking on

10   behalf of the respective slates, I will be speaking on behalf

11   of our respective slate and also Diandra Debrosse Zimmermann,

12   who also goes by the beloved name of Fu, F-u.  So if we hear

13   her referred to as Fu -- we only know her as that.

14          Mr. Crump also may be speaking.  And, your Honor,

15   Mr. Crump right now is in a courtroom in Buffalo for some

16   issues that have happened in this country very recently.  So

17   he may not be able to speak as much as he would have.

18          But for the DRC slate, as we have named ourselves,

19   you will hear mostly with respect to this issue, it will be

20   from Ms. Zimmermann, from Fu, and also myself.

21          And the answer to your question, your Honor, is,

22   since the two competing slates have offered their briefs,

23   there have been no other communications between us since one

24   week ago yesterday.

25          THE COURT:  Got it.  Okay.

1          Ms. Kaveny, I think you were holding forth on this.

2     No.  You turned it over to Mr. Childers?

3          MS. KAVENY:  Correct.

4          MR. CHILDERS:  It's actually Childers, your Honor.

5          THE COURT:  I'm sorry.

6          MR. CHILDERS:  Mr. Ronca actually was going to

7     address this first.  I'm sorry.  We had a little confusion on

8     our end there.

9          I apologize, Beth.

10         THE COURT:  Mr. Ronca, good morning.

11         MR. RONCA:  Good morning, your Honor.

12         So I don't know if you want us to just launch into

13    argument or how you want to handle this proceeding.  It's

14    difficult in the presence of the defendants, but I'm ready to

15    launch right in if you want.

16         THE COURT:  It is complicated and difficult.  I

17    think that there is -- although I realize it is a matter of

18    some debate, that defendants themselves may have some views

19    on the issue.  Obviously we don't expect there to be any

20    collusion on the one hand.  On the other hand, we think that

21    cooperation between competing counsel, not on issues but on

22    procedure, is always useful.

23         So why don't I let you hold forth briefly unless

24    it's your view that we should look at some of these other

25    issues first.

1    I'm afraid that some of the issues that I need to

2    discuss will turn on whether and who is going to be part of

3    the liaison team.

4    But one of the things we will need to know, as an

5    example of another issue, would be the number of cases that

6    are expected to be part of this MDL; what we should be doing,

7    for example, about remand motions that are filed in a number

8    of the cases already.  I have looked at those briefs.

9    There are other issues, too, obviously.  Some of

10   those, it seems to me, probably we would not want to address

11   until we have an idea who's going to be lead counsel, but

12   there may be other ways of approaching this.

13   Anyway, go ahead, Mr. Ronca.

14   MR. RONCA:  Sure, your Honor.

15   Unfortunately for me, last week I had all day, but

16   today I have a deposition in a different MDL where I'm the

17   chief questioner, and it starts at noon.  So I think I am

18   going to speak to the issue right now.  The Court has the

19   papers, and you have reviewed those.

20   So I want to speak to the leadership slate that's

21   headed up by Wendy Fleishman, José Rojas, Andy Childers, Tim

22   Becker, and liaison counsel Beth Kaveny.

23   I think we can all agree that the lawyers on both

24   slates are confident and capable people.  Both slates are

25   diverse.

1    Our proposed slate, for example, is inclusive.  We

2  represent small and large firms from Connecticut to Florida,

3  Minnesota to Texas, Pennsylvania to San Francisco, and a

4  bunch of states in the middle.  We have lawyers on long

5  experience and we have younger lawyers.

6    We tried to resolve the dispute with the other

7  slate by offering to merge leadership -- and I mean top

8  leadership -- but we could not get an agreement.

9    So naturally, it's going to come down to the Court

10  to choose or figure out a method to get us to a resolution of

11  this so we can go forward and litigate these cases on behalf

12  of the clients.

13    In putting together our slate, the leadership was

14  looking for lawyers who had clients, and they concentrated on

15  three things:  Lawyers who had been litigating this case on

16  infant formula and NEC around the country for the last two

17  years and bring a wealth of knowledge from that litigation to

18  this litigation; secondly, to look for lawyers who have

19  unique specialties, for example, craft and emphasis on

20  science or on law and briefing; and, third, lawyers who we

21  know from long experience are hard workers.  Let me briefly

22  expand on these in reverse order.

23    These MDL cases, as you know, involve a tremendous

24  amount of work.  To effectively handle the case, the

25  plaintiffs' bench has to be deep.

1    I have experience and maybe the Court has witnessed

2    situations where you have a leadership committee and people

3    disappear and not for bad reasons.  Other cases sometimes

4    take precedence.

5    And when people disappear, your bench gets thin,

6    and you can't get the work done.  It happens too often.  It

7    happened to us in the *Zimmer* case that you are especially

8    familiar with, and especially it could happen in this case

9    because we are proposing an accelerated schedule.

10    Our group has met with the other side and talked

11    about procedural issues.  Our group has gotten together and,

12    for example, formed a committee to try to determine

13    bellwether cases on an early basis so we are not doing that

14    down the road, and we can launch into picking cases for trial

15    early.

16    When we picked this slate, we made sure each of the

17    proposed members had a track record of persistence and hard

18    work.  The slate is large, but there is a lot of work to do.

19    For example, no matter how much IT leverage -- and

20    I heard you say that you hate the IT people or you have a

21    love-hate relationship.

22    In any event --

23    THE COURT:  Not the people.  It's just tech itself.

24    MR. RONCA:  So no matter how much IT you leverage

25    in trying to go through hundreds of thousands, if not

1  millions, of pages of documents, you need human eyes, lawyer

2  eyes, on those documents before you can make determinations

3  about what they are going to use in deposition and for

4  *Daubert* hearings or for trial.

5  And if you had a million pages of documents -- and

6  recall that in *NexGen* it was 10 million.  In *Zantac* it's

7  15 million.  Okay.

8  If you had a million pages and you had 20 lawyers

9  working 50 hours a week, that's a month's work.  If you had

10  10 million pages, that's ten months' work for 20 lawyers at

11  50 hours a week.

12  In *Zantac* there are 23 lawyers on the steering

13  committee, and we are too thin.  We have lawyers doubling up

14  and tripling up time because we are too thin.

15  In *Zimmer* we had 16.  And in the end, only a few

16  people did most of the work.

17  I will just use my own example.  I was involved

18  mostly as first chair in 50 depositions in that litigation

19  because we weren't deep enough.

20  So the idea of appointing a small, tight committee

21  that supposedly is more efficient, that's a fool's errand

22  because the work will never get done.  You need people to

23  contribute financially.  You need people to contribute hours.

24  You need people to contribute expertise.

25  That leads me to the second point, which is, we

1    tried to assemble lawyers who had certain specialties to

2    cover all areas from IT, electronic discovery, science, law

3    and briefing, to trial lawyers.

4            I'm using myself as an example.  I did not ask to

5    be on this committee.  The lawyers who are the leadership

6    that I named earlier came to me and said, "We know you have

7    cases, and you have a particular expertise in the science

8    side of it, and we know that you work.  Will you join us?"

