**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: ABBOTT LABORATORIES, et al., | ) | |
| PRETERM INFANT NUTRITION PRODUCTS | ) | **MDL No. 3026** |
| LIABILITY LITIGATION | ) | |
| | ) | **Master Docket No. 22 C 71** |
| This Document Relates to: | ) | |
| Removed Pennsylvania Cases[1] | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

In dozens of cases, parents of premature infants have alleged that infant formula

manufactured by Defendant Manufacturers—Abbott Laboratories ("Abbott") and Mead Johnson

& Company, LLC and Mead Johnson Nutrition Company (collectively, "Mead Johnson")—caused

premature infants to develop necrotizing enterocolitis ("NEC"). The Judicial Panel on Multidistrict

Litigation has consolidated a number of these cases for pretrial proceedings before this court. In

---

[1]     This opinion relates to the cases that were originally filed in Pennsylvania state court and have pending remand motions. Specifically, the opinion concerns the following cases with Plaintiffs who are Pennsylvania citizens: *Abdullah v. Mead Johnson & Co.* ([22] in Case No. 1:22-cv-02511); *Drayton v. Mead Johnson & Co.* ([22] in Case No. 1:22-cv-02513); *Stills v. Mead Johnson & Co.* ([23] in Case No. 1:22-cv-02515); *Gray v. Mead Johnson & Co.* ([17] in Case No. 1:22-cv-02714); *Henderson v. Mead Johnson & Co.* ([24] in Case No. 1:22-cv-02611); *Hines v. Mead Johnson & Co.* ([23] in Case No. 1:22-cv-02612); *Johnson v. Mead Johnson & Co.* ([23] in Case No. 1:22-cv-02613); *McMillian v. Mead Johnson & Co.* ([24] in Case No. 1:22-cv-02614); *Moment v. Mead Johnson & Co.* ([24] in Case No. 1:22-cv-02615); *Sanders v. Mead Johnson & Co.* ([23] in Case No. 1:22-cv-02617); *Short v. Mead Johnson & Co.* ([24] in Case No. 1:22-cv-02618); *Whitfield v. Mead Johnson & Co.* ([23] in Case No. 1:22-cv-02619); *Thomas v. Mead Johnson & Co.* ([23] in Case No. 1:22-cv-02620); *Williams v. Mead Johnson & Co.* ([23] in Case No. 1:22-cv-02621); *Witherspoon v. Mead Johnson & Co.* ([22] in Case No. 1:22-cv-02623); *Goodmond v. Mead Johnson & Co.* ([16] in Case No. 1:22-cv-02712); *Goodmond v. Mead Johnson & Co.* ([16] in Case No. 1:22-cv-02713); *Kajuffa v. Mead Johnson & Co.* ([19] in Case No. 1:22-cv-02716); *Mays v. Mead Johnson & Co.* ([17] in Case No. 1:22-cv-02719); *Parker v. Mead Johnson & Co.* ([19] in Case No. 1:22-cv-02760); *Ross v. Mead Johnson & Co.* ([19] in Case No. 1:22-cv-02761); *Wiggins v. Mead Johnson & Co.* ([19] in Case No. 1:22-cv-02762); *Watson v. Mead Johnson & Co.* ([16] in Case No. 1:22-cv-02763). The opinion also concerns the following cases with Plaintiffs who are non-Pennsylvania citizens: *Carter v. Mead Johnson & Co.* ([19] in Case No. 1:22-cv-02516); *Padilla v. Mead Johnson & Co.* ([18] in Case No. 1:22-cv-02720); *Taylor v. Mead Johnson & Co.* ([19] in Case No. 1:22-cv-02517); *Walker-Savage v. Mead Johnson & Co.* ([19] in Case No. 1:22-cv-02616); *Weiger v. Mead Johnson & Co.* ([21] in Case No. 1:22-cv-02518); *Wieger v. Mead Johnson & Co.* ([22] in Case No. 1:22-cv-02519).

this opinion, the court addresses motions for remand filed by Plaintiffs in cases originally filed in Pennsylvania state court and now before this court. Unlike most other cases in this MDL, the complaints in these Pennsylvania lawsuits include negligence claims against the in-state hospitals where the preterm infants were fed the formula at issue ("Defendant Hospitals"). Resisting remand, Abbott argues that Plaintiffs fraudulently joined these in-state hospitals to defeat complete diversity, *see* 28 U.S.C. § 1332(a), or to trigger the forum-defendant rule and preclude removal. *See* 28 U.S.C. § 1441(b)(2). Because Plaintiffs have no good-faith intention to pursue any viable claims against the Hospitals, Abbott urges, the court should deny their remand motions. For the reasons explained below, the court defers ruling on these motions, pending limited supplemental briefing.

## BACKGROUND

The following facts, primarily taken from Plaintiffs' complaints, are assumed to be true at this stage of the proceedings.[2] The court first recites the relevant jurisdictional facts, and then turns to Plaintiffs' substantive allegations, focusing on those levied against the Defendant Hospitals.

---

[2] The parties have not identified any differences among the numerous complaints originally filed in Pennsylvania state court, with one exception. As Plaintiffs point out, in a small number of cases, the parties are completely diverse, but the named Plaintiffs are non-Pennsylvania citizens—which means the forum-defendant rule (rather than a lack of complete diversity) is the basis for their request to remand to state court. *See supra* at note 1.

As the allegations appear otherwise to be substantively identical, the court uses the following documents from *Parker v. Mead Johnson & Co.* (Case No. 1:22-cv-02760) as representative: Plaintiff's Complaint ([1-1], hereinafter "Parker Compl."), Abbott's Notice of Removal ([1], hereinafter "Parker Notice of Removal"), and Plaintiff's Motion to Remand ([19], hereinafter "Parker Mot. to Remand"). Other citations are to the MDL Master Docket, No.1:22-cv-00071: Abbott's Omnibus Memorandum of Law in Opposition to Plaintiffs' Motions to Remand to Pennsylvania ([115], hereinafter "Def.'s Opp."), and Pennsylvania Plaintiffs' Reply in Support of Their Motions to Remand ([125], hereinafter "Pls.' Reply").

