UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: ABBOTT LABORATORIES, ET AL. PRETERM INFANT NUTRITION PRODUCTS LIABILITY LITIGATION | MDL No. 3026 |
| | Master Docket No. 22 C 71 |
| This Document Relates to: | |
| KEOSHA DIGGS, *individually and as parent and general guardian of* K.B*., a minor*, | |
| Plaintiff, | |
| v. | No. 22 C 5356 |
| ABBOTT LABORATORIES, ET AL., | Judge Rebecca R. Pallmeyer |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

In dozens of cases, parents of premature infants have alleged that infant formula manufactured by Defendant Manufacturers—Abbott Laboratories and Abbott Laboratories, Inc. (collectively, "Abbott") and Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, "Mead Johnson")—caused premature infants to develop necrotizing enterocolitis ("NEC"). The Judicial Panel on Multidistrict Litigation has consolidated a number of these cases for pretrial proceedings before this court. In this opinion, the court addresses Abbott's motion to dismiss portions of Plaintiff's Amended Complaint. For the reasons discussed below, Defendants' motion to dismiss Plaintiff's prayer for punitive damages [30] is denied. Defendants' earlier motion to dismiss [21] is terminated as moot.

**BACKGROUND**

Plaintiff Keosha Diggs is one of many parents of premature infants who allege that their babies developed NEC as a result of consuming infant formula and fortifier products manufactured by Abbott. Plaintiff is the mother of K.B., who was born premature in 2015. (First Amended Compl. ("Am. Compl.") [29] ¶¶ 1–2.) Plaintiff alleges that soon after K.B.'s birth,

University of Maryland Medical Center staff fed him Abbott's preterm infant nutritional products, including Similac Special Care and Similac and/or Enfamil Human Milk Fortifier. (*Id.* ¶¶ 2, 80.) Shortly after being fed the products, K.B. developed NEC, and he continues to suffer from severe complications and injuries as a result. (*Id.* ¶¶ 81–83.)

On September 15, 2022, Plaintiff, a citizen and domiciliary of Maryland (*id.* ¶ 1), brought this case against Abbott, a citizen and domiciliary of Illinois[1] (*id.* ¶¶ 3–4), in the United States District Court for the District of Maryland under that court's diversity jurisdiction. A few weeks later, the United States Judicial Panel on Multidistrict Litigation transferred the case to this court [12]. On January 31, 2023, Abbott moved to dismiss Plaintiff's negligent misrepresentation claim and request for punitive damages [21]. On February 28, 2023, Plaintiff filed a First Amended Complaint [29], from which she removed the negligent misrepresentation claim—thus mooting that portion of Abbott's motion—but retained her request for punitive damages, along with strict products liability and negligence claims. (*Id.* ¶¶ 86–141.) Abbott now moves to dismiss Plaintiff's punitive damages allegations, arguing that she has failed to state a claim that supports such an award under Maryland law [30].

Relevant to her punitive damages request, Plaintiff alleges that Abbott knew its cow's-milk-based preterm infant nutritional products caused NEC. (*Id.* ¶ 135.) Specifically, Plaintiff contends, Abbott knew or should have known about a number of scientific studies published between 1990 and 2015, which show that preterm infants who are fed cow's-milk-based products face increased risks of NEC as compared with infants who are fed human milk. (*See id.* ¶¶ 22–30). Plaintiff also alleges that, as a manufacturer of cow's-milk-based formula and fortifier, Abbott had a duty to "keep abreast of scientific knowledge" regarding the link between its products and increased risks of NEC. (*See id.* ¶¶ 126–27.)

---

[1] Both Abbott Laboratories and Abbott Laboratories, Inc. are citizens and domiciliaries or Illinois. Abbott Laboratories, Inc. is additionally a resident, citizen, and domiciliary of Delaware. (Am. Compl. ¶ 4.)

Plaintiff further alleges that "[d]espite knowledge that their Cow's Milk Products significantly increased the risk of NEC and death when used by premature infants, Defendants deliberately disregarded the devastating and foreseeable harm resulting from use of their products by premature babies and continued to promote their products for use by that vulnerable group." (*Id.* ¶ 136.) Plaintiff outlines several steps Abbott allegedly took to promote the use of its preterm infant nutritional products despite these known risks. (*Id.* ¶¶ 137(a)–(g), 140–41.)

