**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JACKLYN SUTTON AND JAMES SUTTON, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVES OF THE ESTATE OF A.S., A MINOR, DECEASED** | § § § § § | |
| *Plaintiffs,* | § | **CIVIL ACTION NO. _____** |
| | § | |
| **v.** | § | |
| | § | |
| **MEAD JOHNSON NUTRITION COMPANY, MEAD JOHNSON & COMPANY, LLC, ABBOTT LABORATORIES, INC. AND ABBOTT LABORATORIES D/B/A ABBOTT NUTRITION** | § § § § § § | |
| *Defendants.* | § | **JURY TRIAL DEMANDED** |

<u>**PLAINTIFFS' ORIGINAL COMPLAINT**</u>

NOW COME Plaintiffs, James Sutton and Jacklyn Sutton, Individually and as Personal Representatives of the Estate of A.S., a Minor, Deceased, complaining of Defendants Mead Johnson Nutrition Company, Mead Johnson & Company, LLC, Abbott Laboratories, Inc. and Abbott Laboratories d/b/a Abbott Nutrition, and for causes of action would respectfully show as follows:

## I. PARTIES

1. Plaintiffs James Sutton and Jacklyn Sutton ("Plaintiff Parents") are natural persons and residents of San Antonio, Bexar County, Texas, and are the biological mother and father of A.S., a Minor, Deceased.

2. Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware, with its principal place of business located at 2400 W. Lloyd Expwy., Evansville, Indiana 47721. Defendant Mead Johnson & Company, LLC, is a limited

liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company. Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name. Mead has agreed to waiver formal service of summons pursuant to Rule 4 of the Federal Rules of Civil Procedure. Service of Defendant shall be deemed complete upon providing copies of the Complaint, Summons, Civil Cover Sheet and CMO Order No. 11, via electronic mail delivery to: snjmdl@steptoe.com.

3.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois. Its principal place of business is in Illinois. Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name. Abbott may be served with Summons by delivery to its registered agent: CT Corporation System, 208 So. Lasalle Street, Suite 814, Chicago, IL 60604.

## II.      NATURE OF THE ACTION

4.      This action arises out of the injuries suffered by infant, A. S. (the "Injured Infant") who was given Defendants' cow's milk-based infant feeding products. Defendants' products caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), which ultimately killed the newborn approximately ten days after birth. As a result of the Injured Infant's death, "Plaintiff Parents" also suffered unimaginable emotional distress, psychological injury, and financial loss.

5.      Plaintiff Parents individually and as personal representatives of the Estate of A.S. (collectively "Plaintiffs") bring these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of Defendants' unreasonably dangerous cow's milk-based infant feeding products.

### III.    JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to 28 USC §1332 because Abbott Laboratories is a citizen of Illinois, Plaintiffs are residents of Texas and the amount in controversy is over $75,000.00.

7.    Venue is proper in this District pursuant to Case Management Order No. 11 of MDL 3026 stating that any Plaintiff whose case would be subject to transfer to MDL 3026 may file his or her case directly in MDL 3026 in the Northern District of Illinois. See Dkt. 296, Case 1:22-md-3026-RRP.

8.    If not for Case Management Order No. 11, Plaintiffs would have filed, and venue is proper, in the Western District of Texas San Antonio Division Court.  Plaintiffs did not discover, and using reasonable diligence could not have discovered, Defendants' negligent and other wrongful conduct until May 16, 2022. Therefore, the filing of this action is timely.

9.    Due to Defendant's' intentional concealment of the known or knowable unreasonably dangerous risks of NEC posed by its cow's milk-based products, Plaintiffs and their medical professionals had no way of knowing about the connection between Defendants' cow milk-based products and NEC. The discovery rule applies, and the statute of limitations was tolled until the day Plaintiffs knew or had reason to know that A.S.'s injury, including NEC, was linked to his ingestion of Defendant's cow's milk-based product.

10.    Within the time period of any applicable staute of limitations, Plaintiffs could not have discovered through the exercise of reasonable diligence that Defendants' cow's milk-based products were injurious to human health.

11.    Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with Defendants' cow's milk-based products and NEC, nor

would a reasonable and diligent investigation by Plaintiffs have disclosed that Defendant's cow's milk-based product would cause A.S.'s NEC diagnosis and related injuries.