9    That's the way we approached it.

10           This isn't the idea that we want to control this

11   litigation.  What we want to do is get the work done that

12   needs to be done for our clients.  And it's a tremendous

13   amount of work, and certain expertise is hard to find.

14   That's what our leadership looked for.

15           On the third point, I would like to pass the ball

16   to one of my colleagues, José Rojas, because Mr. Rojas has

17   been litigating these cases for a couple of years, and he can

18   explain what has gone on in these cases prior to today.

19           And, of course, if you have any questions, your

20   Honor, I am happy to answer them.

21           MR. ROJAS:  Good morning, your Honor.

22           José Rojas.  A pleasure.

23           I think I have been asked to say a few things about

24   the history of this litigation and how it is that we got

25   here.  That history is actually a testament to the level of

1    hard work and cooperation that has already occurred in this
2    case.
3            My partner, Stephen Reck, actually met with the
4    very first mom at a McDonald's in New Haven back in 2017,
5    just to give some sense of how long this has been going on.
6            In 2019, we filed -- our law firm filed the first
7    case in Connecticut with Judge Underhill.
8            THE COURT:  Right.
9            MR. ROJAS:  And since that time, your Honor, we
10   have continued to file cases across the country.
11           But very early on, we really recognized that our
12   small firm from Connecticut would never be capable of
13   handling a case of this massive scale.  So what we did is, we
14   engaged amazing lawyers, such as John Romano, who I see on
15   the screen here today; Beth Kaveny, who you have already
16   heard from; Deborah Dixon in California; Chris Mason,
17   Washington, D.C.
18           And with these lawyers, we started filing cases
19   across the country, and we began the process of litigating
20   them.  We made pretty good progress, and it is that progress
21   that we made that I think ultimately led to the national
22   interest in this litigation.
23           We defeated -- again, with the help of many
24   lawyers, we defeated four motions to dismiss, three of them
25   in federal court, one of them with the help of Ben Gastel in

1    state court.  Ben is also on the line here.  He is primarily

2    involved in the state court litigation.

3            And with this team, we moved the litigation

4    forward.  We were able to even serve comprehensive discovery.

5    We received some production from the defendants.

6            And through that time -- for at least 18 months,

7    your Honor, our group met regularly.  We met once a month in

8    an effort to try to coordinate this litigation in an

9    effective fashion.

10           We held these monthly meetings over Zoom.  During

11   these meetings there were experts, nationally renowned --

12   actually world renowned experts, who spoke at our meetings

13   about the dangers of infant formula and about this deadly

14   disease, necrotizing enterocolitis, and we had numerous

15   experts speak to us during that period.

16           As the cases evolved, we quickly realized we grew

17   to an inventory of about 1400 cases, your Honor.  I think we

18   have the largest inventory of any of the lawyers involved in

19   the federal litigation anyway.

20           And we quickly realized we needed more help than

21   the great trial lawyers that were with us.  So we engaged the

22   help of folks like Wendy Fleishman, Andy Childers, and Tim

23   Becker, who we knew were experienced MDL lawyers.  And these

24   lawyers actually were the ones who steered this case toward

25   an MDL, toward consolidation.  They have amazed me at their

1    knowledge of MDLs and how effectively and efficiently they

2    have been able to bring this case toward consolidation and

3    ultimately here before your Honor.

4         But they didn't stop there.  They have actually

5    worked together with the defendants in this case to try to

6    get some proposed orders ready, to get discovery concepts

7    ready.  We have even gone as far as discussing the selection

8    of bellwether trials and how that structure would be.  There

9    have been multiple meetings with the defendants.  It's been

10   an impressive statement to collaboration.

11        So, your Honor, the last thing I want to say -- and

12   I appreciate the time.  I don't want to take too much of the

13   Court's time.  But as we have worked through these cases hand

14   in hand with these moms, I have personally spoken to dozens

15   of mothers who have been affected by the tragedy of this

16   disease.  Their babies have died.  Their babies have

17   developed cerebral palsy, retinopathy of prematurity, Dravet

18   syndrome.  These have been very difficult conversations.

19        The one thing that's emerged is the truism, which

20   is that this disease seems to disproportionately affect

21   persons of color.  I have personally noticed that from our

22   own inventory.  I have personally spoken to many, many

23   mothers in my native Spanish.  It is unquestionable that

24   their interests need to be served.

25        What I'm certain of is that the slate that we are

1    proposing is a slate that will accomplish the goals -- the

2    most important goals, which is to effectively and efficiently

3    represent these clients.  I'm very confident of that because

4    it's quite a team.  I think it's the right size.  I think the

5    best interest of these clients will be served.

6              Thank you, your Honor.

7              THE COURT:  All right.  Thank you.

8              I realize that the -- let me get it right -- DRC

9    group will want to be heard.

10             Mr. Romanucci, you wanted to make a further

11   comment; is that right?

12             MR. ROMANUCCI:  Yes, your Honor.  Thank you very

13   much.

14             Nice to meet everybody this morning.  Pleasure to

15   be here.

16             So, your Honor, I want to give a little bit of a

17   macro overview of the DRC proposal, and then I want to hand

18   it over to Fu, as she will discuss some of the other minutia

19   that we have.

20             But, first of all, your Honor, you have to

21   understand that we really want to place an emphasis on the

22   size of our group, the diversity of our group, and the

23   experience of this group.

24             You are hearing two competing arguments regarding

25   the briefs that were filed about the size of the group.  And

1  without referring to whether or not the size of our group is

2  foolish one way or another, I'm going to put that argument

3  aside because I do think that the size of our group is

4  absolutely the right size, and it is for a number of reasons.

5  First of all, when you look at who belongs to the

6  DRC group, we have a very strong local presence with regard

7  to DRC.  Not only do we have Romanucci and Blandin, but we

8  have the DiCello Levitt firm, the Cohen Milstein firm, the

9  Hart McLaughlin firm.  Those are -- the Power Rogers firm.

10 Those are all very strong local presences that have a very

11 diverse experience in these types of cases.

12 Not only are they very strong in MDL litigation

13 across the board, but they also have very strong backgrounds

14 in science and specifically medical malpractice.

15 So you have to look at not only -- not how many

16 firms there are but also how many attorneys are behind all

17 those firms.  And when you look at the number of attorneys

18 behind those firms, I think that is compelling as to whether

19 or not the work gets done.

20 There is no question that I am beyond confident,

21 extremely confident that the work gets done here.  And I can

22 tell you that from my own personal experience in a current

23 litigation that is also the local controversy.  It's widely

24 known as the Sterigenics litigation.  It is a toxic tort that

25 comes from Willowbrook, Illinois.  It's a Cook-County-based

1    case.  I am one of the three coleads.  And there are well
2    over 800 plaintiffs in that case.  We had to sift through, if
3    I'm not mistaken, somewhere around 3 to 400,000 documents
4    that equalled well over 5 million pages.  Each one of those
5    pages had eyes on it.
6         We did actually employ a team of lawyers for six
7    weeks to go through most of the documents that were so old
8    that they were still in warehouse, 900 Bankers Boxes of
9    documents.
10        Our structure there is seven PEC firms.  Besides
11   leadership, we have seven other PEC firms.
12        We have been able to get all of that work done,
13   multiple defendants, and the first three cases are going to
14   trial this year.  And we have been able to do that in -- it
15   will be four years that the cases have been filed.  We had to
16   go through the pandemic.  We went through a remand -- I'm
17   sorry -- a removal and then a remand indeed.  So we have
18   moved those cases beyond efficiently.
19        So when you look at the size of this group, it is
20   not to be criticized at all.  If anything, it should be
21   complimented.
22        The other factor is this also, your Honor:  We have
23   made great, great pains to ensure diversity here.  You can
24   see that Mr. Crump and Ms. Zimmermann have been postured as
25   coleads here, and there is a reason for that.  There have

1   been too many cookie-cutter type leaderships that we have

2   seen in this country that do not represent the demographics

3   of our country nor what the current bar representation is

4   nor, indeed with this particular case, the effect that the

5   NEC has on the minority communities.  It is absolutely

6   necessary that there be a diverse leadership that includes

7   what I just mentioned with regard to the expertise and the

8   specific scientific background.