For arguments specifically concerning the non-Pennsylvania Plaintiffs, the court cites to the following documents in *Carter v. Mead Johnson & Co.* (Case No. 1:22-cv-02516): Plaintiff's Complaint ([1-1], hereinafter "Carter Compl."), and Plaintiff's Motion to Remand ([19], hereinafter "Carter Mot. to Remand"). The court also cites to the Non-Pennsylvania Plaintiffs' Reply in Support of Their Motions to Remand ([126] in Master Docket No. 1:22-cv-00071, hereinafter "Non-Pa. Pls.' Reply").

## I.     Jurisdictional Facts

Defendant Abbott is incorporated in and has its principal place of business in Illinois. (Parker Compl. ¶ 5.)  Defendant Mead Johnson is incorporated in Delaware, and has its principal place of business in either Illinois (according to Plaintiffs) or Indiana (according to Defendants). (*Id.* ¶ 4; Parker Notice of Removal ¶ 31).  The Defendant Hospitals are non-profit corporations which are organized under the laws of Pennsylvania and have their principal places of business in Pennsylvania.  (Parker Compl. ¶ 6).  It is undisputed that each lawsuit alleges an amount in controversy that exceeds the jurisdictional amount of $75,000.  (*See, e.g.*, Parker Notice of Removal ¶¶ 26–27.)

In most of the instant cases with pending remand motions, Plaintiffs are citizens of Pennsylvania.  (*See, e.g.*, Parker Compl. ¶ 3.)  In these cases, there is complete diversity—and the statutory requirements for diversity jurisdiction are met—only if the Defendant Hospitals' Pennsylvania citizenship is disregarded.  *See* 28 U.S.C. § 1332(a).  In a smaller number of cases, Plaintiffs are citizens of states other than Pennsylvania, Delaware, Illinois, or Indiana.  (*See, e.g.*, Carter Compl. ¶ 3.)  In these cases, all statutory requirements for diversity jurisdiction are satisfied.  But the Hospitals' presence in the cases triggers the removal statute's forum-defendant rule, which precludes removal of diversity actions where any "properly joined and served" defendant is a citizen of the forum-state (here, Pennsylvania).  *See* 28 U.S.C. § 1441(b)(2); *see also supra* at note 1 (listing cases by Plaintiffs' citizenship).

## II.     Allegations Against In-State Hospitals

Plaintiffs' lawsuits arise out of injuries suffered by premature infants, who were given Defendant Manufacturers' cow's-milk-based infant formula at a Defendant Hospital.  (Parker Compl. ¶ 1.)  Plaintiffs allege that this formula caused premature infants to develop necrotizing enterocolitis ("NEC"), a condition that occurs when bacteria breaches the walls of the intestine, and can result in serious injury or death.  (*Id.* ¶¶ 1, 14.)  "Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems," and Plaintiffs

3

allege that "[e]xtensive scientific research" confirms that cow's-milk-based feeding products cause NEC in premature infants. (*Id.* ¶ 15.) They allege, further, that at the time the infants in these cases were fed Defendant Manufacturers' products, "the science clearly demonstrated to Defendants that these products cause NEC," and there was "scientific consensus that the Defendant Manufacturers' cow's[-]milk-based products present a dire threat to the health and development of preterm infants." (*Id.* ¶¶ 27–28.) Despite knowing of the increased risk of NEC for preterm infants, Defendant Manufacturers are alleged to "have continued to sell their unreasonably dangerous products" without sufficient warning. (*Id.* ¶¶ 29, 47, 52.)

The Defendant Hospitals were also allegedly "aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's[-]milk-based products to its premature infant patients," and "knew or should have known" that these products "can cause NEC in premature infants." (*Id.* ¶ 55.) Instead of "warning of those dangers" or "supplying breast milk-based feeding products to preterm infants," the Defendant Hospitals "continued to source, distribute, and supply the Defendant Manufacturers' products in their hospitals without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities." (*Id.*) Plaintiffs allege that there are safer options besides cow's-milk-based products for feeding preterm infants—specifically, "the mother's own milk," "pasteurized donor breast milk" (which can be delivered nationwide through "an established network"), and "shelf-stable formula and fortifiers derived from pasteurized breast milk." (*Id.* ¶ 23.) Plaintiffs further assert that other "hospitals across the country warn and obtain consent from parents" and "provid[e] other safer forms of nutrition, such as donor breast milk." (*Id.* ¶ 56.) The complaint allegations provide no further information on how other hospitals (as opposed to these hospitals' medical professionals) "obtain consent."

According to Plaintiffs, the Hospitals' "failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits [they] accrue[] from [their] relationships with the Defendant Manufacturers." (*Id.* ¶ 57.) Defendant Manufacturers

are alleged to "incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount." (*Id.* ¶ 28.)  Thus, Plaintiffs appear to suggest, in return for "receiv[ing] the Defendant Manufacturers' cow's[-]milk-based products for free or at a significant discount," the Hospitals granted Defendant Manufacturers' sales representatives access to hospital professionals and medical staff.  (*Id.* ¶ 57.)  The sales representatives then "provided deceptive information that [the Hospitals] reasonably knew or should have known would ultimately reach parents through those staff." (*Id.*)  The Hospitals "knowingly authorized" these sales representatives "to market, advertise, distribute, and/or sell their products" at the Hospital, and "knowingly allowed" the representatives "to routinely misrepresent the risks and benefits of Defendants' products to [the Hospital]'s healthcare professionals and medical staff." (*Id.* ¶¶ 113–14.)

Based on these allegations, Plaintiffs have brought numerous claims against Abbott and Mead under Pennsylvania law: strict liability for design defect and failure to warn, intentional and negligent misrepresentation, and general negligence.  (*See id.* ¶¶ 61–107.)  Plaintiffs also brought two state-law claims against the Defendant Hospitals: negligent failure to warn and "negligent corporate liability of healthcare provider" (that is, a corporate negligence claim under Pennsylvania law).  (*See id.* ¶¶ 108–42.)

For the negligent failure-to-warn claim, Plaintiffs allege that Defendant Hospitals were purchasers, suppliers, or distributors of the cow's-milk-based products at issue in this litigation, and owed a duty to the general consuming public to purchase, supply, and distribute products free of unreasonable risk of harm.  (*Id.* ¶ 109.)  The Hospitals allegedly breached this duty by failing to warn their medical professionals and patients about Defendant Manufacturers' products, including by failing "to provide a warning in a method reasonably calculated/expected to reach the parents of newborns," "to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice" about the

products, or to provide these medical professionals with "statistical evidence" or "studies" showing the NEC risks of cow's-milk-based products for premature infants. (*Id.* ¶ 116.)