## DISCUSSION

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. To survive such a motion, a complaint must state a claim for relief in accordance with Federal Rule of Civil Procedure 8(a). Together the rules demand more than "naked assertions devoid of further factual enhancement." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 740 (7th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[T]hreadbare recitals of a cause of action's elements, supported by mere conclusory statements," do not suffice. *Iqbal*, 556 U.S. at 663. To support a request for punitive damages, a plaintiff must plead facts that "plausibly give rise to a viable claim for punitive damages." *Smith v. I-Flow Corp.*, 753 F. Supp. 2d 744, 750 (N.D. Ill. 2010).

Because this case originated in Maryland, that state's choice-of-law rules apply. *See Chang v. Baxter Healthcare Corp.*, 599 F.3d 728, 732 (7th Cir. 2010) ("When a diversity case is transferred by the multidistrict litigation panel, the law applied is that of the jurisdiction from which the case was transferred.") Maryland applies the law of the state where the injury—the last event required to constitute the tort—occurred. *Lab'y Corp. of Am. v. Hood*, 395 Md. 608, 615, 911 A.2d 841, 845 (Md. 2006). In this case, Maryland law applies because Plaintiff alleges her child was born and suffered injuries in Baltimore. (Am. Compl. ¶¶ 1, 79–81.)

In determining whether Plaintiff's allegations support a punitive damages award, the court therefore looks to Maryland law. Under Maryland law, such an award is "reserved typically for punishing the most heinous of intentional torts and tortfeasors . . . whose conduct is characterized

3

by evil motive, intent to injure, or fraud." *Beall v. Holloway-Johnson*, 446 Md. 48, 71–72, 130 A.3d 406, 419–20 (Md. 2016) (quoting *Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 454, 601 A.2d 633, 650 (Md. 1992)). In *Zenobia*—which both parties recognize as the lead case for assessing punitive damages for products liability claims—Maryland's highest court recognized an inherent difficulty in translating the definition of "actual malice" to products liability cases: "it is not likely that a manufacturer or supplier of a defective product would specifically intend to harm a particular consumer." *Zenobia*, 325 Md. at 461, 601 A.2d at 653; *see also ACandS, Inc. v. Godwin*, 340 Md. 334, 359, 667 A.2d 116, 128 (1995), on reconsideration (Dec. 1, 1995). To overcome this difficulty, the *Zenobia* court held that a products liability plaintiff alleging actual malice must show "(1) actual knowledge of the defect on the part of the defendant, and (2) the defendant's conscious or deliberate disregard of the foreseeable harm resulting from the defect." *Zenobia*, 325 Md. at 462, 601 A.2d at 653.

Assuming the truth of Plaintiff's allegations, as is required at this stage, her Amended Complaint meets this standard. First, the Amended Complaint sufficiently alleges actual knowledge. For example, Plaintiff alleges that "[d]espite knowledge of a causal connection between Cow's Milk Products and NEC, the manufacturers of the Cow's Milk Products, including Defendants, did nothing to change their product, packaging, guidelines, instructions, and/or warnings and continue to promote and sell the Cow's Milk Product versions." (Am. Compl. ¶ 17; *see also id.* ¶ 135.) Rather than relying on "threadbare" assertions, Plaintiff has alleged that Abbott knew or should have known that its cow's-milk-based preterm infant products increased the risk of NEC from several sources of information, including a multicenter study on 926 preterm infants in 1990 finding that NEC was 20 times more likely in premature babies fed formula alone (*id.* ¶ 22); multiple studies issued between 2010 and 2015 showing premature infants fed products containing cow's milk were significantly more likely to develop surgical NEC as compared to those given human milk (*id.* ¶¶ 23, 26, 27, 28, 29, 30); a 2011 report by the U.S. Surgeon General stating that formula feeding is associated with higher rates of NEC than the rates among non-

4

formula fed babies (*id.* ¶ 24); and a statement by the American Academy of Pediatrics recommending that premature infants be fed an exclusively human-milk diet due to the risk of NEC associated with consumption of products containing cow's milk (*id.* ¶ 25). Taking these allegations as true, the Amended Complaint plausibly pleads that Abbott knew about a causal connection between its preterm infant nutritional products and an elevated risk of NEC.