12.     The expiration of any applicable statute of limitations has been equitably tolled by reason of Defendants' fraudulent misrepresentations, fraudulent concealment and fraudulent conduct. Through affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiffs the true risks of its cow's milk-based products.

13.     As a result of Defendants' actions, Plaintiff could not reasonably have known or learned through reasonable diligence that Plaintiff had been exposed to the risks averred herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

14.     Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of their cow's milk-based products, which they had a duty to disclose.

15.     Defendants had the ability to and did spend enormous amounts of money in furtherance of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiffs and medical professionals could neither have afforded nor possibly conducted studies to determine the nature, extent, and identity of related health risks and were forced to rely upon Defendants' representations.

## V. FACTUAL ALLEGATIONS

11.     A.S. was born preterm at North Central Baptist Hospital in San Antonio, Texas on April 8, 2018, and fed Defendants' cow's milk-based products shortly after his birth.

12.     On or about April 11, 2018, A.S. exhibited a swollen abdomen and his parents, Plaintiffs James Sutton and his wife Jacklyn Sutton, were notified that A.S. would need to be fed with an IV. A.S.' condition continued to deteriorate and was later diagnosed with necrotizing enterocolitis. Soon after, A.S. endured an exploratory laparotomy, which revealed Necrotizing

Enterocolitis *totalis*, a condition where the entirety of the intestinal tract is necrotic and inoperable. At this point, A.S. was started on comfort care and passed away from NEC on or about April 18, 2018.

13. NEC Totalis is a devastating disease that is often lethal to infants. NEC Totalis develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die. Once NEC Totalis develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis. Up to thirty percent of NEC Totalis diagnosed infants die from the disease.

14. Preterm and low-birth-weight infants are especially susceptible to NEC Totalis because of their underdeveloped digestive systems. For example, in one randomized, multicenter study of 926 preterm infants, NEC Totalis was ***six to ten*** times more common in exclusively cow's milk formula-fed babies than in exclusively breast milk-fed babies and ***three times*** more common in babies who received a combination of formula and breast milk. For babies born at more than 30 weeks gestation, NEC was ***20 times more common*** in those only fed cow's milk formula than in those fed breast milk.

15. Another randomized controlled trial showed that preterm babies fed an exclusive breast milk-based diet were ***90% less likely*** to develop surgical NEC Totalis (NEC Totalis that requires surgical treatment), compared to preterm babies fed a diet that included some cow's milk-based products.

16. Yet another study that analyzed the data from a 12-center randomized trial concluded that fortification of breast milk with a cow's milk-based fortifier resulted in a 4.2-fold increased risk of NEC Totalis and a 5.1-fold increased risk of surgical NEC Totalis or death, compared to fortification with a breast milk-based fortifier.

17. A Surgeon General report, *The Surgeon General's Call to Action to Support*

*Breastfeeding*, warns that, "for vulnerable premature infants, formula feeding is associated with higher rates of necrotizing enterocolitis." The report also states that premature infants who are not breastfed are ***138% more likely*** to develop NEC Totalis.

18.     The American Academy of Pediatrics, "an organization of 67,000 pediatricians committed to the optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults," has advised that ***all*** premature infants should be fed either their mother's milk or, if their mother's milk is unavailable, pasteurized human donor milk. This recommendation is based on the "potent benefits of human milk," including "lower rates of

NEC Totalis."

19.     A multicenter, randomized, controlled trial found that premature and low-birth-weight infants fed an exclusive breast milk-based diet suffered NEC Totalis only 3% of the time while premature and low-birth-weight infants receiving cow's milk-based formula suffered NEC ***21% of the time***.

20.     Another study conducted a randomized comparison of extremely preterm infants who were given either (a) a diet of breast milk fortified with a breast milk-based fortifier or (b) a diet containing variable amounts of cow's milk-based products. The babies given exclusively breast milk products suffered NEC 5% of the time. The babies given cow's milk products suffered NEC 17% of the time.

### SAFER, NUTRITIONALLY SUPERIOR ALTERNATIVES TO COW'S MILK-BASED PRODUCTS EXIST

21.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition. For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.

Moreover, hospitals have access to shelf-stable formula and milk fortifiers derived from pasteurized breast milk.