9           Even on this call, my partner, Stephan Blandin, he

10  is widely known and is one of the top medical malpractice

11  lawyers in the city.  And that's what's important here.  Not

12  only do we have the specific knowledge about the disease, but

13  we also have the experience.

14          Napoli Shkolnik, Watts Guerra, who better than law

15  firms that have led the opioid litigation and also wildfire

16  litigation.

17          So our breadth of knowledge here is extreme.

18          Hart McLaughlin & Eldridge, they are on the poultry

19  price-fixing case.

20          Our breadth is so wide and our bench is so deep

21  that the actual number of the firms involved is not a

22  consideration but really how many lawyers do we have that can

23  do the work to ensure the optimal outcome for these babies

24  that have been sickened by the milk-based formula -- by the

25  bovine-based formula that we are talking about here.

1          So when you look at -- again, just to recap before

2     I hand it over to Fu -- our strong local presence, our

3     terrific scientific background, our breadth of experience,

4     our knowledge, we are going to be able to move this

5     litigation as her Honor would like and that would be in an

6     efficient, optimal manner to ensure a great outcome for these

7     babies and the mothers that have been affected.

8          I will now turn it over to Ms. Diandra Zimmermann.

9          MS. ZIMMERMANN:   Thank you, Tony.

10         Good morning again, your Honor.

11         And thank you for everyone's words this morning.

12         Let me first agree with Attorney Ronca.   There are

13     extraordinary firms on both slates.   I believe we are all

14     here for the right reason: to fight for the babies and

15     families who have been impacted in this litigation.

16         I think it might help to start with where we agree

17     and to recognize Mr. Rojas' work in this litigation.

18         We agree and we recognize, like Mr. Rojas does,

19     that it is women of color and babies of color who are

20     disproportionately impacted in this litigation.   And for that

21     reason, we were very intentional in discussing collectively

22     the diversity of moving this litigation forward.

23         I think we all know this is a dialogue that has

24     been going on for quite some time about the lack of

25     representative attorneys in national litigation that impacts

1    the people on this soil, and those people include black and

2    brown and Asian people.  So we are not shying away from that.

3    I think it's unfortunate, but I often have to say this, we

4    are also qualified.

5           So when we talk about moving through a litigation

6    and the hard work in the litigation, I do sit on the PEC for

7    the Paraquat litigation in addition to other litigations.

8    Mr. Crump has extensive experience in complex litigation.

9    And the experience of the firms involved in this litigation

10   cannot be understated.  DiCello Levitt alone has been

11   involved in leadership in 40 MDLs.  I assure your Honor that

12   what we do is work.

13          Also on the Zoom is my law partner Mark Abramowitz,

14   who -- I will say, like you, Judge, technology makes me want

15   to jump out a window, but Abe loves it, obsesses over it, and

16   has been key in developing a lot of our ESI protocol in the

17   Paraquat case.

18          And I think we have juggernauts in trial.  Hunter

19   Shkolnik and his firm are on.  Our firm actually has a jury

20   focus group, a trial entire practice with courtrooms in our

21   law firms.

22          So I cannot emphasize that we hold the expertise

23   amongst our firms.

24          As it relates to specific experience in this

25   litigation, let me speak directly to that issue.

1          Attorney Mikal Watts from Watts Guerra has been

2     involved in this litigation for an extended amount of time.

3     As we understand it, he is set for trial in the state court

4     litigation, we believe, in March of 2023.

5          To Mr. Rojas' point, which is a strong point, I

6     have personally spoken with our clients, as have many of our

7     colleagues on the phone.  I have personally looked at the

8     science, as have my colleagues on this phone.

9          We have worked with experts.  We have looked at the

10    science.  We agree with our colleagues.  When we fight for

11    people, we know there is a battle on our hands.  We

12    understand the work that is involved in moving this process

13    forward.

14         We also recognize that part of this process in

15    seeking justice is working with other law firms.  And I don't

16    think we are saying leadership means we speak to no one else

17    ever.  Leadership means -- and I think what is contemplated

18    in the Manual For Complex Litigation is that a really tight

19    team is organized to address and shepherd the litigation for

20    efficiency and, for our purposes, to realize justice for our

21    clients.

22         So what we propose is a strong nine-firm team that

23    will work with the law firms on this Zoom; who will work with

24    the law firms who have cases; who will help create

25    committees; as we say in our paper, who will encourage law

1    students and young lawyers to become involved in a complex

2    process that impacts everyone on this soil, not the same

3    communities and some of the same lawyers.

4         So these are a lot of the things that we

5    contemplated as we decided to move forward.

6         Similarly, we have 2,000 clients.  We will speak to

7    why we don't have 150 cases filed as of today.  I think, for

8    us -- this is not a criticism of anyone else, but, for us,

9    diligence is our focus and making sure that we understand the

10   claims of each plaintiff as we file them, but we do

11   collectively represent approximately 2,000 plaintiffs.

12        I believe if Attorney Crump is available -- we do

13   apologize again, your Honor, he is in that proceeding -- I

14   think he may have some words.  But I would ask that your

15   Honor just consider the consideration that our slate placed

16   into applying for leadership.  We are prepared to work with

17   cocounsel.  We are prepared to work with defense counsel to

18   facilitate an efficient movement of this litigation.

19        Thank you for your time, your Honor -- for

20   everyone's time.

21        Attorney Crump?

22        MR. CRUMP:  Yes.

23        Judge, I apologize for not being able to be on the

24   Zoom as there are circumstances in America that require me

25   only to be able to talk to you by audio.  I will be very

1    brief, as I find myself in Buffalo.

2         Issues of diversity and race in this country have

3    been far too long ignored.  Certainly in our noble

4    profession, we oftentimes find that there are others who

5    always speak for those who are most affected by the

6    injustices.

7         We were very intentional, your Honor, with

8    presenting this motion for leadership for your consideration

9    because we believe that diversity should not be an

10   afterthought, but it should be a forethought.

11        We believe that there are talented lawyers of color

12   who have been denied over and over again positions of

13   leadership for every technical intellectual excuse you can

14   come up with in the book.  Over and over again we say

15   throughout the history of mass torts, why aren't there any

16   black leadership?  Why aren't there any Latin leadership?  It

17   has been pretty nonexistent, so much in fact that articles

18   and treatises have been written about it.  Federal judges

19   have belly ached about it and talked about it *ad nauseam*, but

20   yet nothing has happened to move this issue forward.