For the corporate negligence claim, Plaintiffs allege that Defendant Hospitals owed a duty of care to ensure Plaintiffs' safety and well-being while under hospital care. (*Id.* ¶ 123.) Allegedly, the Hospitals failed "to formulate, adopt, and enforce adequate rules and policies to ensure quality care"—specifically, policies about (among other things) purchasing, supplying, distributing, and using "products that were free of unreasonable risk of harm," "restrict[ing] the use of cow's[-]milk-based products for feeding premature babies," and warning parents and hospital professionals about the risks of these products. (*Id.* ¶¶ 123–24, 130.) Additionally, the Hospitals failed "to oversee its healthcare professionals and medical staff that provided patient care"—specifically, by (among other things) failing to "oversee" medical professionals to restrict the use of cow's-milk-based products for feeding premature babies and not warning parents and hospital professionals about the dangers of these products. (*Id.* ¶¶ 123, 137.)

## DISCUSSION

In opposing Plaintiffs' remand motions, Abbott contends that Plaintiffs in the Pennsylvania cases fraudulently joined the in-state Defendant Hospitals to defeat removal—either because the hospitals' presence as parties defeats the requirement of complete diversity, *see* 28 U.S.C. § 1332(a), or because their presence triggers the removal statute's forum-defendant rule, which provides that a "properly joined and served" forum-state defendant precludes removal. *See* 28 U.S.C. § 1441(b)(2). In an effort to establish fraudulent joinder, Abbott urges that Plaintiffs' claims against the Hospitals fail under Pennsylvania state law and that other circumstances confirm that Plaintiffs' counsel has no intention of pursuing those claims.

## I. Fraudulent Joinder Doctrine

### A. The Seventh Circuit's Standard

In deciding the pending motions, the court applies the substantive state law of the transferor court; when considering matters of federal law raised by the motions, however, the

court applies the law of its own circuit.[3]  *See Chang v. Baxter Healthcare Corp.,* 599 F.3d 728, 732 (7th Cir. 2010) (in multidistrict litigation, the transferee-MDL court applies the transferor court's substantive law); *cf. McMasters v. United States*, 260 F.3d 814, 819 (7th Cir. 2001) (in cases transferred under 28 U.S.C. § 1404, the transferee court is "free to decide [federal issues] in the manner it views as correct without deferring to the interpretation of the transferor circuit" (quoting *In re Korean Air Lines Disaster*, 829 F.2d 1171, 1174 (D.C. Cir. 1987) (Ginsburg, J.)). Though the Seventh Circuit has not addressed which law applies to federal issues in cases transferred through multidistrict litigation, other circuits have concluded that the MDL court's interpretation of federal law governs.  *See, e.g.*, *Korean Air*, 829 F.2d at 1175 ("[B]ecause there is ultimately a single proper interpretation of federal law, the attempt to ascertain and apply diverse circuit interpretations simultaneously is inherently self-contradictory."); *see also In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 853–54, 853 n.5 (N.D. Ill. 2010) (collecting cases).  Courts in this district agree with this approach.  *See, e.g.*, *NCAA Student-Athlete Concussion Inj. Litig.*, 314 F.R.D. 580, 589 n.7 (N.D. Ill. 2016).

The standard for fraudulent joinder is a matter of federal law, *see In re Testosterone Replacement Therapy Prods. Liab. Litig.*, No. 14 C 1748, 2015 WL 920715, at *1 (N.D. Ill. Mar. 2, 2015), and so this court looks to the Seventh Circuit.  Under this circuit's precedent, "[f]raudulent joinder occurs either when there is no possibility that a plaintiff can state a cause of action against nondiverse defendants in state court, or where there has been outright fraud in plaintiff's pleading of jurisdictional facts."  *Gottlieb v. Westin Hotel Co.*, 990 F.2d 323, 327 (7th Cir. 1993).  Absent false jurisdictional facts, a defendant seeking to establish fraudulent joinder bears the "heavy

---

[3]     Neither party directly addresses the choice of law on this issue.  Plaintiffs assume without explanation that Seventh Circuit law applies.  (*See* Pls.' Reply at 6.)  Defendants cite to cases applying both Seventh and Third Circuit law, but—in the context of other pending remand motions in this MDL—agree that the Seventh Circuit's fraudulent joinder standard applies to cases transferred to and consolidated into the MDL.  (*See* Def.'s Opp. at 7–8; *see, e.g.*, [46] in Case No. 1:22-cv-04120 (N.D. Ill.), at 2.)  For the reasons discussed above, the court applies the Seventh Circuit's precedent on fraudulent joinder.

burden" of showing that, "after resolving all issues of fact *and law* in favor of the plaintiff, the plaintiff cannot establish a cause of action against the in-state defendant." *Morris v. Nuzzo*, 718 F.3d 660, 666 (7th Cir. 2013) (quoting *Poulos v. Naas Foods, Inc.*, 959 F.2d 69, 73 (7th Cir. 1992)). Put differently, the court asks "whether there is 'any reasonable possibility' that the plaintiff could prevail against the non-diverse defendant." *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 764 (7th Cir. 2009) (quoting *Poulos,* 959 F.2d at 73). As several courts in this circuit have concluded, this standard "is even more favorable to the plaintiff than the standard that applies to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Id.* (collecting cases). Only if the defendant clears this high hurdle may the court disregard the citizenship of fraudulently joined parties. *Id.* at 763.

## B.    Abbott's Evidence of Intent

As noted, under controlling law the fraudulent joinder standard turns on whether Plaintiffs have a viable claim against the Defendant Hospitals under Pennsylvania law. Abbott nevertheless focuses significant attention on suspicion regarding the motives of Plaintiffs' counsel. Relying on caselaw from another circuit, Abbott contends that Plaintiffs' "intentions and the history of the litigation are also 'certainly relevant' to assessing fraudulent joinder." (Def.'s Opp. at 8 (quoting *In re Zoloft Prods. Liab. Litig.*, 257 F. Supp. 3d 717, 721 (E.D. Pa. 2017)).) But Abbott identifies no Seventh Circuit precedent recognizing the significance of such evidence of intent, and this court has found no such authority. Rather, several courts in this district have concluded that the dispositive question is the legal viability of the plaintiff's claim, without reference to subjective intent. *See Ali v. Volkswagen Grp. of Am., Inc.*, No. 19 C 06148, 2020 WL 5250669, at *3 (N.D. Ill. Sept. 3, 2020) ("[A] viable claim obviates the need to inquire further into motive, because a court cannot conclude as a matter of law that the motive for joinder is solely to destroy diversity."); *Schumacher v. Sterigenics U.S., LLC*, 394 F. Supp. 3d 837, 847 n.4 (N.D. Ill. 2019) ("Defendants incorrectly state that the court should scrutinize Plaintiff's motives for joining the non-diverse defendants . . . .").