Second, the Amended Complaint alleges that Abbott consciously and deliberately disregarded the foreseeable harm that would result from the alleged increased NEC risk. Plaintiff alleges that "Defendants have specifically marketed their formulas and fortifiers as necessary to the growth and development of preterm infants, when instead, these products pose a known and substantial risk to these babies." (Am. Compl. ¶ 36; *see also id.* ¶¶ 69, 71, 137.) Plaintiff further alleges that Abbott deliberately promoted the use of its products by, for example, intentionally encouraging NICUs to use their cow's-milk-based products to feed preterm infants instead of developing a safety plan to protect preterm infants from NEC (*id.* ¶ 137(d)); "[c]laiming their products were beneficial to the growth of extremely premature infants when they knew their Cow's Milk Products were unnecessarily causing NEC and death in premature babies" (*id*. ¶ 137(e)); and promoting cow's-milk-based products despite evidence that human-milk-based products were safer because Abbott did not have human-milk-based products to sell (*id*. ¶ 137(g)).

Abbott notes Maryland's "extremely stringent standard for punitive damages," which applies with equal force in products liability suits, and argues that Plaintiff's allegations do not satisfy that standard. *Pippin v. Potomac Elec. Power Co.*, 78 F. Supp. 2d 487, 496 (D. Md. 1999). Specifically, Abbott argues that Plaintiff has not cited studies supporting the conclusion that Abbott's own products cause NEC, instead relying on studies that suggest infants who are fed solely human milk have lower rates of NEC. Those studies, Abbott contends, do not take account of the fact that medical professionals have at times judged it to be necessary to feed preterm infant formula and fortifiers when human milk sources are unavailable or inadequate to satisfy an infant's nutritional needs. (Reply in Supp. of Mot. to Dismiss ("Reply") [32] at 3.) Put differently,

5

on Abbott's reading of the legal standard, Plaintiff must cite studies that show Abbott's products cause NEC, but Plaintiff has only plausibly alleged that the use of Abbott's preterm infant products is associated with elevated risks of NEC. Abbott's arguments may well prove successful at summary judgment, but the court's task for now is to assess the facial plausibility of the complaint. In the court's view, the complaint plausibly alleges that Defendants knew of and disregarded the risks of using cow's milk in preterm infant formula.

Abbott further argues that this case mirrors *Owens-Corning Fiberglas Corp. v. Garrett*, 343 Md. 500, 551, 682 A.2d 1143, 1168 (Md. 1996), in which Maryland's highest court reversed an award of punitive damages against the defendant seller of asbestos products because the plaintiff failed to present clear and convincing evidence of actual knowledge and bad faith at trial. In *Garrett*, the court noted that "[n]o one in 1968, not even medical experts who were researching and discovering the links between asbestos and cancer, believed, or at least voiced any belief, that asbestos needed to be immediately eliminated entirely." *Id*. at 548, 682 A.2d at 1166. Abbott argues the same is true of their cow's-milk based nutritional products: Plaintiff fails to allege that scientific studies show that Abbott's products cause NEC, and medical experts support the use of Abbott's products to feed premature infants. (Reply at 3.) As Abbott sees things, Plaintiff's case fails because she failed to plead that medical experts made public statements urging immediate elimination of Abbott's products from the market. (*Id.*) As the court reads *Garrett*, however, such an allegation would be sufficient but not necessary to establish Defendants' bad faith. For example, Plaintiff could present expert testimony that Abbott's products are dangerous in a number of circumstances, and that Abbott knew about this danger and should have cautioned doctors about the use of these products. Failure to issue such warnings could establish Defendants' actual knowledge of a product defect and deliberate indifference to its risks, thus supporting Plaintiff's claim. In any event, *Garrett*, in which the plaintiffs presented their punitive damages evidence and arguments at trial, does not satisfy the court that Plaintiff's punitive damages allegations should be dismissed at the pleading stage. Again, Abbott's arguments are

better suited for summary judgment, where the parties may present evidence as to why medical experts have approved of feeding Defendants' products to preterm infants.

## **CONCLUSION**

For the reasons discussed above, Defendants' motion to dismiss [30] is denied. Defendants' prior motion to dismiss [21] is terminated as moot.

ENTER:

Dated: July 17, 2023

_____
REBECCA R. PALLMEYER