22.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC Totalis associated with cow's milk-based products. For example, in a study analyzing preterm infants who were fed an exclusive breast milk-based diet until they reached 34 weeks, all 104 infants exceeded standard growth targets and met length and head-circumference growth targets, demonstrating that infants can achieve and mostly exceed targeted growth standards when receiving an exclusive breast milk-based diet. This is particularly true given the ability of breast milk-based fortifiers to provide the additional nutritional supplements necessary for adequate growth while receiving the protective benefits of a breast milk diet.

23.     Defendants' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive. This displacement only increases infants' vulnerability to NEC Totalis, as studies show that breast milk protects against the disease. For example, a study analyzing 1,587 infants across multiple institutions concluded that an exclusive breast milk-based diet is associated with significant benefits for extremely premature infants and that it produced no feeding-related adverse outcomes.

24.     For the above reasons, experts acknowledge that breast milk is the best source of nutrition for preterm infants and those at risk for NEC Totalis. Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC Totalis.

25.     At the time the Injured Infant was fed Defendants' products, the science clearly demonstrated to Defendants that these products cause and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

26.     Despite the scientific consensus that Defendants' cow's milk-based products present a dire threat to the health and development of preterm infants, Defendants has made no changes to their products or the products' packaging, guidelines, instructions, or warnings. Instead, Defendants have continued to sell their unreasonably dangerous products to unsuspecting parents and healthcare providers, generating huge profits as a result.

### DEFENDANTS' FALSE AND MISLEADING MARKETING REGARDING COW'S MILK BASED INFANT PRODUCTS

27.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant' birth.

28.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that Defendants' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. *None* of Defendants' marketing materials, including its promotional websites, reference the science showing how significantly their products increase the risk of NEC.

29.     Numerous studies have shown the detrimental impact of formula advertising on the rates of initiation and continuation of breastfeeding, including studies that show that as "hand feeding" (non-breastfeeding) advertisements increase, reported breastfeeding rates decrease in the following year.

30.     Undoubtedly aware of the impact of their advertising, Defendants, are willing to spend massive financial resources to disseminate their message, with one study estimating that formula manufacturers collectively spent approximately $4.48 billion on marketing and

promotion in 2014 alone.

31.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

32.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, Defendants' aggressive marketing exploits new parents' darkest fears—that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

33.     For example, Abbott's website, on a page titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—**infant formula is the only appropriate, safe alternative** to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

34.     Abbott markets and sells multiple products specifically targeting preterm and low- birth-weight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the

products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get their full 9 months in the womb, so their body is working hard to catch up. During their first full year, feed them Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support their development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

35.     Defendant markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Defendant emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil EnfaCare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

36.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk

has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive **breast milk studies** to date" (emphasis added).

37.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk. They offer free formula, coupons, and even entire gift baskets to parents in hospitals, medical clinics, and residential charities where out-of-town families stay while their babies receive long-term treatment in the NICU.

38.     Through this early targeting, Defendants create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for Defendants. Defendants' gift baskets send confusing signals to mothers who are simultaneously being encouraged by their health care professionals to breastfeed, and they have been shown to negatively impact breastfeeding rates.

39.     Further, when Defendants recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. One study, for example, found that only 8.8 percent of parents surveyed in the NICU interpreted "human milk fortifier" as potentially meaning a cow's milk-based product. The packaging appears as:



40.     Defendants have designed powerful and dangerously misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider Defendants' cow's milk-based products to be a first choice. This marketing scheme is employed despite Defendants' knowledge, and failure to warn, of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

**DEFENDANTS' INADEQUATE WARNINGS**

41.     Although Mead promotes an aggressive marketing campaign designed to

convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants. Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

42.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

43.     Despite knowing of the risk of NEC, the packaging of Mead's products do not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with their products, or of the magnitude of this increased risk.

44.     Mead cites no medical literature or research to guide the use of its products.

45.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

46.     Mead deceived parents, physicians, other medical professionals and medical staff, and the public into believing that its products were a safe and necessary alternative supplement and/or substitute to breast milk.

47.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals or hospitals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

48.     Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products

significantly increase the chances of a premature infant getting potentially fatal NEC.

49.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

50.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

51.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

52.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals or hospitals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### SAFER ALTERNATIVE DESIGNS

53.     Defendants' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants. Defendants could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

54.     On information and belief, Defendants were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Defendants have continued to use cow's milk as the foundation of its products.