21        With this litigation, we are intentionally trying

22   to push the envelope to say that we believe those most

23   affected will be just as well served by having diversity in

24   leadership, and we believe they may even trust more coming

25   forward.

1      It is not lost on me, and I pray not others, that

2   many times minorities in America who are impacted the most do

3   not get involved in these mass torts, and we can only

4   speculate why.  But some may believe that the people who lead

5   the efforts, they do not feel speak for them.

6      I respectfully ask for your consideration, and I

7   applaud all the lawyers on the call because I think everybody

8   is qualified.  It's just so often minority lawyers have to

9   prove that we are qualified when others are just assumed.

10      THE COURT:  Okay.  There is no question that both

11   slates present qualified proposals here.  I don't believe I

12   would make a mistake going in any direction.

13      I will tell you, I am going to issue something in

14   writing on this, but I don't want to keep my conclusions a

15   complete secret.  I will tell you what I am inclined to do

16   without suggesting you can go to the bank on this.

17      I'm inclined to adopt Slate 1, but I would like to

18   add Ms. Zimmermann to it.  Ms. Zimmermann's background shows

19   she has got significant experience in these cases.  She is

20   geographically diverse.  She brings diversity of gender as

21   well.  And I think she could add to the team.

22      That said, I haven't made up my mind for sure.  I

23   will issue something in writing on this.

24      What I would like to do now, if we can, recognizing

25   that we are in a position where it's not clear who's speaking

1   for whom, I would like to just get a sense about some of the

2   other issues on the agenda that we could discuss.

3          Number one, what is your expectation --

4   Ms. Zimmermann made a reference a moment ago to 2,000

5   potential plaintiffs.  I know there are not that many cases

6   pending right now.

7          But maybe I can ask her to tell us, what would be

8   your best guess, Ms. Zimmermann, about how many cases are

9   going to wind up in this MDL?

10          MS. ZIMMERMANN:  Well, I think, as I said, the DRC

11   group has 2,000.  There will be thousands, potentially above

12   10,000.  It's my educated guess at this time.  And I think

13   more and more women will come forward.

14          THE COURT:  Anybody from the other proposed slate

15   that has a response on that issue?

16          MR. BECKER:  Your Honor, this is --

17          MS. KAVENY:  I do, your Honor.

18          The Rojas firm has itself 1400 cases.  If, in fact,

19   Ms. Zimmermann's colleagues have over 2,000, we would

20   estimate that it would be somewhere between 5 and 10,000

21   tagalong cases.

22          There are only 77 in suit right now, but that would

23   be our estimate as well, 5 to 10,000.

24          THE COURT:  All right.

25          MR. BECKER:  Your Honor --

1          THE COURT:  Go ahead.

2          MR. BECKER:  I'm sorry, Judge.  Can I just comment

3     on that?  It's Tim Becker.

4          Just for your background, we have internally

5     amongst ourselves in what we are coining the "first slate"

6     started to conduct an informal census.

7          Based on our review of that, it gets a little

8     complex because there is some double counting between the

9     Watts firm on the DRC group and on our group.  But be that as

10    it may, our numbers are well in excess currently of 2000

11    cases.

12         So I think it's fair to say, whether the number is

13    5 or 10 or what have you, it's clear, based on our own

14    internal counting as well as what the DRC slate has, that

15    these cases will number in the several thousands, so north of

16    three.  Whether we get to five or not is always an issue.

17         I think we are all mindful of the fact that case

18    counts can be a little bit deceiving in that retainer does

19    not equate to viable claims.  So those numbers may fluctuate

20    a bit.  But it's fair to say at this point they certainly

21    number in the several thousands.

22         THE COURT:  Okay.  That's helpful.

23         We here in chambers have begun the process of

24    creating a spreadsheet, but obviously that's going to be a

25    substantial chore.  I will be relying on the lawyers to make

1  sure that we have a really accurate census because experience

2  teaches, when you are talking about thousands of cases, it's

3  very easy for one or more to slip off the radar screen, and

4  that's not fair because each of these individual plaintiffs

5  is entitled to his or her day in court.

6         Another question I had.  I'm not sure who would

7  like to weigh in on this, but I would like to hear what would

8  be your proposals with respect to remand motions?

9         I know there are several cases in which there are

10 motions for remand.  There are cases in which there's snap

11 removal arguments.  There are also cases in which there are

12 nondiverse defendants that have been added and a challenge to

13 that on the part of defendants on the basis that the

14 litigation against the provider, for example, is a sham

15 addition.

16        What would be your sense of the numbers of remand

17 motions and whether those are going to be grouped or whether

18 they will be individually decided?  What's your thought on

19 that?

20        MR. KELLER:  Good morning, your Honor.

21        This is Ashley Keller from Keller Postman.

22        We have several of those motions to remand that we

23 recently filed.  The defendants removed a bunch of cases in

24 Philadelphia.  They have also removed cases in California

25 that haven't yet been transferred, but they potentially could

1    be.  So this could be happening serially.

2           You won't be surprised to hear that, while we have

3    immense respect for your Honor and your courtroom, we think

4    our clients are entitled to be in state court.  So what we

5    would ask for is whatever efficient process your Honor would

6    like to address these motions to remand expeditiously.

7           What we would like to avoid is a situation that

8    candidly has happened in some MDLs in the past where motions

9    to remand were put on ice for months or potentially even

10   years.

11          And as the Sixth Circuit recently pointed out in

12   its *mandamus* decision in the opioid MDL, that's just not

13   appropriate.  Jurisdiction is a threshold issue that's

14   supposed to be addressed first.  And in our federalist

15   system, particular plaintiffs can't be prejudiced in their

16   right to proceed in the forum that they are entitled to just

17   because it might be more expedient for other plaintiffs who

18   are properly in federal court.

19          So we would respectfully ask the motions to remand

20   be briefed on a schedule that is fast and that suits your

21   Honor from an efficiency perspective.

22          THE COURT:  A couple of comments about that.

23          Number one, even apart from what the Sixth Circuit

24   has done, it's my strong belief that the MDL process is not

25   intended to deprive a litigant of a forum for which she is

41

1    otherwise entitled.  The fact that there is an MDL pending

2    does not mean I will not grant a motion for remand if that's

3    the appropriate result in this case.  That's not fair.  It's

4    not the way -- that's not the purpose for the MDL process.

5              The purpose, as we all know, is to kind of

6    streamline particularly discovery, because when you have

7    dozens, hundreds, thousands of cases involving a particular,

8    in this case, product, we don't want to have to depose one

9    expert hundreds of times.  We want that to be kind of a

10   streamlined process that makes sense.  And to the extent that

11   we can do things that save individuals and the court system

12   effort, we want to do that.  We don't want the MDL to become

13   a black hole where cases get filed and then parked for years

14   and nothing happens.  That's not my goal at all.