The court is uncertain, in any event, that Abbott's proffered evidence in fact "demonstrate[s] that Plaintiffs have no intention to pursue their claims against" the Defendant Hospitals. *In re Zoloft*, 257 F. Supp. 3d at 720. Abbott primarily points to Plaintiffs' counsel's other NEC lawsuits, filed in Illinois and Missouri.[4] The majority of these (61 lawsuits, representing 378 infants) were filed in Illinois, where (because Abbott is a citizen of Illinois) the forum-defendant rule precludes removal. (Brecht Decl., Ex. 1 to Def.'s Opp. [115-1] (hereinafter "Brecht Decl."), ¶ 2). Abbott points out that Plaintiffs' counsel named no in-state defendants in these Illinois lawsuits, even though several were brought on behalf of Pennsylvania infants, and two of those infants allegedly received treatment at Pennsylvania hospitals named as defendants in these Pennsylvania cases. (Brecht Decl. ¶¶ 4–5.) Those circumstances do suggest that Plaintiffs joined Defendant Hospitals to keep their cases in state court—but doing so is entirely permissible, so long as Plaintiffs pursue viable claims against the Hospitals. *See Garbie v. DaimlerChrysler Corp.*, 211 F.3d 407, 410 (7th Cir. 2000) ("[P]laintiffs as masters of the complaint may include (or omit) claims or parties in order to determine the forum."). Unlike the situation presented by *In re Zoloft*, on which Abbott relies, the evidence here does not shed light on whether Plaintiffs intend to prosecute their claims against the Hospitals. *See In re Zoloft*, 257 F. Supp. 3d at 720 (finding fraudulent joinder where plaintiffs made only vague allegations against the in-state defendant and counsel "ha[d] regularly failed to propound discovery on [defendant] and often ha[d] voluntarily dismissed [defendant]").

Plaintiffs' counsel's conduct in the Missouri cases (where they also did not name any in-state hospitals) is even less relevant. Two of these cases involve Illinois plaintiffs and have remained in state court, because Abbott, too, has Illinois citizenship. (Brecht Decl. ¶ 6.) The

---

[4] Abbott also notes that in other MDLs involving Plaintiffs' attorneys, courts have denied motions to remand, finding that local entities were fraudulently joined. (*See* Def.'s Opp. at 15 (citing *In re Zoloft*, 257 F. Supp. 3d at 721; and *In re Zantac (Ranitidine) Prods. Liab. Litig.*, No. 20-MD-2924, 2022 WL 708589, at *6 (S.D. Fla. Jan. 28, 2022)).) Whatever the merits of counsel's conduct in unrelated litigation, this court narrows its focus to the circumstances in the cases before it.

others (Abbott does not clarify how many) were removed to federal court, where Plaintiffs' counsel took voluntary dismissals in two cases and have not to date refiled those two lawsuits. (*Id.* ¶¶ 6, 8.) For now, that conduct suggests only that Plaintiffs' counsel may not intend to proceed with cases removed to federal court—not that they will decline to pursue their claims against the Defendant Hospitals in state court.[5]

Abbott's strongest argument is that Plaintiffs have failed to file a "certificate of merit," which is a substantive state law requirement for professional negligence claims in Pennsylvania. *See* PA. R. CIV. P. 1042.3*; Liggon-Redding v. Est. of Sugarman*, 659 F.3d 258, 265 (3d Cir. 2011). If the defendant follows certain procedural steps, the lack of a timely certificate of merit requires automatic dismissal. *See* PA. R. CIV. P. 1042.6(a), 1042.7(a); *Keel-Johnson v. Amsbaugh*, No. 1:07-CV-200, 2009 WL 648970, at *3–4 (M.D. Pa. Mar. 10, 2009). Abbott characterizes Plaintiffs' failure to file these certificates as additional evidence of their non-intent to pursue claims against the Defendant Hospitals. (Def.'s Opp. at 15.) But the proper question is not whether this failure sheds light on Plaintiffs' intent, but whether it legally dooms Plaintiffs' claims. This is a question of substantive state law, more fully addressed below.

### C. Application to the Forum-Defendant Rule

Before turning to Pennsylvania state law, the court addresses one last aspect of the Seventh Circuit's fraudulent joinder jurisprudence. In a small number of cases with pending remand motions, Plaintiffs are not citizens of Pennsylvania (where Defendant Hospitals are citizens) or of Delaware, Indiana, and Illinois (where Defendant Manufacturers are allegedly citizens).[6] In these cases, there is complete diversity, meaning that the statutory requirements

---

[5] The court observes that any inference that might be drawn from these voluntary dismissals is far from conclusive. Abbott has not provided information on how many removed Missouri cases *remain* in federal court. It appears, further, that Plaintiffs' counsel also voluntarily dismissed 19 other cases, at least eight of which were pending in Illinois state court. (*See* Brecht Decl. ¶ 8.)

[6] These cases are listed in footnote 1 above.

for diversity jurisdiction are met, but the presence of an in-state defendant nonetheless triggers the forum-defendant rule and precludes removal. *See* 28 U.S.C. § 1441(b)(2). According to Plaintiffs, the fraudulent joinder doctrine is relevant only where joinder of an in-state defendant destroys complete diversity—and that doctrine has no purchase in situations where joinder of an in-state defendant triggers the forum-defendant rule. (*See* Carter Mot. to Remand at 5–6.)

The court does not draw a bright line between joinder to defeat diversity, on the one hand, and joinder to trigger the forum-defendant rule, on the other. In the case Plaintiffs rely on in support of the purported distinction, *Morris v. Nuzzo*, 718 F.3d 660 (7th Cir. 2013), the Seventh Circuit grappled with—but did not decide—this issue. The Seventh Circuit noted that the fraudulent joinder doctrine is designed to strike a balance between competing policy interests: the plaintiff's right to select the forum, versus the defendant's statutory right of removal and guarding against abusive pleading practices. *Id.* at 668. But the court left for another day the "very close question" of whether the fraudulent joinder doctrine also applied to the forum-defendant rule, noting its reluctance to decide the issue without "a more thorough and more able presentation of the relevant balance of interests." *Id.* at 670–71. Because the *Morris* plaintiff had a viable claim against the forum-state defendant under state law, the Seventh Circuit assumed without deciding that the doctrine applied and remanded the case to state court. *See id.* at 670, 674–75.