## COUNT I: STRICT LIABILITY FOR DESIGN DEFECT

55.     Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

56.     Defendants, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiffs in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

57.     Defendants also owed a duty to the consuming public in general, and Plaintiffs in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for the intended use.

58.     Defendants' knew that their products would be used to feed premature infants like A.S. and knew or reasonably should have known that the use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death; and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations. Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

59.     The Injured Infant ingested Defendants' unreasonably dangerous cow's milk-based products. The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

60.     Defendants knew or reasonably should have known that breast milk-based nutrition did not carry the same risks of NEC, serious injury and death that cow's milk-based products do.

61.     Defendants' products contained cow's milk at the time they left the manufacturing facility.

62.     Defendants did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

63.     Defendants' products were fed to the Injured Infant, which directly and proximately caused damages to Plaintiffs, including NEC, the need for surgery, permanent injury, and the untimely death of minor A.S.

64.     As a further direct result, Plaintiff Parent incurred medical expenses and suffered significant emotional distress, loss of income, and other damages. Plaintiffs' lives have been permanently affected by their Injured Infant's injuries and death.

## COUNT II: STRICT LIABILITY FOR FAILURE TO WARN

65.     Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

66.     Defendants, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiffs in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

67.     Defendants' duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses. By designing their products with cow's milk-based ingredients, Defendants had a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death. The failure to warn makes the products at issue in this litigation unreasonably dangerous.

68.     Specifically, Defendants breached their duties to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that its products might cause those infants to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks. Among other risks, Defendants:

a.  Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

b.  Failed to warn that cow's milk-based products are unsafe and/or contra-indicated for premature infants like the Injured Infant; and/or

c.  Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.  Failed to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e.  Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.  Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed Defendants' products, notwithstanding their substantial risks; and/or

g.  Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns; and/or

h.  Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

69.     Defendants' products contained cow's milk at the time they left the manufacturing facility.

70.     As a direct and proximate result of Defendants' inadequate warnings and the pervasive marketing campaigns suggesting the safety and necessity of their products, the Injured Infant was fed cow's milk-based products, which caused them to develop NEC.

71.     The unwarned of risks are not of a kind that an ordinary consumer would expect. Had physicians and healthcare providers known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had Plaintiff Parents known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to their child.

72.     As a further direct result, Plaintiff Parents incurred medical expenses and suffered significant emotional distress, loss of income, and other harms. Their lives have been significantly and permanently affected by the loss of their child.

## **COUNT III: NEGLIGENCE**

73.     Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

74.     Defendants, as the manufacturer and/or seller of the products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiffs in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

75.     At all times relevant to this action, the Injured Infant's health care providers used the products at issue in their intended manner and for their intended purpose.

76.     Defendants, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and Plaintiffs.

77.     Specifically, although Defendants knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

    a.  Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    b.  Failing to warn that cow's milk-based products are unsafe and/or contra-indicated for premature infants like the Injured Infant; and/or

    c.  Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

    d.  Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

    e.  Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

    f.  Failing to insert a warning or instruction to healthcare professionals and other

medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed Defendants' products, notwithstanding their substantial risks; and/or

g. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

h. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

78.     In addition, although Defendants knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, Defendants failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

79.     As a direct and proximate result of Defendants' failure to act in a reasonably prudent manner and its breach of duty, the Injured Infant was fed cow's milk-based products, which caused him to develop NEC and ultimately pass away.

80.     Had Defendants satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

81.     As a further direct result, Plaintiffs suffered and will continue to suffer from injuries and damages for which they are entitled to recovery, including wrongful death and survival damages, loss of consortium, compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT IV: INTENTIONAL MISREPRESENTATION

82.     Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

83.     At all times relevant to this action, the Injured Infant (and their caretakers) used the products at issue in their intended manner and for their intended purpose.

84.     Defendants, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiffs in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

85.     Defendants breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

86.     Specifically, upon information and belief, Defendants made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

   a.   That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

   b.   That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d. That cow's milk-based products were safe for premature infants; and/or

e. That cow's milk-based products were necessary for optimum growth; and/or

f. That cow's milk-based products were similar or equivalent to breast milk; and/or

g. That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h. That their products were based on up-to-date science, which made them safe for premature infants; and/or

i. Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

87. Defendants knew or reasonably should have known those misrepresentations to be false.

88. Defendants' misrepresentations were intended to, and in fact did, induce hospitals and health care providers, including the Injured Infant's hospital and health care providers, to provide their infant products to babies, including the Injured Infant.