15             What I will ask, then, that you do is -- and we can

16   do this -- perhaps a lawyer on each side can identify, so far

17   as we know right now, the cases that have motions for remand

18   pending -- I will look myself; I can find them myself, too,

19   but I don't want to lose track -- and perhaps what

20   overlapping issues there are.  And I will set a relatively

21   rapid schedule to get those briefed, recognizing that it may

22   be that we are going to have additional such motions being

23   filed as time goes by with additional arguments that might be

24   made.

25             I have a question for Mr. Rojas, and that is, I

1    think you mentioned earlier that you met with a client back

2    in 2017.

3            Have there been any cases that have gone to verdict

4    in the state court or any federal court?

5            MR. ROJAS:  No, your Honor, not to my knowledge.

6    Not -- there have been, obviously, NEC cases filed in other

7    contexts, mostly medical malpractice.  But in the context of

8    a claim that the product is defective, I'm not aware of any

9    verdicts.

10           We had some trial dates before the MDL.  The

11   *Sanchez* case was set for trial in the early part of next

12   year, but obviously that's been subsumed into here.

13           THE COURT:  All right.  And so far as you know, are

14   there any cases that -- any other cases set for trial where

15   it hasn't happened yet but will happen or expected to happen?

16           MR. ROJAS:  Yes.  In the state court litigation,

17   the *Simmons* case, I think, is first up out in Lake County.

18   That's probably the next trial as things currently stand.

19           THE COURT:  Who represents the parties in that

20   case?

21           MR. ROJAS:  So that is being handled by -- it is

22   one of our cases, but it's being handled by the Stranch firm.

23   Primarily Ben Gastel, who's on the line, has done amazing

24   things in that case.

25           MR. GASTEL:  Good morning, your Honor.

1             This is Ben Gastel for the Simmons plaintiff.

2             And I also am counsel in the four Cook County cases

3    that have been snap removed and have fulled briefed motions

4    to remand on the snap removal issue before your Honor that I

5    think you mentioned that you are aware of.

6             THE COURT:  I am aware of those, yes.

7             Let me ask another question.  Are you expecting --

8    anybody here expecting additional defendants besides Abbott

9    and Mead Johnson?

10        (No response.)

11            THE COURT:  Are there additional defendants -- I'm

12   not talking about medical providers.  I'm talking about

13   manufacturers or distributors.

14            Are there other players in that field that are

15   producing this formula?

16            MS. FLEISHMAN:  Your Honor, Wendy Fleishman.

17            No, we do not expect any additional defendants in

18   that regard, none anticipated at this point based on the

19   investigation we have done to date.

20            THE COURT:  All right.

21            Has there been any discussion or thought about

22   filing of a master complaint or a complaint with related fact

23   sheets?

24            Would such a proposal, in your view, be useful?  To

25   my mind, it seems like it would be, but I want to hear from

1    the lawyers.

2            MS. PARKER:  Your Honor, if I may jump in?

3            This is Stephanie Parker for Abbott.

4            Just a little bit of background before I answer

5    that particular question, if I may?

6            THE COURT:  Sure.

7            MS. PARKER:  We have been having actually a

8    significant number of, I think, very helpful discussions with

9    the plaintiffs' group.  The discussions started even before

10   we knew you were going to actually be the MDL judge, when

11   everyone agreed that there should be an MDL.

12           We spent a lot of time on this issue about master

13   complaints and a number of other issues.  And we hope that we

14   will be able to come to your Honor with an overall proposal

15   on how to select bellwethers, forms to be filled out,

16   discovery deadlines, all such as that, in short order -- I

17   would say definitely within two weeks, something like that.

18           But particularly with respect to the master

19   complaint, we believe we can reach agreement with the

20   plaintiffs' group on a profile form and medical record

21   authorizations that would be promptly completed by all of the

22   plaintiffs.  And that will enable us to select the bellwether

23   cases -- both sides to select the bellwether cases, and then

24   a more extensive fact sheet to be completed by all the

25   plaintiffs designated as bellwethers.  The plaintiffs will

1    speak up and agree with all of that, kind of where we are.

2            With respect to the master complaint question

3    itself, we do propose -- the defendants -- we do propose a

4    master complaint with accompanying -- what we are calling a

5    short form complaint.  In that short form complaint

6    individual plaintiffs could identify any plaintiff-specific

7    allegations that they would like to raise.

8            And our view is -- the defendant's view is that

9    that master complaint would not be just purely

10   administrative.  Instead that could be subject to affirmative

11   defenses and motions to dismiss so we can go ahead and start

12   moving forward on those legal issues as well.

13           MS. ZIMMERMANN:  Your Honor, if I may?

14           THE COURT:  Sure.

15           MS. ZIMMERMANN:  The DRC slate through Tony and I

16   were involved in, I believe, the last of those conversations.

17   I know time is of the essence, but sometimes, as we say in

18   our office, you got to move slow to move fast.

19           So I think we had some additional concerns whether

20   it was about, you know, do we need a master complaint and

21   master answer?  What is the timeline for the discovery plan?

22   What does it look like for bellwether selections?  Or things

23   that, while I think it can feel great to say, "Your Honor, I

24   will get this to you in 10 days," it sometimes takes a little

25   more time to make the right decisions that we need to make on

1    behalf of our clients.  And I say that especially in light of

2    the fact that some of the proposed dates and the movement of

3    the discussions were without the appointment of leadership.

4           So on behalf of DRC team, I wouldn't say let's wait

5    until June 15th, but I would say we probably need more than

6    two weeks to work through some of those issues, your Honor.

7           Thank you.

8           MR. BECKER:  Judge, this is Tim Becker on behalf of

9    the, I guess, first slate.

10          Just to echo what Ms. Parker said, we have been in

11   negotiations with the defendants for quite some time

12   regarding most of the preliminary orders as well as the

13   preliminary procedures that you would anticipate similar to

14   what we did in the *Zimmer* litigation.

15          We had reached out to the DRC folks.  They declined

16   to participate.

17          But be that as it may, where we are at this point,

18   irrespective of whether it's 7 days or 10 days or 50 days,

19   the Mead Johnson defendants are going to oppose a direct

20   filing order.  They can talk about why they are going to do

21   that, but basically they are opposing the direct filing order

22   in part because, as they alluded to in their papers, they

23   have serious concerns about venue issues and where cases are

24   properly venued and how they are filed, much like *Zimmer* did

25   in our prior MDL.

47

1      So what that means practically is that every
2   plaintiff in America who files a case is going to have to
3   file it an appropriate jurisdiction and file it using a long
4   form complaint.

5      So our concern, which we expressed to defendants,
6   was twofold.

7      One, if you are already filing a long form
8   complaint, what's the practical point of a master complaint
9   and then a short form complaint on top of that?

10      But more important, while we agree generally and
11   think we will get to an agreement on a process to allow
12   defendants to test the sufficiency of some of their
13   affirmative defenses -- most notably preemption -- we think
14   that many of the defenses that they are going to bring are so
15   inherently factually specific that they are not -- it's not
16   possible to plead those in a master complaint.

17      For example, all fraud claims are inherently
18   factual because they have a reliance element.  All factual
19   limitation claims are inherently factual because it requires
20   notice and when the plaintiff knew what they knew.