This court does not read the *Morris* decision as precluding application of the fraudulent joinder doctrine. The forum-defendant rule, as codified in the removal statute, provides that a diversity action "may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of [the forum state]." 28 U.S.C. § 1441(b)(2). As the court previously explained, this "properly joined and served" language "was intended to prevent gamesmanship by plaintiffs, who would name (but never plan on joining or serving) a strawman in-state defendant to defeat complete diversity." *In re Abbott Lab'ys, et al., Preterm Infant Nutrition Prods. Liab. Litig.*, No. 22 C 192, 2022 WL 2257182, at *3 (N.D. Ill. June 23, 2022) (collecting authority). In other cases in this MDL, Abbott has attempted to use so-called "snap removal"—that is, removing

11

a case to federal court before plaintiffs effectuated service on the forum-state defendant, and then arguing that there was no "properly joined and served" forum-defendant to trigger the forum-defendant rule.  *See id.* at 1–2.  Uncomfortable with such defendant-side gamesmanship, this court concluded that the "properly joined and served" language "permits removal only where the plaintiff has fraudulently joined and improperly delayed service on a home-state defendant."  *Id.* at *9.  The natural corollary to this conclusion is that plaintiff-side gamesmanship is also prohibited, as "a fraudulently joined forum defendant is an improperly joined defendant."  *Bahalim v. Ferring Pharms., Inc.*, No. 16 C 8335, 2017 WL 118418, at *3 (N.D. Ill. Jan. 12, 2017) (St. Eve, J.).  In other words, where an in-state defendant is fraudulently joined, the forum-defendant rule does not impede an out-of-state defendant's statutory right of removal.  *See id.* at *3–4 (considering the *Morris* factors and applying the fraudulent joinder doctrine).

Significantly, however, Abbott has not responded to this argument in their opposition briefing.[7]  (*See* Non-Pa. Pls.' Reply at 2–3.)  And, as the court will discuss below, further briefing may be necessary to determine whether Plaintiffs have a viable claim against any Defendant Hospitals.  If it so chooses, Abbott may respond to this argument in the supplemental briefing.

---

[7]     Plaintiffs also contend that courts in this circuit have found fraudulent joinder defeats the forum-defendant rule only where "additional factors" counsel this conclusion.  (*See* Carter Mot. to Remand at 6 n.2.)  But only one of their cited cases suggest this.  *Antcliff v. Custom Blending & Packaging of St. Louis, LLC*, No. 18-CV-1776-NJR-GCS, 2019 WL 276156, at *3 (S.D. Ill. Jan. 22, 2019) ("Because there are no more additional factors here than before the Seventh Circuit in *Morris*, this Court also finds it appropriate to refrain from expanding the fraudulent joinder doctrine.").  The court respectfully disagrees that *Morris* imposes any additional-factors requirement, as the Seventh Circuit only determined that the court "required a 'better understanding' of the need to expand the fraudulent joinder doctrine before rendering a decision on the matter." *Id.* at *3 (quoting *Morris*, 718 F.3d at 670).  The other cases cited by Plaintiffs are readily distinguishable.  In those cases, the court noted that "[n]othing in the record before the Court indicates that [plaintiff] joined [the in-state defendant] in this action in order to prevent removal to federal court or to otherwise engage in abusive pleading practices," and concluded that even if the doctrine applied, the defendant had not established fraudulent joinder.  *Pauley v. Aspide Med.*, No. 18 C 4178, 2018 WL 11195081, at *3 (N.D. Ill. Aug. 29, 2018); *Bennington v. Aspide Med.*, No. 18 C 4964, 2018 WL 11199013, at *3 (N.D. Ill. Oct. 26, 2018).

## II.     Pennsylvania State Law

Plaintiffs bring two Pennsylvania state-law claims against the Defendant Hospitals: a claim of negligent failure to warn and a claim of negligent corporate liability.  The court is inclined to rule that at least this latter claim has some "reasonable possibility" of success, which would mean that Abbott has not established fraudulent joinder and the cases must be remanded.  *See Poulos,* 959 F.2d at 73.  However, it does not appear that Plaintiffs have complied with Pennsylvania's substantive requirement that they file a certificate of merit, which—at least in some circumstances—requires dismissal of their claims against the Hospitals.  The court considers both of these issues below.

### A.     Claims Against the Hospitals

Pennsylvania follows the doctrine of "corporate negligence," which holds that corporations—including hospitals—may be held directly liable for negligence.  *See Welsh v. Bulger*, 548 Pa. 504, 512, 698 A.2d 581, 585 (1997).  Under this doctrine, a hospital has a nondelegable duty "to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital."  *Thompson v. Nason Hosp.*, 527 Pa. 330, 339, 591 A.2d 703, 707 (1991).  In *Thompson*, the Pennsylvania Supreme Court identified four duties encompassed in this standard of care: "to use reasonable care in the maintenance of safe and adequate facilities and equipment," "to select and retain only competent physicians," "to oversee all persons who practice medicine within its walls as to patient care," and "to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients."  *Id.* 527 Pa. at 339–40, 591 A.2d at 707.  To establish corporate negligence, the plaintiff must show that the hospital "deviated from the standard of care" (that is, breached a duty to its patients), "had actual or constructive notice of the defects or procedures that created the harm," and performed an act or omission that "was a substantial factor in bringing about the harm."  *Kennedy v. Butler Mem'l Hosp.*, 2006 PA Super 138, ¶ 10, 901 A.2d 1042, 1045.