89. Plaintiff Parents were not aware that these misrepresentations were false and justifiably relied on them. Defendants' misrepresentations induced Plaintiff Parents to allow their child to be fed Defendants' infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, from Defendants' messaging. Had Defendants not committed these intentional misrepresentations, the Injured Infant would not have been

exposed to their unreasonably dangerous cow's milk-based products.

90.     As a direct and proximate result, Defendants' products were fed to the Injured Infant, causing their NEC and the subsequent health impacts.

91.     As a further direct result, Plaintiff Parents have incurred medical expenses and suffered significant emotional distress, loss of income, and other harms. Their lives have been significantly and permanently affected by the Injured Infant's injuries.

## COUNT V: NEGLIGENT MISREPRESENTATION

92.     Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

93.     At all times relevant to this action, the Injured Infant used the products at issue in their intended manner and for their intended purpose.

94.     Defendants, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiffs in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

95.     In the course of their business, Defendants breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

96.     Specifically, upon information and belief, Defendants made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

  a.   That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were

unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.  That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c.  That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.  That cow's milk-based products were safe for premature infants; and/or

e.  That cow's milk-based products were necessary for optimum growth; and/or

f.  That cow's milk-based products were similar or equivalent to breast milk; and/or

g.  That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.  That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.  Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

97.  Defendants were negligent or careless in not determining those representations to be false.

98.  Defendants' misrepresentations were intended to and did in fact induce hospitals and health care providers, including the Injured Infant' hospital and health care providers, to provide their products to babies, including the Injured Infant.

99.  Defendants' misrepresentations induced, and were intended to induce, Plaintiff

Parents to allow their child to be fed Defendants' infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, from Defendants' messaging. Had Defendants not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

100. As a direct and proximate result, Defendants' products were fed to the Injured Infant, causing their NEC and death.

101. As a direct and proximate result of Defendant Abbott's negligent misrepresentations and omissions concerning the risk of harm associated with its contaminated Similac, Alimentum, and EleCare powdered infant formula, Plaintiffs suffered and will continue to suffer from injuries and damages for which they are entitled to recovery, including wrongful death and survival damages, loss of consortium, compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT VI: BREACH OF EXPRESS WARRANTY

102. Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

103. At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its cow's milk-based feeding products, which are defective and unreasonably dangerous to consumers, including Plaintiffs. These actions were under the ultimate control and supervision of Defendants.

104. Defendants had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of cow's milk-based feeding products, including duty to:

    a.  Ensure that their products did not cause the user unreasonably dangerous

side effects;

b.   Warn of dangerous and potentially fatal side effects; and

c.   Disclose adverse material facts, such as the true risks associated with the use of and exposure to cow's milk-based feeding products, when making representations to the FDA (Food and Drug Administration), consumers, and the general public, including the Plaintiffs.

105.    As alleged throughout this pleading, the ability of Defendants to properly disclose those risks associated with its product is not limited to representations made on the labeling.

106.    At all relevant times, Defendants expressly represented and warranted to the purchasers of their products, by and through statements made by Defendants in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Defendants' cow's milk-based feeding products were safe for premature babies' health, effective, fit, and proper for their intended use.

107.    Defendants advertised, labeled, marketed, and promoted its products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its cow's milk-based formula products would conform to the representations.

108.    These express representations include incomplete warnings and instructions that purport but fail to include the complete array of risks associated with use of and/or exposure to Defendants' cow's milk-based formula products. Defendants knew and/or should have known that the risks expressly included in the warning and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendants expressly represented that its cow's milk-based formula products

were safe and effective, that it was safe and effective for use by individuals such as the Plaintiffs, and/or that it was safe and effective as preterm baby formula.

109.    The representations about Defendants' cow's milk-based products, as set forth herein, contained, or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

110.    Defendants placed its cow's milk-based products into the stream of commerce for sale and recommended its use to consumers and the public without adequately warning of the true risks of premature babies developing injuries associated with the ingestion of cow's milk-based products.