21      So what we have gotten to -- and I would agree with
22   Ms. Parker on this -- is, we have advanced the ball to the
23   point that we all agree there will be some motion practices
24   on what we are coining as "general legal issues."  But we may
25   part company in terms of the need for a master complaint and

1    a master answer as it relates to all causes of action and all

2    defenses.

3              That said, we continue to work with them on that.

4    We put forth a proposal that I think we both endorsed, that

5    if we can't get that done in the next, say, 7 to 10 days,

6    that we will put briefing out on it in, similar to what we

7    did in *Zimmer*, three-page letter briefs, and then let you

8    call a ball and strike on it.

9              THE COURT:  That sounds fine.

10             Let me just ask a question about your statement,

11   Mr. Becker.

12             If the case -- I have a slight inclination in favor

13   of -- against direct filing as well, but we don't need to go

14   down that road for now.

15             Let me ask a question.  If people file in their

16   venues that are otherwise appropriate, why would it be that

17   it's not possible to use a short form complaint?

18             Wouldn't a short form complaint that includes venue

19   allegations satisfy the judge that will know, looking at that

20   complaint, this case is going to be MDL anyway?  It's going

21   to be part of a tagalong?

22             I guess I think the advantage -- it is a small

23   one -- of filing in the appropriate venue is that years from

24   now if we remand cases for trial to other venues, we don't

25   want them to come as a complete shock to the judges who then

1   receive those cases, nor do we want to open up a situation

2   where at that point there is a dispute about venue.

3            MR. BECKER:  Sure.

4            Your Honor, the defendants in our initial

5   conversation reminded me of the case law we created in *Zimmer*

6   on the DFO, so we were not going to relitigate that battle.

7   I mean, Mead Johnson's position is their position.  At least

8   in terms of what your prior rulings are, we don't intend to

9   fight that.

10           In terms of a short form complaint, if it's more

11  convenient for the Court to do that, of course we will do

12  that.  But the bottom line is, the allegations within the

13  complaint itself are specific -- as well as the cause of

14  action -- to the individual plaintiffs.  So it's sort of a

15  belt-and-suspenders approach.

16           One other thing I would note is that, in our

17  discussions -- and I think we put this in our joint

18  submission proposal to you, is that we are not contemplating

19  that the defendants waive any of their Rule 12 motions.

20           What you are going to hear from if we go into this

21  a little bit deeper is that we have had extensive

22  conversations about a bellwether process, what that would

23  look like, and how expedited it would be.

24           Our offer to the defendants was, once you -- once

25  we identify the particular bellwether pool, the defendant

1    reserves its right to move for any type of Rule 12 pleading

2    it thinks is sufficient as it relates to an individual

3    plaintiff.

4           And we think that that's sufficient for a couple of

5    reasons.  One, you can't possibly plead everything in a

6    master complaint as it relates to every person.  But, two,

7    and more important, once you have these test cases, as you

8    know, your rulings in those test cases as it relates to the

9    sufficiency of fraud allegations or statute of limitations

10   will give guidance to the rest of the litigation that then

11   plaintiffs' counsel can react to.

12          So all of this is kind of a large machine moving in

13   tandem together.  It's not kind of pick a box and go down

14   that vein.

15          So we are not intending to deny the defendants

16   their opportunity to challenge the sufficiency of pleadings.

17   We are just proposing they do that as it relates to

18   individual bellwether claims.

19          THE COURT:  Got it.

20          I'm not going to hold you to this, but what

21   generally were you talking about with respect to a schedule

22   for bellwether trials?

23          MS. PARKER:  Your Honor, if I may jump back in

24   again?  It's Stephanie Parker.

25          We had discussed just very generally, if we were

1    able to go ahead and move forward so we get the forms filled

2    out and get the medical authorizations -- if we can get that

3    going really quickly, and then we can start the process of --

4    both sides determining which cases that we would propose for

5    a first tranche of bellwethers and go ahead and get discovery

6    started.

7             We are very tentatively talking about trial dates

8    that would be in perhaps the first quarter of 2023.

9             THE COURT:  Okay.  Got it.

10            MS. FLEISHMAN:  If I may, your Honor?

11            We also anticipate that while we are doing the

12   bellwether process, we are also going to do general liability

13   discovery in a parallel course so that we are in fact ready

14   to proceed to trial as quickly as possible because our

15   clients really need these cases to move quickly.  Many of our

16   clients are struggling and have very injured children.  So

17   they really desperately do need us to move this in as

18   streamlined and expeditious fashion as possible.

19            THE COURT:  All right.  One observation I am going

20   to make.  I am not holding anybody to anything.  But with

21   respect to selection of bellwethers, experience suggests to

22   me that it's better to use some form of randomization for

23   that process because otherwise we have a situation where

24   plaintiffs choose the cases that are absolutely rock-hard

25   winners for them and vice versa.  That's not terribly

1    instructive when you are looking to see generally how are

2    these cases going to shake out.

3           In other words, to serve the bellwether function,

4    we would want a case that looks more like a bellwether than

5    an outlier.  We don't need to explore that issue in any

6    detail right now.

7           Let me just ask one more question, recognizing Zoom

8    time -- online time for these hearings is challenging under

9    the best of circumstances, and everybody has other things to

10   do.

11          I do think it is going to be useful for us to have

12   an in-person meeting.  I would like your views on that.

13   Anybody who wants to weigh in on that is welcome to let me

14   know how you feel about it.

15          I will say this:  The pandemic has taken its toll

16   on all of us.  And I know travel is a challenge.  I would, of

17   course, not expect everyone to be here for any in-person

18   hearing.  I would expect people who are taking leadership

19   roles to be here and pretty much that's it.

20          And I would also encourage, if not mandate, that

21   you have to be vaccinated.  We have a vaccine mandate in our

22   court.  We test everybody.  We have got PCR testing in our

23   building.  Just so you know, I take it very seriously because

24   I recognize that travel under these circumstances can be

25   challenging.  Nobody wants the litigation to make anybody

1   else sick.

2         Let me just ask one more question while I have got

3   this -- oh, with respect to an in-person conference,

4   recognizing that we may have some other written or online

5   conferences in between these, how often do you expect those

6   status conferences should take place to make sure that we are

7   moving forward aggressively?

8         MS. PARKER:  We also discussed this.  Actually,

9   your Honor, we tried very hard to address all the items that

10  we thought might arise today so that we could come to the

11  Court with that background.

12        We have actually discussed and we would like to

13  recommend to the Court jointly that we would be available, of

14  course, whenever the Court would like, but we are suggesting

15  every six weeks, and perhaps with the next status conference

16  somewhere around June 30th.  That would allow us the

17  opportunity to finish the various drafts that we are already

18  exchanging and get those to your Honor so your Honor will

19  have a chance to review those beforehand.  I think I'm

20  speaking for everybody on those prior discussions.

21        MS. KAVENY:  Yes, that's right.

22        And we also had discussed whether the preference

23  would be to have them in person or to have them by video.  It

24  was our thought that in person would be the preferred method

25  for the most substantive meetings every six weeks.

1      A lot could be done by all of us getting together

2   even if it's in the hallway sometimes.  But just to kind of

3   be there and be together in person, that sometimes serves a

4   lot of purposes.