Abbott argues that Plaintiffs' two claims (failure to warn and corporate negligence) are not adequate because Plaintiffs have not alleged that the Hospitals breached any of the four duties identified in *Thompson*.  In making this argument, Abbott primarily contends that, no matter how the claims are characterized, both attempt to hold Defendant Hospitals liable for failing to obtain informed consent, which is not a basis for hospital liability under Pennsylvania law.  (Parker Notice of Removal ¶ 42); *see Gentzler v. Atlee*, 443 Pa. Super. 128, 136, 660 A.2d 1378, 1382 (1995) ("In Pennsylvania, only surgeons who actually perform the operative procedures have the duty to warn patients of risks and thus obtain informed consent."); *Tucker v. Cmty. Med. Ctr.*, 2003 PA Super 356, ¶ 16, 833 A.2d 217, 225 ("Pennsylvania law forbids a claim of corporate negligence against a hospital to be founded upon a theory that the hospital failed to ensure the patient's informed consent.").  The negligent failure-to-warn claim, Abbott asserts, simply "amounts to a claim for failure to obtain informed consent."  (Def.'s Opp. at 9); *cf. Gentzler*, 443 Pa. Super. at 136 n.7, 660 A.2d at 1382 n.7 ("In determining whether a patient's consent is 'informed,' the standard is whether the physician disclosed [certain] facts, risks and alternatives . . . .").

According to Abbott, the corporate negligence claim similarly rests on failure-to-warn allegations and therefore also attempts to impose a duty to obtain informed consent on the Hospitals.  (Parker Notice of Removal ¶¶ 44–45.)  Thus, Abbott asserts, the corporate negligence claim invokes two of the duties identified in *Thompson* (overseeing doctors within the hospital and adopting adequate rules and policies), but does so by alleging that Defendant Hospitals failed to oversee doctors in their responsibility to warn patients and failed to implement policies about warning of the risks of Defendant Manufacturers' products.  (*See, e.g.*, Parker Compl. ¶¶ 130(b)–(d), (f); 137(b)–(c), (e), (g).) Such allegations, Abbott contends, do not state a claim against the Hospitals under Pennsylvania law.  *See Kelly v. Methodist Hosp.*, 444 Pa. Super. 427, 432, 664 A.2d 148, 150 (1995) (allegations that the hospital negligently failed to "set forth the . . . information that should be disclosed" and to "ensure" its physicians fully explained potential risks "clearly attempt to impose upon a hospital duties which are every bit as extensive as the duty to

14

obtain informed consent," which is not "a viable cause of action in Pennsylvania"). *But see Corrigan v. Methodist Hosp.*, 158 F.R.D. 70, 73 (E.D. Pa. 1994) ("a hospital cannot be sued for corporate negligence for failure to seek informed consent," but can be sued "for negligently failing to oversee its doctors and failing to 'formulate, adopt and enforce adequate rules and policies,' which may include policies governing obtaining informed consent" (quoting *Thompson,* 527 Pa. at 339, 591 A.2d at 707)).

The Defendant Hospitals thus cannot be held liable under the informed consent argument, Abbott contends; nor can they be sued for failure to warn under traditional products liability principles. In that regard, Abbott points out that "[i]n general, a defendant must be identified as the manufacturer, distributor, or seller of the offending product before the injuries suffered by the plaintiff may be found to be proximately caused by some negligent act or omission of the defendant." *Mellon v. Barre-Nat'l Drug Co.*, 431 Pa. Super. 175, 184, 636 A.2d 187, 191 (1993). Plaintiffs point to no case holding that a hospital is a supplier of products used during medical treatment. (Def.'s Opp. at 12); *see Cafazzo v. Cent. Med. Health Servs., Inc.*, 542 Pa. 526, 534, 668 A.2d 521, 525 (1995) (holding that, for purposes of strict liability, the hospital was not a seller, supplier, provider, or distributor of a defective product incidental to the provision of medical services).

For now, however, the court need not determine conclusively whether Plaintiffs can proceed against Defendant Hospitals on a failure-to-warn theory, as Plaintiffs have also offered a different theory of negligence: that Defendant Hospitals' conduct relating to the use of cow's-milk-based products for feeding premature babies was itself negligent. According to the complaints, there was at relevant times a "scientific consensus" that cow's-milk-based products "present[ed] a dire threat" to preterm infants, and Defendant Hospitals were aware of the "significantly increased risk of NEC and death" for premature infants fed these products. (Parker Compl. ¶¶ 28, 55.) Defendant Hospitals had a "range of options" to feed premature babies with "exclusively human milk-based nutrition" (such as an established breast milk donor network and shelf-stable

formula derived from pasteurized breast milk), and, according to Plaintiffs, other hospitals in fact provided "other safer forms of nutrition, such as donor breast milk." (*Id.* ¶¶ 23, 56.)

Despite knowing of the risks of cow's-milk-based products and having access to safer alternatives, Plaintiffs allege, Defendant Hospitals lacked adequate policies on supplying "products that were free of unreasonable risk of harm," "restrict[ing] the use of cow's[-]milk-based products for feeding premature babies," and "establish[ing] a donor milk program that was sufficient to meet the needs of the premature babies." (*Id.* ¶¶ 124; 130(a), (h).) Additionally, Plaintiffs assert, the Hospitals failed to oversee medical professionals on their use of these products for feeding premature babies and failed to oversee these professionals "to restrict their feeding" of the products to premature babies. (*Id.* ¶¶ 137(a), (d).) The court cannot say, without expert testimony, whether this alleged conduct did or did not deviate from the applicable standard of care. *See Welsh*, 548 Pa. at 514, 698 A.2d at 585 ("[U]nless a hospital's negligence is obvious, a plaintiff must produce expert testimony to establish that the hospital deviated from an accepted standard of care and that the deviation was a substantial factor in causing the harm to the plaintiff.").

The court concludes that Abbott has not met its heavy burden of establishing there is no reasonable possibility of success for Plaintiffs' claim that Defendant Hospitals should have implemented policies or oversight to restrict the use of cow's-milk-based products for premature babies. Beyond arguing that Plaintiffs have not established that the Hospitals breached a duty to obtain informed consent, Abbott makes a handful of other arguments against the corporate negligence claim, but none are persuasive. Abbott first contends that Plaintiffs attempt to hold the Hospitals liable "simply because they allowed Abbott sales representatives on the premises." (Def.'s Opp. at 12–13.) But Plaintiffs' allegations say more than that; they also plausibly suggest that Defendant Hospitals did not restrict the use of cow's-milk-based products for feeding premature infants, despite knowing of the risks of NEC, because Abbott and Mead provided the products for free or low cost, in exchange for sales representatives' access to hospital

professionals. (*See* Parker Compl. ¶ 57; *see also id.* ¶ 28 (asserting that Defendant Manufacturers "incentivize" hospitals—who know about the risks of the products—to use them anyway, by providing them "for free or at a significant discount").) Abbott next asserts that Plaintiffs "fail to point to any inadequacies in the hospitals' policies, protocols, practices, or oversight, much less do they connect those alleged inadequacies to what happened with these particular infants." (Def.'s Opp. at 13.) As discussed above, however, Plaintiff may be able to prove that Defendant Hospitals deviated from the standard of care by failing to restrict the use of Defendant Manufacturers' products for feeding premature infants.