111.    Defendants breached these warranties because, among other things, its cow's milk- based products were defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendants breached the warranties in the following ways:

      a.  Defendants represented through their labeling, advertising, and marketing materials that its products were safe, and intentionally withheld and concealed information about the risks of premature babies developing serious injuries associated with the use of cow's milk-based formula products; and

      b.  Defendants represented that its products were safe for use and intentionally concealed information that demonstrated that human breast milk was a safer alternative than cow's milk-based formula.

112.    Plaintiffs detrimentally relied on the express warranties and representations of Defendants concerning the safety and/or risk profile of cow's milk-based products in deciding to

consume the product. Plaintiffs reasonably relied upon Defendants to disclose known defects, risks, dangers, and side effects of their products. Plaintiffs would not have used Defendants products had Defendants properly disclosed the risks associated with the products, either through advertising, labeling, or any other form of disclosure.

113.    Defendants had sole access to material facts concerning the nature of the risks associated with their products, as expressly stated within their warnings and labels, and knew that consumers and users such as Plaintiff Parents could not have reasonably discovered that the risks expressly included in its warnings and labels were inadequate and inaccurate.

114.    Plaintiffs had no knowledge of the falsity or incompleteness of Defendants' statements and representations concerning its cow's milk-based products.

115.    Plaintiff, A.S., was exposed to cow's milk-based products as manufactured, tested, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the

stream of commerce by Defendants.

116.    Had the labels, advertisements, or promotional material for its products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiffs' injuries, rather than expressly excluding such information, and warranting that the products were safe for their intended use, Plaintiffs could have avoided the injuries complained of herein.

117.    As a direct and proximate result of Defendants' breach of express warranty, Plaintiffs have sustained pecuniary loss and general damages in a sum exceeding this court's jurisdictional minimum.

118.    As a proximate result of Defendants' breach of express warranty, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs suffered

great personal injury and damages. As a direct and proximate result of Defendants' breach of express warranty, as alleged herein, Plaintiffs sustained suffered and will continue to suffer from injuries and damages for which they are entitled to a recovery, including wrongful death and survival damages, loss of consortium, compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT VII: BREACH OF IMPLIED WARRANTY

119.     Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

120.     At all relevant times, the Defendants controlled their cow's milk-based products.

121.     The Defendants designed, developed, tested, labeled, packaged, distributed, marketed and/or sold their cow's milk-based products, including the products ingested by the minor Plaintiff.

122.     At all relevant times, Defendants intended premature babies to ingest their cow's milk-based products, and Defendants impliedly warranted their cow's milk-based products to be of merchantable quality and fit for consumption.

123.     Injured Plaintiffs were foreseeable users of cow's milk-based products.

124.     The Defendants knew or had reason to know that Plaintiff Parents would rely on the Defendants' judgment and representations regarding the safety of their cow's milk-based products for premature babies.

125.     The Defendants' cow's milk-based products were expected to reach and did reach consumers, including Plaintiffs, without substantial change in the condition in which it was labeled and sold by the Defendants.

126.     The Defendants breached various implied warranties with respect to its cow's milk- based products in that they were not fit for its intended purpose or ordinary use, and specifically, that the Defendants represented that their cow's milk-based formula product was safe for premature babies and would not cause Necrotizing Enterocolitis (NEC) when ingested.

127.     In reliance upon the Defendants' implied warranty, Plaintiff A.S. ingested the products in a manner normally intended, recommended, promoted, and marketed by the Defendants.

128.     The Defendants' breach of their implied warranty regarding their cow's milk-based formula products was a substantial factor in causing Plaintiffs' injuries. As a direct and proximate result of Defendants' breach implied warranties concerning their cow's milk-based formula products as described herein, Plaintiffs suffered and will continue to suffer from injuries and damages for which they are entitled to recovery, including wrongful death and survival damages, loss of consortium, compensatory damages, consequential damages, interest, costs and attorneys' fees.

## <u>COUNT VIII: DECEPTIVE TRADE PRACTICES</u>

129.     Plaintiffs bring this count pursuant to the Consumer Fraud and Deceptive Business Practices Act.

130.     Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

131.     By the conduct described in detail above and incorporated herein, Defendants engaged in unfair or deceptive acts that violated the Deceptive Trade Practices-Consumer Protection Act.