5           THE COURT:  I have exactly the same experience.

6           MR. ROMANUCCI:  Your Honor --

7           THE COURT:  Yes.  Go ahead.

8           MR. ROMANUCCI:  Your Honor, I do have a comment and

9   understanding with respect to what you said earlier.

10          It is -- it was the DRC's position that we would

11  agree to the first hearing being on June 23rd.  But we

12  thought that having status hearings every four weeks, at

13  least initially, would be more beneficial.  There's a lot of

14  work to be done initially.  Six weeks is quite a considerable

15  long time.

16          Within four weeks -- for example, if we don't get

17  the ESI protocol done in time by June 23rd and we need a

18  hearing, we don't want to wait six more weeks, until

19  mid-August, to have that done.

20          So I do think that, at least in the beginning, it

21  would be extremely beneficial for us to be meeting every four

22  weeks until this Court deems otherwise where the Court is

23  satisfied that we have the work done and we have everything

24  in place in order to move the litigation efficiently.

25          THE COURT:  Okay.  First, I understood the proposal

1    was June 30th rather than June 23rd.  Did I get that wrong?

2                MR. ROMANUCCI:  No.  I thought it was June 23rd.

3                MS. PARKER:  If I said that, I misspoke.  I meant

4    to say June 30th.

5                THE COURT:  June 23rd likely would not work for me.

6    I'm 99 percent sure I will be on trial that date.  June 30th

7    will work for me.  So I will set it for June 30th,

8    recognizing, Mr. Romanucci, that going forward we may very

9    well want to make these status conferences more frequent.  I

10   agree with everything that you said.

11               I also just want to make a point.  Ms. Kaveny may

12   have made this.  It really does make a difference to see

13   people in person even in the hallways.  And sometimes just

14   getting a cup of coffee, you solve some dispute or another.

15   I don't mean a global settlement.  I mean dates for a

16   deposition, for example.

17               I worry -- I will tell you, since we talked about

18   the issue of diversity and getting newer lawyers involved, I

19   really worry about how we are going to be socializing our

20   newer lawyers in this cyber age.  I know lawyers are going to

21   be more creative about the whole problem than I am.  I myself

22   learned a lot about practicing law by sitting in the back of

23   a courtroom and watching other people.  And I worry that that

24   just doesn't happen in the same way that it once did.  But I

25   don't want to be negative here.

1      June 30th we will set for an in-person conference.

2      Another reason for making June 30th the first date

3  is, you will still need to wait for me.  I'm going to you I

4  should be able to get a written ruling in a week on the

5  precise slate here.

6      One thing that I know that Mr. Ronca, who I believe

7  is no longer with us, mentioned that there is a tremendous

8  amount of work.  He is certainly right.

9      And it's also correct that the MDLs take time, and

10  this one sounds like we are going to be moving pretty

11  quickly.  But even so, lawyers come and go from time to time.

12  You don't always have -- you can't always count on the same

13  people to do all the same work.

14      That having been said, I have had good experience

15  in the past with lawyers dividing the amount of work that has

16  to be done such that we don't over-lawyer a case or have too

17  many people or have a swollen state, all of whom need to

18  stand in line for fees in the end.  I have had, as I say,

19  very good experiences.  I haven't had those problems.  I know

20  other judges have.

21      So I am going to ask that -- and I may put this in

22  my order regarding the appointment of the appropriate

23  slate -- that we talk about a way of ensuring that we don't

24  get overlapping and duplicative effort and that the roles

25  that counsel play are relatively well-defined.

1          For example, it may be that we need to identify
2     some lawyers who are going to be doing a lot of the
3     discovery, the experts, the electronic discovery, and then
4     others who may be focusing on, say, trial preparation or
5     talking about settlement of individual cases or large groups
6     of cases, things like that.

7          We could leave a more specific discussion of that
8     whole issue for another day, I think.

9          Are there other issues that I think we really do
10    need to iron out right now?

11         Oh, I do want a proposal.  When you do put these
12    proposed dates together, I do want a proposal that includes a
13    relatively prompt briefing schedule on motions for remand, if
14    not individual, then group motions, however you think those
15    should be resolved.

16         Are there other issues that we really do need to
17    address right now?

18         MS. PARKER:  If I may?

19         A different issue that I think would be helpful to
20    the Court as the Court begins to look at all these other
21    orders and briefs that will come in, and that's the idea of
22    each side submitting a position statement.

23         I understand that your Honor had such a provision
24    in the *Zimmer* MDL.  And we have been discussing it at length
25    with the plaintiffs' group.  I think we can agree on the

1    parameters.  But what we have been discussing is just

2    simultaneous filing -- something like 20 pages --

3                THE COURT:  Perfect.  That's fine.

4                MS. PARKER:  -- that would identify claims, key

5    issues.  And that way your Honor can -- as your Honor is

6    reviewing all this other pleadings and such, you will have

7    kind of the overall lay of the land, so to speak, from each

8    side.

9                THE COURT:  That would be great.  That would be

10   great.

11               MS. PARKER:  Two weeks I think we could get -- Tim,

12   if that works for you all.

13               MR. BECKER:  Judge, what I was going to propose is,

14   if the next status hearing is going to be set for the 30th --

15   as we have alluded to, we are very, very close to completion

16   of the preliminary orders, and I think that we are 95 percent

17   plus in agreement, but there may be an issue or two that we

18   need you to weigh in on.

19               Does it make sense that we submit those issues to

20   you along with the position papers by June 17th?  That will

21   give you, roughly, two weeks to digest them and evaluate them

22   in anticipation of the status conference?

23               THE COURT:  June 17th would be great.

24               Make sure that -- again, I'm expecting I'm going to

25   be adding somebody from the DRC group, and I'm expecting

1    right now that's likely to be Ms. Zimmermann.  So you will

2    definitely need to confer with that person or those people.

3            MR. BECKER:  I should have mentioned -- and I

4    apologize for not doing it, Judge -- that moving forward,

5    based on your comments, we will clearly, after this

6    conference, reach out to Fu as well as her entire team and

7    get them up to speed of where we are at and seek their input.

8            THE COURT:  Great.

9            All right.  There was somebody else who wanted to

10   be heard, correct?

11           MR. GASTEL:  Your Honor, this is Ben Gastel from

12   Branstetter in Nashville.

13           I just want to very briefly bring up the snap

14   removed cases.

15           THE COURT:  Yes.

16           MR. GASTEL:  Again, those motions are fully

17   briefed.  I'm not entirely sure if your Honor prefers to have

18   oral argument on them.  But if you would -- if your

19   preference is for oral argument, I would respectfully request

20   that that also be added to the agenda on the June 30th

21   conference meeting because, with all due respect, it would

22   tremendously help us if we could get a prompt answer to

23   whether or not snap removal is available going forward in the

24   MDL.

25           THE COURT:  I will certainly consider oral

1    argument.  If we are going to do oral argument, we can make
2    it on the 30th, because -- you are right -- the motions are
3    fully briefed.

4            It may be that there are going to be other snap
5    removal motions.

6            The other issue I have got that I'm only just kind
7    of dipping my feet into is, the law on snap removals varies
8    from circuit to circuit.  It will be -- it may be that a case
9    that is snap removed in one state or jurisdiction will stick
10   with me and that others under the identical circumstances
11   will not.  So that's just something I have to be sensitive
12   to.