Finally, Abbott notes the paucity of Pennsylvania caselaw supporting Plaintiffs' specific corporate negligence claim. The court agrees that Plaintiffs have provided minimal helpful authority, but it is Abbott who bears the burden of establishing fraudulent joinder, not Plaintiffs. And Abbott has not cited to a single Pennsylvania case rejecting a corporate negligence claim on facts similar to Plaintiffs'. Instead, Abbott attempts to distinguish *Welsh*, 696 A.2d 581—the primary case relied upon by Plaintiffs (*see* Parker Mot. to Remand at 8)—as resting on "specific facts." (Def.'s Opp. at 13.) But as this court reads *Welsh*, it suggests that Pennsylvania law imposes fairly expansive liability on hospitals, so long as expert testimony establishes a deviation from the standard of care or the negligence is obvious. *See Welsh*, 548 Pa. at 514, 696 A.2d at 585. In that case, the plaintiff's child died from injuries inflicted during delivery. Her expert opined "that the fetal monitoring readout evidenced a need for a surgical delivery," and so the "nurses must have known what was going on," but failed to act. *Id.* at 510–11. The expert also opined that if a cesarean section had been performed, the child would have survived; but the delivering doctor was not qualified to perform this surgery. *Id.* The Pennsylvania Supreme Court concluded that, based on the expert's opinion that this breached the standard of care, plaintiff's corporate negligence claim against the hospital survived summary judgment. *See id.* at 515. Here, too, Plaintiffs may be able to offer expert testimony that Defendant Hospitals breached the applicable standard of care by not implementing policies or oversight restricting the feeding of cow's-milk-

based products to premature infants. The court cannot say Plaintiffs have no chance of success on this claim.

### B. Certificate of Merit

Although the court has concluded that Plaintiffs' claim against the Hospitals survives the fraudulent joinder scrutiny, one issue—not well briefed by either side—gives this court pause. Under Pennsylvania law, a plaintiff must file a "certificate of merit" within 60 days of filing any action "based upon an allegation that a licensed professional deviated from an acceptable professional standard." PA. R. CIV. P. 1042.3(a). In this certificate, an appropriate licensed professional must attest that there is a reasonable probability that defendant's conduct fell outside acceptable professional standards and was a cause of the harm, or that no expert testimony is needed. *Id.* 1042.3(a)(1), (3). This certificate requirement is a substantive rule of state law that applies in federal court. *See Liggon-Redding*, 659 F.3d at 264–65.

The failure to file a timely certificate of merit typically requires dismissal—but only if the defendant has taken certain steps.[8] *See Moore v. John A. Luchsinger, P.C.,* 2004 PA Super 432, ¶ 6, 862 A.2d 631, 633 (the certificate of merit requirement is not "self-enforcing"). The defendant must give notice of his intention to seek dismissal and then, after waiting at least 30 days, file a dispositive motion.[9] *See* PA. R. CIV. P. 1042.7(a)(3)–(4); *see also Liggon-Redding*, 659 F.3d at

---

[8] Pennsylvania Rule of Civil Procedure 1042.7(a) provides that, if the statutory requirements are met, "[t]he prothonotary, on praecipe of the defendant, shall enter a judgment of non pros against the plaintiff for failure to file a certificate of merit within the required time." But "there is no mechanism for automatic dismissal by praecipe in federal court." *Keel-Johnson*, 2009 WL 648970, at *3. Most federal courts to consider the issue have held that a defendant seeking an entry of judgment on this basis must file motion with the court, typically a motion to dismiss. *See id.*; *Alsop v. Fed. Bureau of Prisons*, No. 3:17-CV-02307, 2019 WL 6049248, at *2 (M.D. Pa. Nov. 14, 2019).

[9] This notice requirement does not apply if the plaintiff had unsuccessfully requested an extension of the filing deadline, or if the court-extended deadline passed. *See* PA. R. CIV. P. 1042.6(b). The court may extend the original 60-day deadline for successive periods of up to 60 days, with no limit on the number of extensions; a motion to extend must be filed within 30 days of the defendant's notice or the expiration of any previously granted extension. *See id.* 1042.3(d)

260 n.2 ("a plaintiff may file an untimely certificate of merit as long as she does so before the defendant files a praecipe for non pros"); *Schmigel v. Uchal*, 800 F.3d 113, 124 (3d Cir. 2015) (the 30-day notice requirement is a substantive rule that applies in federal court). Additionally, after the defendant gives notice and at any time before the case is terminated, "a plaintiff may file a motion seeking a determination by the court as to the necessity of filing a certificate of merit."[10] *See* PA. R. CIV. P. 1042.6(c) & note. This motion tolls the original filing deadline and, while it is pending, the case cannot be terminated. *Id.* 1042.6(c), 1042.7(a)(1). Then, if the court determines a certificate is required, the plaintiff must file the certificate "within twenty days of entry of the court order on the docket or the original time period, whichever is later." *Id.* 1042.6(c).

The parties have provided limited information about Plaintiffs' compliance with Pennsylvania's certificate requirement, or whether that requirement requires dismissal of their claims against Defendant Hospitals. Rather, both parties appear to view the matters as relevant evidence concerning Plaintiffs' intent, rather than a requirement of substantive Pennsylvania law—meaning neither party has provided the court with the nitty-gritty details necessary to determine whether Plaintiffs or any Defendant have complied with the statutory prerequisites.