132.     Plaintiffs used Defendants' products for personal use and thereby suffered

ascertainable losses as a result of Defendants' actions.

133.    Had Defendants not engaged in the deceptive conduct described herein, Plaintiff would not have purchased and/or paid for Defendants' product and would not have incurred related injuries and damages.

134.    Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, monetary gain from Plaintiffs for the Products that would not have been paid had Defendants not engaged in unfair and deceptive conduct.

135.    Defendants engaged in unfair methods of competition and deceptive acts or practices that were prescribed by law, including the following:

    a.  Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

    b.  Failing to disclose information concerning goods or services that was known at the time of the transaction inducing the consumer into a transaction into which the consumer would not have entered if the information had been disclosed; and

    c.  Defendants intended for Plaintiff to rely on their representations and advertisements regarding the Products in order to achieve monetary gain from Plaintiff through his purchase of the Products. Plaintiff was injured by the cumulative and indivisible nature of Defendants' conduct. The cumulative effect of Defendants' conduct directed at Plaintiff and other consumers was to create demand for and sell the Products.

136.    Defendants' intentional, deceptive, unconscionable, and fraudulent representations and material omissions to Plaintiff, physicians, and consumers, constituted unfair and deceptive acts and trade practices.

137.    Defendants have engaged in unfair competition or unfair or deceptive acts or trade practices or have made false representations.

138.    Defendants had actual knowledge of the defective and dangerous condition of Defendants' products and failed to take any action to cure such defective and dangerous conditions.

139.    Plaintiffs relied upon Defendants' misrepresentations and omissions in determining which product to use.

140.    Defendants' deceptive, unconscionable, or fraudulent representations and material omissions to Plaintiffs and other consumers constituted deceptive acts and practices.

141.    By reason of the unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Plaintiffs, suffered ascertainable losses and damages.

142.    As a direct and proximate result of Defendants' violations of consumer protection laws, Plaintiffs sustained economic losses including medical care.

143.    Defendant's violation of consumer protection laws as described herein was a producing cause of Plaintiffs' injuries and damages for which they are entitled to recover, including wrongful death and survival damages, loss of consortium, compensatory damages, consequential damages, treble damages, interest, costs and attorneys' fees.

144.    Additionally, Defendant's violation of these DTPA consumer protection laws were committed knowingly and intentionally; therefore, Plaintiffs should recover, in addition to the actual damages, treble damages as allowed by law.

## COUNT IX: LOSS OF CONSORTIUM

145.    Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

146.    Loss of filial consortium is a derivative claim. It is a derivative of each of the claims and allegations set forth above.

147.     At all relevant times Plaintiffs were A.S.'s parents and natural guardians.

148.     As a direct and proximate result of Defendants' wrongful acts and omissions as described herein, Plaintiffs James Sutton and Jacklyn Sutton have suffered a loss of the positive benefits flowing from the love, comfort, companionship and society that, in reasonable probability, they would have experienced if A.S. had lived.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

149.     For compensatory damages in an amount in excess of $75,000.00 to be proven at trial;

150.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Defendants' conduct;

151.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

152.     For loss of consortium damages;

153.     For all applicable wrongful death and survival damages, costs of this action, and post-judgment interest; and

154.     For interest and all other further relief as permitted by law.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a jury trial for all claims triable.

Dated: **April 5, 2024**

Respectfully Submitted,

**DILLEY LAW FIRM, PC**

By: /s/ Douglas E. Dilley
Douglas E. Dilley *(pro hac vice)*
State Bar No. 05872000
douglas@dilleylawfirm.com
Claudia I. Guerrero *(pro hac vice)*
State Bar No. 24079670
claudia@dilleylawfirm.com
Miguel E. Dilley *(pro hac vice)*
State Bar No. 24058330
miguel@dilleylawfirm.com
635 S. Presa
San Antonio, TX 78210
Telephone: (210) 225-0111
Facsimile: (210) 228-0493

**TINSMAN & SCIANO, INC.**

By: /s/ Daniel J. T. Sciano
Daniel J. T. Sciano *(pro hac vice)*
State Bar No. 17881200
dsciano@tsslawyers.com
10107 McAllister Freeway
San Antonio, TX 78216
Telephone: (210) 225-3121
Facsimile: (210) 225-6235

**ATTORNEYS FOR PLAINTIFFS**