13           MR. GASTEL:  I'm fully abreast of what you are
14   saying, your Honor, and I fully agree with you.

15           I do think that the fully briefed ones coming out
16   of Cook County are very laser focused on the specific issue
17   as to whether or not Abbott, as the forum defendant in
18   Illinois, has the right to snap remove under Seventh Circuit
19   precedent.  I'm sure your Honor is aware that the Northern
20   District of Illinois juris prudence on this falls on both
21   sides of the line.

22           And I do think that even if snap removal may arise
23   in other contexts with potentially doctors or hospitals or
24   treating physicians, certainly this issue is certainly ripe,
25   and I would respectfully request a prompt ruling on it.

1      THE COURT:  I will do my best on that.

2      And for those of you who -- for all of you -- you

3   are correct, Mr. Gastel, that my colleagues have come down on

4   both sides of the issue.

5      I myself have not weighed in on a snap removal

6   issue in another case.  So this will be the first time I have

7   written about it, but I certainly recognize that it's

8   critical in this case, at least with respect to that handful

9   of cases you are mentioning.

10      MR. GASTEL:  Thank you, your Honor.

11      MR. ROMANUCCI:  Your Honor, maybe just one more

12   issue with respect to -- maybe defendants can answer whether

13   or not they are going to be accepting service or whether it

14   will be waivers going forward for future filings?

15      MS. PARKER:  I think we have already done that

16   previously.

17      THE COURT:  You do not object to accepting service;

18   is that right?

19      MS. PARKER:  That's correct, your Honor.

20      THE COURT:  All right.  Good.

21      MR. ROMANUCCI:  Thank you for confirming.

22      MR. ANDRICHIK:  Your Honor, this is Bill Andrichik

23   on behalf of Mead Johnson.

24      On that point -- and we previewed this for you in

25   our papers that we submitted before last week's conference --

1     we would actually request a briefing schedule on the issue of

2     the direct filings that have taken place after your Honor's

3     initial case management order.

4          There were at least four lawsuits filed by these

5     second proposed leadership teams in the Northern District of

6     Illinois apparently based on the theory that Mead Johnson's

7     principal place of business was in Chicago, despite there

8     being several courts already finding that the principal place

9     of business is in Evansville, Indiana.

10         So your Honor's initial case management order, of

11    course, said that tagalong cases are supposed to be filed in

12    an appropriate venue and that direct filing in the Northern

13    District of Illinois is appropriate only if appropriately

14    venued here.

15         The issue with the direct filing in the Northern

16    District of Illinois and then a motion to reassign, which was

17    granted before Mead Johnson could object, is that it bypasses

18    kind of the JPML process, which it just doesn't give us that

19    opportunity to address that issue.

20         So I did want to raise this today and not let it

21    linger until June 30th.  I'm not asking for a decision on

22    this today or a full-blown argument, but the opportunity to

23    brief it for your Honor, especially because I expect there to

24    be more lawsuits filed directly in the Northern District of

25    Illinois with this motion to reassign.  We would like to

1   address that sooner rather than later.

2   THE COURT:  Why don't I ask that -- we have got

3   this June 17th target date for submission of issues as to

4   which the parties have agreed and not agreed.  Why don't I

5   ask that you submit a brief maybe simultaneous on the issue

6   of snap removal at that -- I'm sorry -- on the issue of

7   direct filing versus tagalong at that time as well.

8   As I mentioned -- and I'm not wedded to this

9   position, but I have a slight preference in favor of filing

10  in the appropriate venue, as I indicated in the order that I

11  entered.  I could change my mind on that.  My sense is, for

12  recordkeeping purposes, it's slightly easier.

13  But I know that, based on Mr. Becker's comments,

14  you have got issues with respect to the short form complaint

15  and the like.  So there may be some very good arguments for

16  not doing it in the way that I had expected.  We will take

17  that up.

18  And you are right.  It's something that we have to

19  decide really quickly, especially if we are talking about

20  thousands of cases.  We are south of a hundred right now.  So

21  if we are talking about even hundreds of more cases coming

22  in, we really do need for people to know where they should be

23  filing those cases.

24  MS. ZIMMERMANN:  Thank you, your Honor.

25  I believe the DRC in one of our responsive

1   pleadings said we would be prepared to brief the issue, would

2   only take task with the basis for our filing -- only that

3   they are headquartered, but we are prepared to fully brief

4   the issue moving forward, and we will be prepared at that

5   date.

6          Thank you, your Honor.

7          MS. PARKER:  Your Honor, if I may raise one other

8   item?

9          THE COURT:  Sure, Ms. Parker.

10         MS. PARKER:  Thank you.

11         Just to let your Honor know that we have already

12  provided to the plaintiffs a draft.  We are having

13  discussions about a joint coordination order that would

14  address the state court cases as well.

15         My understanding is that the federal plaintiffs and

16  the state plaintiffs have been having discussions themselves

17  about the coordination topics.

18         THE COURT:  Okay.  Good.  Good.

19         MR. BECKER:  Your Honor, I can weigh in on that.

20         So clearly I think everybody recognizes the need

21  for cooperation, if not coordination.  The devil is always in

22  the details.  We have expressed to defense counsel that we

23  agree that cooperation is wholly appropriate.

24         We have also started the process of reaching out to

25  the stakeholders in the state court.  They have a copy of the

 1    coordination order.  We have tapped the brakes on moving

 2    forward with that until the Court appointed a formal

 3    leadership structure.  But hearing what you said today, I

 4    think we will be able to move forward with that in a more

 5    fulsome manner.  But we have had a number of discussions with

 6    the state court lawyers and are actively trying to work

 7    something out.

 8             THE COURT:  Great.  All right.

 9             I don't need to cut anybody else off.

10             Anyone else need to weigh in at this point?

11        (No response.)

12             THE COURT:  I want to thank you for your time and

13    again apologize for what happened last week and just commit

14    to you that we are going to be -- that we are not going to

15    have these problems in the future.

16             The next time I see you all is likely to be on that

17    June 30th date.  When I say "you all," I mean those of you

18    who will be participating in the hearing, recognizing that

19    not everybody has to be here.

20             Sometimes I get asked about whether we can do

21    things in a hybrid fashion.  I guess I would probably

22    slightly prefer not to, at least initially.  So I will see

23    you in person.

24             The courthouse, as you know, is right downtown,

25    those of you who are in from out of town.  We will set aside

1   a large courtroom for these purposes so people can be spaced

2   out appropriately.

3           MS. KAVENY:  Thank you, your Honor.

4           THE COURT:  I want to thank you again.

5           I think we are ready to be adjourned.

6           MS. ZIMMERMANN:  Thank you, your Honor.

7           MS. FLEISHMAN:  Thank you.

8           MS. KROEGER:  Thank you, your Honor.

9           MR. SILL:  Have a good afternoon.  Thank you, your

10  Honor.

11      (An adjournment was taken at 11:35 a.m.)

12                  *    *    *    *    *

13  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.
14

15  /s/ Frances Ward_____June 24, 2022.
    Official Court Reporter
16  F

17

18

19

20

21

22

23

24

25