---

& note. While a timely motion to extend is pending, the case may not be terminated. *See id.* 1042.7(a)(1)

[10]     It appears that in this motion for determination, a plaintiff can argue that the certificate of merit requirement does not apply to her case as a threshold matter, because (for instance) she "is not bringing a state law medical negligence claim." *Dunlap v. Smith*, No. 3:CV-14-1478, 2015 WL 3488246, at *2 (M.D. Pa. June 2, 2015). Plaintiffs hint at this type of argument, with a cursory suggestion that the certificate requirement does not apply to either of the claims brought against the Hospitals. (*See* Pls.' Reply at 7.) But a certificate of merit "is required as to corporate negligence claims that are premised on allegations that a hospital's actions fell below the applicable medical or professional standard, *i.e.,* where the claim is predicated upon facts constituting medical treatment." *See Stroud v. Abington Mem'l Hosp.*, 546 F. Supp. 2d 238, 248 (E.D. Pa. 2008) (collecting cases). This clearly encompasses Plaintiffs' corporate negligence claim. Assuming Plaintiffs' failure-to-warn claim has merit, the court notes that the certificate requirement "appl[ies] to a claim for lack of informed consent." *See* PA. R. CIV. P. 1042.3(a) & note. To the extent Plaintiffs believe the certificate requirement does not in fact apply to their claims, they are free to address this in supplemental briefing.

19

Specifically, neither party has clarified whether Plaintiffs have missed the 60-day deadline to file their certificates, or whether they moved to extend this deadline. Plaintiffs merely contend that Abbott "removed these cases from state court prior to any purported deadline, and then successfully sought a stay." (Pls.' Reply at 7.) But the cases were only stayed pending a decision by the Judicial Panel on Multidistrict Litigation concerning consolidation, and the Panel has since consolidated the cases before this court. So even if removal or the pending consolidation decision stayed Plaintiffs' deadline, more than 60 days have passed since Abbott noted the issue in their remand briefing, yet to this date, it appears Plaintiffs have not cured the deficiency. Nor does it appear that the removal excuses Plaintiffs' apparent untimeliness for any other reason. "Under Pennsylvania law, a court may consider two equitable exceptions when a plaintiff has improperly filed a [certificate of merit]"—substantial compliance and "reasonable explanation or legitimate excuse for failure to comply." *Ramos v. Quien*, 631 F. Supp. 2d 601, 611 (E.D. Pa. 2008). Neither of these exceptions appears relevant here, as Plaintiffs have not yet filed certificates of merit, even after Abbott flagged the issue. *Cf. Papurt v. Northampton Cnty. Dep't of Corr.*, No. CV 15-2523, 2016 WL 354883, at *3 (E.D. Pa. Jan. 27, 2016) (plaintiff's counsel "attribute[d] his failure to an oversight because the action was removed to federal court" and the certificate was attached to plaintiff's response brief).

Plaintiffs' failure to file the required certificates appears, thus, to be both untimely and unexcused. Yet it is not clear to the court that this deficiency requires automatic dismissal. As noted above, Pennsylvania law directs the defendant to comply with the 30-day notice requirement and file a dispositive motion. Abbott has shed no light on whether the Defendant Hospitals took those steps. From the court's own research, it appears that, at least in some cases, Defendant Hospitals filed notices of intent in state court, but had not yet sought dismissal when Abbott removed to federal court. (*See, e.g.*, State Court Docket in *Parker v. Mead Johnson & Co.*, Ex. 6 to Abbott's Notice of Removal [1-6] in No. 1:22-cv-02760, at 6.) It is not clear to this court whether any Defendant intends to seek dismissal based on the certificate of merit issue, or

whether Plaintiffs intend to file a motion seeking clarification on the necessity of a certificate of merit; such a motion would, as the court reads the rules, extend the filing deadline to 20 days after the court's determination. *See* PA. R. CIV. P. 1042.6(c) & note. Additionally complicating this situation is that dismissal for failure to file a timely certificate is ordinarily without prejudice. *See Alsop*, 2019 WL 6049248, at *2. Neither party provides insight into whether dismissal without prejudice would by itself confirm a finding of fraudulent joinder, as there may be a reasonable possibility of success if Plaintiffs intend to refile their cases.

All this to say that the possibility of a without-prejudice dismissal of claims against the Hospitals—contingent on several unknown facts—would not by itself satisfy the court that Plaintiffs' naming them as Defendants constitutes fraudulent joinder. The court might therefore conclude that Abbott has not met its burden, and then grant the remand motions. The court declines to take that step at this stage. Plaintiffs' apparent disregard of the certificate of merit requirement is troubling, as that requirement is imposed "to identify and weed non-meritorious malpractice claims from the judicial system efficiently and promptly." *Womer v. Hilliker*, 589 Pa. 256, 266, 908 A.2d 269, 275 (2006). Rather than assure this court of their intention to file the requisite certificates, Plaintiffs claim that it can be addressed "after remand" and "with the appropriate state court." (Pls.' Reply at 7.) But remanding the case to state court—where the result might well be immediate dismissal of the claims against Defendant Hospitals—exemplifies the reasons for the fraudulent joinder doctrine. The court has already disapproved of defendant-side gamesmanship to keep cases in this MDL, *see In re Abbott*, 2022 WL 2257182, at *11, and will not countenance plaintiff-side gamesmanship to keep cases *out* of this MDL, to the extent such gamesmanship exists here.

For these reasons, the court will invite supplemental briefing. If the parties wish to provide further information on this certificate of merit issue and the application of the fraudulent joinder doctrine to the forum-defendant rule, they may do so by the following deadlines: Defendant Abbott may file supplemental briefing by August 29, 2022, and Plaintiffs may file a response by

21

September 6, 2022.  Any supplemental briefing must be limited to the two issues identified; the court will not consider any other arguments. In submitting supplemental briefing, the parties are reminded that the court "may consider evidence outside the pleadings when analyzing fraudulent joinder," though "it must be careful not to pre-try the case."  *Andersen v. Phillip Morris USA Inc.*, No. 19 C 5812, 2020 WL 433867, at *4 (N.D. Ill. Jan. 28, 2020) (quotation marks and citation omitted); *see Dillon v. Naman, Howell, Smith & Lee, PLLC*, No. 18-CV-00470, 2018 WL 2933602, at *4 (N.D. Ill. June 12, 2018) (a court should disregard affidavits that "deny[] the plaintiff's allegations or otherwise address[] the merits of the case").  Affidavits concerning the parties' plans for filing (or not filing) a certificate of merit would be helpful to this court's analysis.

## CONCLUSION

For the reasons discussed above, the court declines to rule on Plaintiffs' remand motions in the Pennsylvania cases, pending the parties' supplemental briefing.  The court will also rule on Plaintiffs' request for an award of fees and costs at that time.  *See* 28 U.S.C. § 1447(c) ("An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal.")

ENTER:

Date:  August 22, 2022

_____

REBECCA R. PALLMEYER
United States District Judge

22