**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CADENCE COLLINS, individually and as** | ) | |
| **Next Friend of her minor child K.H.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 24 C 7140** |
| | ) | |
| | ) | **Judge Rebecca R. Pallmeyer** |
| **MEAD JOHNSON & COMPANY, LLC,** | ) | |
| **MEAD JOHNSON NUTRITION COMPANY,** | ) | |
| **and JESSICA MACKEY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Cadence Collins's minor child, K.H., was born prematurely and developed necrotizing enterocolitis ("NEC"), a life-threatening disease. Alleging that NEC results from ingestion of infant formula manufactured by Defendants Mead Johnson, LLC and Mead Johnson Nutrition Company (collectively "Mead Johnson"), Collins sued Mead Johnson and a Mead Johnson sales representative in Missouri state court. Mead Johnson removed the case to federal court, citing diversity jurisdiction under 28 U.S.C. § 1332, and it is now one of several hundred such cases pending as part of multidistrict litigation ("MDL") before this court. (*See* No. 22 C 00071 (master docket).) Plaintiff Collins moves for remand, arguing that because Defendant Mackey is a citizen and resident of Missouri, the "forum defendant" rule bars removal. *See Morris v. Nuzzo*, 718 F.3d 660, 665 (7th Cir. 2013). Mead Johnson contends that removal is proper because Mackey was fraudulently joined to Plaintiff's claim. For the reasons discussed below, the court disagrees and grants the motion for remand.

**BACKGROUND**

I.      **Jurisdictional Facts**

Plaintiff Cadence Collins is a natural person and a resident of Illinois whose infant, K.H., allegedly suffered serious injuries resulting from ingestion of infant formula manufactured by Mead

Johnson.  (Pet. [6] ¶¶ 3, 9, 15.)  Mead Johnson Nutrition Company is a corporation incorporated under the laws of Delaware and with its principal place of business in Evansville, Indiana.  (Notice of Removal [1] ¶ 6.)  Mead Johnson & Company is a limited liability company organized under the laws of Delaware; its sole member is Mead Johnson Nutrition Company.  (*Id*.)  Jessica Mackey is a natural person and resident of St. Louis, Missouri.  (Pet. ¶ 5.)  Plaintiff seeks compensatory and punitive damages for "past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Defendants' conduct," and for "past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment" (Pet. ¶¶ 99-101), clearly exceeding $75,000.  (*See generally* Notice of Removal ¶¶ 12-15.)

## II.    Factual Background

Plaintiff's action is one of hundreds of claims against Mead Johnson and Abbott Laboratories, alleging that the companies' cow's-milk-based infant feeding products caused preterm infants to develop NEC, a life-threatening disease.  *See In re Abbott Lab'ys Preterm Infant Nutrition Prods. Liab. Litig.*, No. 22 C 2017, 2024 WL 2132425, at *1 (N.D. Ill. 2024) (hereinafter "*Abbott I*").

### A.    K.H.'s NEC Diagnosis

Plaintiff's child, K.H., was born prematurely on September 4, 2021, at Barnes-Jewish Hospital in St. Louis, Missouri.  (Pet. ¶ 9.)  K.H., who was initially fed human milk and human-milk-based products, was diagnosed with NEC on September 15, 2021, and was treated with antibiotics.  (*Id*. ¶ 10.)  K.H. reached 32 weeks gestational age on October 20, 2021, and at that time was transitioned to Mead Johnson's Enfamil formula, a cow's-milk-based formula developed and marketed by Mead Johnson as a "human milk fortifier" for feeding very young, even pre-term,

infants. (*Id*. ¶¶ 12, 43-44.)[1]  "Almost immediately," K.H.'s NEC symptoms dramatically worsened, and K.H. was required to undergo the first of multiple surgeries on October 22, 2021. (*Id*. ¶¶ 13-14.)  K.H. "suffers and continues to suffer from permanent and severe injuries" resulting from NEC. (*Id*. ¶ 15.)

### B.    Claims Against Mead Johnson

Plaintiff alleges that despite increasing scientific consensus that substituting human milk with cow's milk formulas dramatically increases the risk of NEC in preterm infants (*see id*. ¶¶ 17-24, 29), Mead Johnson made no changes to its cow's milk-based formula, Enfamil, and continued to market Enfamil as safe and beneficial for preterm infants.  (*Id*. ¶¶ 30, 37.)  On its web page (which has since been edited), Mead Johnson asserted that "Premature babies fed Enfamil formulas . . . have achieved catch up growth similar to that of full term, breastfed infants" and that Enfamil was "expert-recommended . . . to support brain and eye development."  (*Id*. ¶¶ 36-37.) The web page makes no mention of the risks of developing NEC.  Indeed, Plaintiff alleges that Mead Johnson marketed Enfamil with assertions that human milk alternatives to Enfamil would keep premature babies from "grow[ing] adequately."  (*See id*. ¶¶ 44, 50.)  Plaintiff alleges that despite being aware of the heightened risk of NEC created by Enfamil, Mead Johnson provided no warning of the risks of NEC on any of the Enfamil packaging, nor did it recommend that medical professionals and hospitals inform parents of preterm babies about such risks.  (*Id*. ¶¶ 47, 51.)

As a result, in addition to strict product liability claims arising from the defects in Enfamil's design and warning, Plaintiff also brings negligence (count III), intentional misrepresentation (count IV), and negligent misrepresentation (count V) claims against Mead Johnson for producing Enfamil and making various claims about the formula's safety and beneficial use for prematurely born infants.  (*See generally id*. ¶¶ 71-98.)

---

[1]    At some point, K.H. was moved to St. Louis Children's Hospital and treated there, but the Petition does not state when.  (*See* Pet. ¶ 1.)

### C.     Claims Against Mackey

In her claims for negligence, intentional misrepresentation and negligent misrepresentation, Plaintiff names Jessica Mackey, a Mead Johnson sales representative, as an additional Defendant.  (*See id.*)  Mackey has been employed by Mead Johnson since at least 2018 (*id.* ¶ 5) and is tasked with promoting Mead Johnson's products, including Enfamil, to hospitals and healthcare providers.  (*See id.* ¶ 72.)  She also educates these providers about the products and their intended use.  (*Id.*)  In this capacity, Plaintiff alleges that Mackey was responsible for "convincing hospital personnel, including personnel at the hospitals where K.H. was treated and developed NEC, to give Mead Johnson's Enfamil to infants and/or to convince parents like Cadence Collins to allow their children to be fed those products."  (*Id.* ¶ 40.)

Plaintiff alleges upon information and belief that Mackey made various misrepresentations to induce hospitals like the one where K.H. was treated to use Enfamil.  Those alleged misrepresentations included that Mead Johnson's cow's-milk-based products were safe for premature infants, that the products were necessary for the growth and nutrition of preterm infants, that the products had no serious side effects, and that the products were based on up-to-date science.  (*See id.* ¶ 84(a)-(i).)  Plaintiff also claims that Mackey failed to warn hospitals and providers of, among other things, the increased risk of NEC, severe injury, or death from using cow's milk-based products like Enfamil.  (*See id.* ¶ 76(a)-(f).)  Mackey made such representations and omitted such warnings while she "knew or reasonably should have known" that cow's-milk-based products increased the risk of NEC, serious injury, and death.  (*Id.* ¶ 76.)

## III.     Procedural Background

Plaintiff filed her Petition[2] and Demand for a Jury Trial [6] in the Circuit Court for the City of St. Louis, Missouri on June 14, 2024.  (Pet. at 1.)  Mead Johnson promptly removed the case

---

[2]     In Missouri courts, the first pleading in a civil suit is known as a petition. *See* MO. R. CIV. P. 53.01.

4

to the federal district court for the Eastern District of Missouri on July 22, 2024. (Notice of Removal at 12.) Given the common questions of fact between Plaintiff's claim and the hundreds of similar cases consolidated before this court as MDL 3026, *see* 600 F. Supp. 3d 1345 (J.P.M.L. 2022), the JPML transferred Plaintiff's action here on August 12, 2024. (*See* Transfer Order [22].) On August 14, 2024, Plaintiff filed an emergency motion to remand the case [25], and an emergency motion to expedite the briefing schedule for the motion to remand [26]. In her memorandum supporting remand, Plaintiff argues that the forum defendant rule bars removal in this case and requests an award of attorney fees and costs. (*See* Pl.'s Mem. at 4.) Before the court ruled on the request for an expedited briefing schedule, Defendant Mead Johnson filed a response in opposition [31]. Resisting remand to state court, Mead Johnson argues that Mackey was fraudulently joined to the Petition because, as a matter of law, Mackey could not be held liable for Mead Johnson's conduct, she owed no duty to the Plaintiff, and Plaintiff's allegations against Mackey were insufficient. (*See* Opp'n at 3.) Mead Johnson also submitted a signed declaration from Mackey [31-1] as an exhibit to its opposition brief.

## LEGAL STANDARD

Federal district courts "may not exercise jurisdiction absent a statutory basis." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). 28 U.S.C. § 1332(a) grants jurisdiction where there is complete diversity between parties and the amount in controversy exceeds $75,000. "A defendant removing a case on diversity grounds," however, "must not only demonstrate that the case satisfies the requirements of 28 U.S.C. § 1332(a), but must also clear the 'additional hurdle' of 28 U.S.C. § 1441(b)(2), or the 'forum defendant rule.'" *Morris v. Nuzzo*, 718 F.3d 660, 664–65 (7th Cir. 2013) (quoting *Hurley v. Motor Coach Indus., Inc.*, 222 F.3d 377, 378 (7th Cir. 2000)). Under the forum defendant rule, an action otherwise removable under diversity jurisdiction "may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b)(2).

There is an exception, however, that permits removal even where one of the named defendants is a citizen of the forum state. The "fraudulent joinder" doctrine applies where a plaintiff attempts to destroy diversity jurisdiction by naming a "nondiverse defendant against whom the plaintiff's claim has 'no chance of success.'" *Morris*, 718 F.3d at 666 (quoting *Poulos v. Naas Foods, Inc.*, 959 F.2d 69, 73 (7th Cir. 1992)). In *Abbott I*, this court held that the fraudulent joinder doctrine applies, as well, where a forum defendant whose presence would otherwise defeat removal is fraudulently joined. [3] Mead Johnson argues that the doctrine applies here because Plaintiff Collins has no chance of prevailing in her claims against Mackey.

Fraudulent joinder is "difficult to establish." *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 764 (7th Cir. 2009). A defendant must show that "after resolving all issues of fact *and law* in favor of the plaintiff, the plaintiff cannot establish a cause of action against the in-state defendant." *Morris*, 718 F.3d at 666 (quoting *Poulos*, 959 F.2d at 73). In other words, "the district court must ask whether there is 'any reasonable possibility' that the plaintiff could prevail against the non-diverse defendant." *Schur*, 577 F.3d at 764 (citing *Poulos*, 959 F.2d at 73). As several courts in this circuit have concluded, "the burden is even more favorable to the plaintiff than the standard that applies to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Schur*, 577 F.3d at 764 (collecting cases).

In determining whether Mead Johnson can meet this burden, the court's inquiry is guided by two principles. First, the court must apply "state law to determine whether the plaintiff has any reasonable possibility of success" against the party destroying diversity—in this case, Defendant Mackey. *Id.* Both parties agree that in this action filed in Missouri for injuries suffered while K.H. was treated in Missouri hospitals, Missouri law applies. (*See* Mot. to Remand at 5, Opp'n at 4

---

[3] As discussed in *Abbott I*, the fraudulent joinder doctrine classically applies when the addition of a nondiverse defendant obstructs removal, and the Seventh Circuit has not decided the "very close question" of whether fraudulent joinder applies where removal is obstructed instead by the presence of a forum defendant. *See Abbott I* at * 5–6; *Morris*, 718 F.3d at 668. For the reasons discussed in *Abbott I*, the court finds that fraudulent joinder does apply in cases involving the forum defendant rule. *See generally Abbott I* at * 5–6.

("The relevant inquiry is whether, under Missouri law . . . ."))); *see also Chang v. Baxter Healthcare Corp.*, 599 F.3d 728, 732 (7th Cir. 2010) (in multidistrict litigation, the transferee-MDL court applies the transferor court's substantive law). Second, "in determining the propriety of removal, the court may consider 'summary judgment-type evidence' such as affidavits." *See Momans v. St. John's Nw. Mil. Acad., Inc.*, No. 99 C 8510, 2000 WL 33976543, at *3 (N.D. Ill. Apr. 20, 2000) (citations omitted). Defendant Mackey has been sued in other cases, and on this motion, both parties rely on testimony Mackey gave in earlier trials regarding Mead Johnson's products. Mead Johnson cites, in addition, Mackey's sworn declaration. In considering these materials, "a limited use of affidavits and other evidence is permissible so long as the evidence is not used to 'pre-try' the case." *Peters v. AMR Corp.*, No. 95 C 1417, 1995 WL 358843, at *3 (N.D. Ill. June 13, 1995). To that end, the court will consider Mackey's declaration and prior testimony to the extent that it is consistent with, or unrefuted by, the substantive claims in the Petition.

## DISCUSSION

The parties do not appear to dispute any of the jurisdictional facts asserted in the notice of removal—such as citizenship of the parties, amount in controversy, and timeliness of removal. (*See* Notice of Removal ¶¶ 4-15.) The question for the court is whether Mead Johnson has made a showing that, under Missouri law, Plaintiff has no "reasonable possibility of success" in her claims against Mackey. *See Morris*, 718 F.3d at 666. To meet this burden, Mead Johnson makes three arguments. First, Mead Johnson argues that Plaintiff's Petition improperly seeks to hold Mackey liable for the conduct of her employer. (*See* Opp'n at 4.) Second, Mead Johnson argues that Mackey did not have a duty of care towards Plaintiff. (*See id.* at 6-7.)[4] Third, Mead Johnson

---

[4]    Plaintiff argues that the court must disregard this argument because Mead Johnson did not raise the issue of duty in their notice of removal. (Reply [33] at 4.) It is true that a defendant may not, generally, amend the notice of removal to add "completely new grounds for removal or furnish missing allegations" after the 30-day removal period has elapsed. *See* 14C Wright & Miller*, Federal Practice and Procedure* § 3733 (2d ed. 1985). This rule does not bar defendants from "set[ting] out more specifically the grounds for removal that already have been stated in the original notice." *Id.* While Mead Johnson could have been more specific, the court

argues that Plaintiff's general factual allegations fail to state actionable tort claims against Mackey. (*See id.* at 8.)

## I. Applying Missouri Law

As noted, the Petition asserts three state law tort claims against Mackey: negligence, intentional misrepresentation, and negligent misrepresentation. (*See* Pet. ¶¶ 71–98.) Missouri follows general principles of negligence, requiring a showing of duty, breach of duty, proximate cause, and actual damages. *See Cooper v. Praxair, Inc.*, No. 4:07 C 119 CEJ, 2007 WL 4372798, at *2 (E.D. Mo. Dec. 10, 2007) (citing *Phelps v. Bross*, 73 S.W.3d 651 (Mo. Ct. App. 2002)). Missouri recognizes both intentional and negligent misrepresentation claims. *See Kesselring v. St. Louis Grp., Inc.*, 74 S.W.3d 809, 813–14 (Mo. Ct. App. 2002).[5] The elements of an intentional or fraudulent misrepresentation claim are:

> (1) a false, material representation, (2) the speaker's knowledge of its falsity or his ignorance of its truth, (3) the speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated, (4) the hearer's reasonable reliance on its truth, and (5) the hearer's consequent and proximately caused injury.

*Id.* at 813 (citing *ITT Com. Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 386 (Mo. 1993), *superseded on other grounds by* Mo. Sup. Ct. Rule 74.04(c)(2) (1994)). The elements of negligent misrepresentation are nearly identical, with only two differences: negligent misrepresentation requires only failure to exercise reasonable care regarding falsity, not knowledge or recklessness, and requires that information "be supplied in the course of the defendant's business." *Id.*

---

concludes that the argument that Mackey did not owe a duty to Plaintiff falls in this latter category. As will be discussed below, the question of whether Mackey owed a duty to Plaintiff is linked to the argument, properly raised in the notice to remove, that the allegations do not "establish a claim against Ms. Mackey as Mead Johnson's agent." (Notice of Removal ¶ 18.)

[5] "Intentional misrepresentation" and "fraudulent misrepresentation" are used interchangeably by Missouri courts. *See BMK Corp. v. Clayton Corp.*, 226 S.W.3d 179, 193 (Mo. Ct. App. 2007).

There are limited circumstances under Missouri law—two identified in case law—where an employee can be held liable to third parties for negligence. *See Hutchen v. Wal-Mart Stores E. I, LP*, 555 F. Supp. 2d 1013, 1018 (E.D. Mo. 2008) (citing *State ex rel. Kyger v. Koehr*, 831 S.W.2d 953, 956 (Mo. Ct. App. 1992). First, "when an employee has or assumes full and complete control of his employer's premises, his liability to the public or to invitees is the same as that of his employer." *Kyger*, 831 S.W.2d at 956. There is no claim here that Mackey had "full and complete control" over Mead Johnson's premises, or over the production and marketing of Enfamil. Second, an employee "may be liable for injury to third persons when he breaches some duty which he owes to such third person." *Id*.[6] "The test is whether he has breached his legal duty or been negligent with respect to something over which he did have control." *Id*. With these principles of Missouri law in mind, the court now turns to Mead Johnson's arguments that they do not support Plaintiff's allegations.

## A. "Independent Tort"

Mead Johnson argues that Plaintiff's allegations are not supported by Missouri law because Plaintiff fails to assert an "independent tort" apart from Mead Johnson's allegedly tortious conduct. (*See* Opp'n at 5.) Mead Johnson draws this "independent tort" language from *State ex rel. William Ranni Assocs., Inc. v. Hartenbach*, wherein the Missouri Supreme Court held that an "agent is liable only if he commits acts which would constitute an independent tort." 742 S.W.2d 134, 139 (Mo. 1987). Mead Johnson is correct that Plaintiff's claims against Mackey are closely linked with her claims against Mead Johnson, such that Mackey's conduct in relaying Mead Johnson's (inadequate) warnings to hospitals appear to form a basis for both Mackey and Mead

---

[6]      Plaintiff raises the question of whether *Kyger* requires Plaintiff to show that Mackey owed a "duty to third party" for Plaintiff's two misrepresentation claims, given that neither the negligent misrepresentation nor the intentional misrepresentation claims requires a showing that the defendant owed plaintiff a duty. (*See* Reply at 5.) Missouri cases hold that the *Kyger* rule does not apply to intentional torts, but the court sees no reason to exclude Plaintiff's negligent misrepresentation claim from this rule. While "duty" is not a discrete element of negligent misrepresentation, the tort of negligent misrepresentation arises from the "duty of care" owed between commercial partners. *See* Restatement (Second) of Torts § 552 (1977).

Johnson's tort liability. (*See generally* Pet. ¶¶ 41, 71-98; Opp'n at 5.) But the rationale of *Ranni* does not have direct application in the facts before this court.

*Ranni* involved claims by the beneficiaries of a life insurance policy against an insurance company's agent for failing to disclose the existence of the policy upon the death of the policyholder, resulting in a 14-month delay to plaintiffs' receipt of benefits. *See* 742 S.W.2d at 135–36. The plaintiffs brought no claim against the insurance company itself. Finding that plaintiffs had no actionable claim against the insurance agent, the Missouri Supreme Court held that the agent's duty to fulfill a contract between his employer and a third party (i.e. a duty to notify beneficiaries of the existence of the policy) and avoid economic loss is a duty the agent owes to his employer, not to the third parties. *See id.* at 139–40 ("[T]he agent is the agent for the insurance carrier, not the insured . . . . [A]n agent is not liable for economic loss to third person when he negligently fails to perform duties owed only to his principal.") The court went on to clarify that "[i]f plaintiffs suffered economic loss" from the breach resulting the agent's conduct, "their remedy is to sue the principal" for breach of contract. *Id.* at 140. As such, "the agent is liable [to third parties] only if he commits acts which would constitute an independent tort" from causing the breach of the employer's contract. *See id.* The rule cited by Mead Johnson, therefore, applies in the limited circumstance where an agent is sued for conduct that breaches the agent's duty to her employer, resulting in an economic injury to a third party. *See, e.g.*, *Kerr v. Fed. Emerg. Mgt. Agency*, 113 F.3d 884, 886 (8th Cir. 1997) (citing rule in *Ranni* as "general rule of Missouri law that an insurer's agent is not liable for economic loss suffered by an insured when the agent fails to perform a duty owed to the insurer"); *Stricker v. Auto-Owners Ins. Co.*, No. 2:22 C 4074-NKL, 2022 WL 4348466, at *3 (W.D. Mo. Sept. 19, 2022) (applying *Kerr* and *Ranni*).

In this case, Plaintiff is not seeking to enforce a duty Mackey owed to her employer, nor does she claim purely economic loss. Instead, Plaintiff aims her claims at Mackey's own misrepresentations (sanctioned by Mead Johnson) about the risks of Enfamil, resulting in a physical injury. *Ranni* does not address a situation like this one, where a plaintiff claims that *both*

a principal and an agent breached a duty owed to the plaintiff and caused physical harm. In such cases, Missouri law does not require a showing that the claim against the agent is an "independent tort," only that the agent "breaches some duty which he owes to such third person." *See Kyger*, 831 S.W.2d at 956.

### B. Existence of a Duty

Mead Johnson's second argument is that Plaintiff's claims against Mackey fail because Mackey had no duty of care towards the general public or to Plaintiff and K.H. (Opp'n at 6–7.) In support of this argument, Mead Johnson relies on *Ridings v. Maurice*, No. 15-00020 C W-JTM, 2015 WL 1474080, at *1 (W.D. Mo. Mar. 31, 2015). In *Ridings,* plaintiff was harmed by the use of a drug prescribed by his physician and brought suit in state court against the manufacturer and in-state sales representatives. Seeking to remove the case to federal court, the defendant argued that the sales representatives were fraudulently joined. *Id*. The court determined that, under Missouri law, "in the absence of any communications or interactions between the sales representatives and [plaintiffs or their doctors]," there was no duty owed by the sales representatives to the plaintiffs. *Id*. at *5. The court went on to reject the plaintiffs' argument that pharmaceutical sales representatives owe a "generalized duty to the public at large," finding that "Missouri law takes the opposite approach and provides such sales representatives with additional protections" under the learned intermediary doctrine. *Id*. Under that doctrine, "the sales representatives had no duty to provide warnings directly to the patients" and "any duty to warn is fulfilled through the drug manufacturer's warning to the prescribing physician." *Id*. (quoting *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods.*, No. 03 C 20611, 2004 WL 2203712, at *2–3 (E.D. Pa. Sept. 28, 2004) (applying Missouri law)). The court concluded that the sales representative defendants were fraudulently joined and denied the motion to remand. *Id*. at *6. But for the reasons explained below, this court concludes *Ridings* is factually distinguishable.

11

### 1.    Communication Between Mackey and Hospital Personnel

First, the *Ridings* court observed that the individual sales representatives "ha[d] never had any direct dealings or communications" with the plaintiffs or their physician.  2015 WL 1474080, at *4.  Those representatives owed no specific duty to the plaintiff "in the absence of any communications or interactions between the sales representatives and [plaintiffs or their doctors]." *Id.* at *5.  In contrast, Plaintiff here asserts that "the Petition is replete with allegations that Mackey communicated to Ms. Collins, the hospital where K.H. received Mead Johnson's cow's milk-based formula products, and K.H.'s treating physicians."  (Reply at 11.)  Plaintiff's reading of the Petition is overly generous; the court finds no allegation of any specific communication between Mackey and Plaintiff.[7]  Nor does the petition identify K.H.'s treating physician, much less allege that Mackey communicated with them.  Instead, Plaintiff makes vague assertions that Mackey communicated with "hospital personnel, including personnel at the hospitals where K.H. was treated" (Pet. ¶ 41) or "individuals at K.H.'s treating hospitals" (*Id.* ¶ 94)—without naming these "personnel" or "individuals."  That said, the Petition does allege that "Ms. Mackey [was] the sales representative promoting and educating hospitals and health care providers, including K.H.'s hospital and health care providers, about the products at issue in this litigation."  (Pet. ¶ 91.)

Evidence offered by Mead Johnson does not rebut this allegation.  Mackey states that she has never communicated directly with Plaintiff and "ha[s] never spoken with the parents of any child before, during, or after their treatment in a [NICU]."  (Mackey Decl. ¶ 1.)  She confirms, however, that her "territory includes the Barnes Jewish Healthcare system, including St. Louis Children's Hospital and Barnes-Jewish Hospital located in St. Louis, Missouri" where K.H. was

---

[7]    The closest that the Petition comes to suggesting that Mackey communicated with Plaintiff is the vague allegation that "Ms. Mackey, directly or indirectly, negligently marketed, sold, and/or distributed [Enfamil products], including to Ms. Collins and K.H.'s caregivers."  (Pet. ¶ 74.) At a hearing on December 19, 2024, Plaintiff's counsel clarified that such "indirect" contact between Plaintiff and Mackey would have consisted of "patient-facing" pamphlets that Mackey provided to the hospital, which in turn may have been distributed to Plaintiff.

treated, and she does not dispute having made representations about Mead Johnson's products to K.H.'s providers.[8]  This distinguishes Plaintiff's claims from the claims at issue in the cases cited by Mead Johnson.  *Cf. Ridings*, 2015 WL 1474080, at *4; *In re Diet Drugs*, 2004 WL 2203712, at *2 ("[Defendant contends] none of the sales representative defendants named in these actions promoted this drug [and] supports its position with uncontested affidavits of the defendant sales representatives.").  Having alleged that Mackey communicated directly with the providers who ultimately made the decision to give Enfamil to K.H., Plaintiff need not also allege a "generalized duty to the public at large."  *Cf. Ridings*, 2015 WL 1474080, at *5.

### 2.    Learned Intermediary Doctrine

Mead Johnson does not mention the learned intermediary doctrine in its memorandum or notice of removal, but that doctrine provides the legal basis for the holdings in *Ridings* and *In re Diet Drugs*.  For prescription drugs or products, the doctrine holds that the manufacturer's "duty to warn is fulfilled through the drug manufacturer's warning to the prescribing physician."  *In re Diet Drugs*, 2004 WL 2203712, at *3 (citing *Johnston v. Upjohn Co.*, 442 S.W.2d 93, 95 (Mo. Ct. App. 1969)); *see also Doe v. Alpha Therapeutic Corp.*, 3 S.W.3d 404, 419–20 (Mo. Ct. App. 1999).  Thus, as *Ridings* and *In re Diet Drugs* recognize, once drug manufacturers have provided warnings to the physician, the learned intermediary doctrine limits the duty that drug manufacturers owe directly to patients.  *See Ridings*, 2015 WL 1474080, at *5.  The doctrine is relevant here as Plaintiff's negligence claim against Mackey is no more than a failure to warn claim.  (*See* Pet. ¶¶ 76(a)–(f).)

---

[8]    Mackey testifies that she was on maternity leave during the period immediately preceding K.H.'s birth and treatment (Mackey Decl. ¶ 5), but, as Plaintiff points out, this does not foreclose the possibility that Mackey made misrepresentations to providers that treated K.H. prior to going on leave.  (*See* Reply at 7.)  If anything, this goes to causation (which Mead Johnson does not challenge), not duty.

As a preliminary question, however, it is unclear whether the learned intermediary doctrine applies to medical products like Enfamil.[9]  Enfamil products (including those manufactured for feeding premature infants) are commercially available at retail locations and on the internet without a prescription.  (*Id.* ¶ 46.)  At the same time, the Petition alleges that K.H. was given Enfamil at the direction of healthcare providers, suggesting that "specialized pre-term infant formulas were intended to be used only under a doctor's care."  *See Juan v. Abbott Lab'ys, Inc.*, No. 6:21 C 502-RBD-EJK, 2021 WL 12303405, at *3 (M.D. Fla. Aug. 2, 2021) (finding that learned intermediary doctrine applied to Abbott infant formula under Florida law).  At least one other court has determined that cow's-milk-based formula, though commercially available, may be covered by the learned intermediary doctrine.  *See id*; *cf. Ferry v. Mead Johnson & Co., LLC*, 514 F. Supp. 3d 418, 433 (D. Conn. 2021) (submitting the question of whether the learned intermediary doctrine applies to Enfamil under Connecticut law to the Connecticut Supreme Court.)[10]

A case could well be made for applying the learned intermediary doctrine to Enfamil products in this context, as neither party disputes that hospitalized preterm infants are provided such products only under the supervision and discretion of a provider.  But Missouri courts have not reached this conclusion, and ambiguity on this issue requires the court to draw inferences in Plaintiff's favor.  *See Dodson v. Spiliada Mar. Corp.*, 951 F.2d 40, 42 (5th Cir. 1992) ("In evaluating fraudulent joinder claims, we must . . . resolve all . . . ambiguities in the controlling state law in favor of the non-removing party.")  Moreover, if the learned intermediary doctrine were to apply to this case, it might not negate any duty owed by Mackey.  The few Missouri cases that address the learned intermediary doctrine do not hold that the doctrine defeats any claim that a drug

---

[9]     At a December 19, 2024, hearing on this motion, Plaintiff contended that infant formula products, regulated as a "food," are not subject to the learned intermediary doctrine. Mead Johnson took the contrary position.  Neither party, however, provided the court with Missouri caselaw that addresses the question.

[10]    The case was voluntarily dismissed before the certified question was answered. *See Hunte v. Abbott Lab'ys, Inc.,* 556 F. Supp. 3d 70, 78 (D. Conn. 2021).

manufacturer has a duty of care; it instead imposes on the manufacturer the "duty to properly warn the doctor of the dangers involved." *Krug v. Sterling Drug, Inc*., 416 S.W.2d 143, 146 (Mo. 1967) (quoting *Yarrow v. Sterling Drug, Inc.*, 263 F. Supp. 159, 162 (D. S.D. 1967), *aff'd*, 408 F.2d 978 (8th Cir. 1969)). Courts applying the learned intermediary doctrine in pharmaceutical product liability cases are split as to whether this duty extends to a sales representative employed by the manufacturer.[11] Assuming in Plaintiff's favor that such a duty would extend to Mackey under Missouri law, Plaintiff has a colorable claim that Mackey breached her duty by failing to provide warnings to the providers and offering misrepresentations.[12] *See Salazar v. Merck & Co.,* No. 05

---

[11] *See generally Wells v. Medtronic, Inc.*, 171 F. Supp. 3d 493, 507–09 (E.D. La. 2016) (discussing conflicting cases); *compare Smith v. Merck & Co.*, No. 4:07 C 170PB, 2007 WL 3120254, at *3 (N.D. Miss. Oct. 23, 2007) ("[T]he Complaint sufficiently alleges that the resident sales representatives directly participated in a tort rendering it reasonably possible for the plaintiffs to recover against the sales representatives.") *and Vargas v. Merck & Co.*, No. CIV.A. C-06-501, 2006 WL 3487403, at *3 (S.D. Tex. Dec. 1, 2006) ("Examining allegations in the Petition in the light most favorable to the Plaintiff, the Court concludes that the learned intermediary doctrine does not preclude the Plaintiff from seeking damages from the Sales Representatives.") *with Bloodsworth v. Smith & Nephew*, No. 2:05 C 622-D, 2005 WL 3470337, at *7 (M.D. Ala. Dec. 19, 2005) ("Pursuant to the learned intermediary doctrine . . . any duty to warn is owed by [the manufacturer] to the surgeon who performed [plaintiff's] procedures at issue; the duty is not owed by [the sales representative].") *and Catlett v. Wyeth, Inc.*, 379 F. Supp. 2d 1374, 1381 (M.D. Ga. 2004) ("There is no basis for a claim against a sales representative under the learned intermediary doctrine that imposes a duty on the *manufacturer* of the drug to warn the physicians.").

Missouri courts have not addressed this question, nor have they discussed how the learned intermediary doctrine reconciles with the "independent tort" doctrine in cases, like this, where a suit is a brought against both a sales representative and the manufacturer to enforce a (shared) duty to warn. The court recognizes that this is a close question but given the requirement that ambiguity must be resolved in favor of Plaintiff, the court concludes that the learned intermediary doctrine, assuming it applies, would not categorically bar Plaintiff's claims against Mackey. *See Wells*, 171 F.Supp.3d at 509 ("Under these circumstances, the Court is not in a position to make an *Erie* guess that Louisiana law precludes recovery against a sales representative, and as such, Defendants have not demonstrated that 'there is no possibility of recovery by the plaintiff against an in-state defendant.'").

[12] The court observes that though the learned intermediary doctrine would not negate Mackey's duty of care, it might well defeat a claim that Mackey's alleged negligence was the proximate cause of the harm to K.H. From the court's read of Missouri case law, the thrust of the learned intermediary doctrine is not to eliminate a prescription drug manufacturer's duty, but instead to confirm that "the failure of a drug manufacturer to provide the physician with an adequate warning of the risks associated with a prescription product is '*not the proximate cause* of a patient's injury if the prescribing physician had independent knowledge of the risk that the adequate warnings should have communicated.'" *Doe v. Alpha Therapeutic Corp.*, 3 S.W.3d 404,

C 445, 2005 WL 2875332 at *2 (S.D. Tex. Nov. 2, 2005) (applying Texas learned intermediary doctrine) ("[W]hen the warning to the learned intermediary-the prescribing physician-is inadequate or misleading, the manufacturer and its sales representatives remain liable for injuries sustained by the patient . . . .").

### 3.    Duty Arising from Knowledge of Defect

Mead Johnson's argument that Mackey owed no duty to Plaintiff must be read against the background principle that Missouri courts recognize that a duty of care arises when a defendant has "actual or constructive knowledge that there is some probability of injury sufficiently serious that an ordinary person would take precautions to avoid it." *Like ex rel. Like v. Glaze*, 126 S.W.3d 783, 785 (Mo. Ct. App. 2004); *see also Dorman v. Bridgestone/Firestone, Inc.*, 992 S.W.2d 231, 239 (Mo. Ct. App. 1999) ("[I]f the defect is such that a reasonably prudent seller should have discovered it before selling the product to the consumer, the seller may be held liable for the injuries caused by the defect."). In *Hutchen v. Wal-Mart Stores East I, LP*, the district court applied this rule in finding that a store manager was not fraudulently joined in a negligence claim brought against the store for selling the plaintiff contaminated spinach. 555 F. Supp. 2d at 1016, 1020. The court held that the allegation the store manager "knew or should have known" about the contaminated spinach was sufficient to establish a duty to the plaintiff. *Id*. at 1019 ("Such knowledge creates a duty as a matter of Missouri law.") Plaintiff argues that she may pursue theories of liability in negligence based on Mackey's personal alleged knowledge of the dangers of Enfamil products for preterm babies, and knowledge that her representations about the risks of the products were false. (Reply at 5–6.)

_____

420 (Mo. Ct. App. 1999) (quoting *Christopher v. Cutter Lab'ys*, 53 F.3d 1184, 1192 (11th Cir. 1995)) (emphasis added). This would be particularly relevant here where Plaintiff's basis for alleging that Mackey "knew or should have known" about the risks of Enfamil was the availability of accepted scientific and medical knowledge (Mot. to Remand at 6–7) that would presumably be available to any of K.H.'s providers. But Mead Johnson focuses entirely on duty in its briefing and does not press a causation argument.

Mead Johnson does not appear to dispute that an allegation that an employee has knowledge of a statement's falsity gives rise to individual liability. (*See* Notice of Removal ¶¶ 2, 19.) Instead, Mead Johnson maintains that "sales representatives may not be subject to suit for passing on information provided by their employer or for not independently verifying the safety of the products they sell" (*id.* ¶ 21) and suggests that Ms. Mackey is not a "seller" for the purpose of identifying a duty to warn of discoverable defects (Opp'n at 14). Neither of these arguments persuades the court that Plaintiff's theory of liability must fail as a matter of law.

Mead Johnson's first contention is inconsistent with Missouri agency principles. As Mead Johnson concedes (*see* Notice of Removal ¶ 20), Missouri has adopted the Restatement (Third) of Agency, which states that "an agent who makes an untrue statement to a third party based on information provided by the principal is not subject to liability to the third party simply because the principal knew the information to be untrue, *provided that the agent does not have notice that the statement is untrue*." Restatement (Third) of Agency § 7.01 cmt. d. (2006) (emphasis added). Missouri law thus recognizes that an agent is not sheltered from liability for knowingly false representations to third parties, even if those representations are sanctioned by the principal. Indeed, each of the cases cited by Mead Johnson for the proposition that sales representatives cannot be liable for passing on information relied on findings that the defendant *did not* have knowledge of the dangers of the product or falsity of the representations in question. (*See* Notice of Removal ¶ 21.) Mead Johnson contests that Plaintiff has established Mackey's knowledge (*see* Opp'n at 10–11), but this argument goes to the factual sufficiency of the Petition, discussed below, not the legal determination of Mackey's duty.

As for Mead Johnson's suggestion that Mackey was not a seller for the purposes of establishing her duty to customers like Plaintiff and K.H., Mead Johnson only cites *Ridings*, where the court found that "the sales representatives were not sellers upon whom Missouri law imposes duties." 2015 WL 1474080, at *5. As discussed earlier, however, the sales representative in *Ridings* never communicated with the plaintiffs or their doctor. *See id.* As the sentence directly

proceeding the language quoted by Mead Johnson clarifies, "*[i]nasmuch* as the sales representative *never communicated with* [plaintiffs] or [their doctor], Missouri law regarding truthfulness and avoidance of representation and deception are inapplicable to the sales representatives." *Id*. (emphasis added). *Ridings* does not stand for the proposition that sales representatives are *not* sellers, in a categorical sense—if anything, it implies the opposite.

Ultimately, Mead Johnson's arguments that Plaintiff cannot hold Mackey personally liable rest on whether Plaintiff has adequately alleged that Mackey made misrepresentations to Plaintiff or K.H.'s provider, and whether Mackey knew these representations were false. The court turns to that question next.

### C. Sufficiency of Factual Allegations

Mead Johnson argues that Plaintiff's factual allegations are insufficient as a matter of law to establish either that Mackey made certain representations, or that Mackey knew such representations were false. (*See* Opp'n at 8.) Put simply, Mead Johnson argues that the court cannot credit Plaintiff's factual allegations because they were either (1) contradicted by Mackey's declaration, (2) made upon information and belief, (3) generalized and unspecific, or (4) conclusory. (*See id*. at 8–12.)

#### 1. Factual Allegations Contradicted by Mackey

Mead Johnson argues that the court must reject Plaintiff's allegation that Mackey "misrepresented the risks and benefits of Mead Johnson's products" because Mackey's declaration states that her discussions with hospital personnel were "limited to the information provided in [Mead Johnson's] materials" and that she "referred question[s] to medical experts." (*See* Opp'n 8–9.) That argument misunderstands the Petition. Plaintiff has not alleged that Mackey went beyond the materials provided by Mead Johnson or provided improper medical advice; Plaintiff is claiming that Mackey's misrepresentations about the risks and benefits of Enfamil were contained within the materials sanctioned and provided by Mead Johnson, and that Mackey knew those statements to be false. (*See* Pet. ¶ 94.) To the extent that Mackey has

denied that she made the alleged statements to hospital personnel (*see* Mackey Decl. ¶ 13), that would be the kind of substantive denial that the court cannot credit at this stage.

Similarly, the court cannot accept Mackey's broad denial that "I have never told anyone that 'premature babies would not grow adequately with human milk and human milk products' or that the 'use of donor milk was not advised for premature infants.'" (Mackey Decl. ¶ 13.) Plaintiff has alleged that Mackey made such statements (Pet. ¶ 94), and the court must draw this disputed fact in Plaintiff's favor.

### 2. Allegations Made "Upon Information and Belief"

Mead Johnson appears to argue Plaintiff's allegations that Mackey "represented that premature babies would not grow adequately with human milk," must be disregarded because those allegations were made "upon information and belief." (*See* Opp'n at 9.) But in deciding motions to remand, courts are free to consider allegations made upon information and belief. *See, e.g., Alegre v. Aguayo*, No. 06 C 5744, 2007 WL 141891, at *6 (N.D. Ill. Jan. 17, 2007) (denying fraudulent joinder where "Plaintiff's Complaint alleges upon information and belief that '[forum defendant] actually knew of the increased risk of cardiovascular events associated with [defendant's medication]'"); *Hatherley v. Pfizer, Inc.*, No. 2:13 C 00719 WBS, 2013 WL 3354458, at *7 (E.D. Cal. July 3, 2013) ("[P]laintiffs' allegation based upon information and belief . . . is sufficient to survive defendants' opposition to remand based on fraudulent joinder."); *Tur v. Sabanosh*, No. 22 C 3879, 2023 WL 1993674, at *2 (E.D. Pa. Feb. 14, 2023) ("[Defendants] maintain that the plaintiffs cannot rely upon information and belief to allege facts stating a cause of action against Coyne. They are wrong.").

Plaintiff's allegation here is a factual claim concerning the specific statement Mackey is alleged to have made; it is not a "formulaic recitation and conclusory allegation" under information and belief that the court may otherwise be persuaded to discount. *Cf. Texas Ujoints, LLC v. Dana Holding Corp. Mach. Serv.*, No. 13 C 1008, 2013 WL 6230675, at *7–8 (E.D. Wis. Dec. 2, 2013)

(discounting, for purposes of fraudulent joinder, allegation that "[u]pon information and belief, [defendant] knowingly interfered with the obligations of the [contract]").

### 3. Generalized Allegations of Scientific Studies

Mead Johnson next argues that Plaintiff's references to various scientific studies showing the correlation between NEC and Defendant's products lack the necessary specificity to establish Mackey's knowledge of such studies. (Opp'n at 9–10.) Indeed, as Mead Johnson notes, Plaintiff does not name the title, authors, or dates of the studies referenced in the Petition. (*See generally* Pet. ¶¶ 17–26.) Mead Johnson asserts, further, that many of Plaintiff's allegations "are so vague and generic" that Mackey is unable to address them; for example, Plaintiff's complaint does not identify K.H.'s treating physician. (*See* Opp'n at 11.)

As a preliminary point, the court notes that both the Federal and the Missouri Rules of Procedure require that fraud be pleaded with particularity. *See* Fed. R. Civ. P. 9(b); Mo. R. Civ. P. 55.15. Plaintiff's failure to provide specifics about when Mackey made the alleged fraudulent statements, or to whom Mackey made such statements, likely means that "[P]laintiff['s] attempt to allege fraud falls far short of what is required under federal or Missouri law." *See In re Diet Drugs*, 2004 WL 2203712, at *3. But Missouri courts do not appear to subject negligent misrepresentation claims to this heightened standard. *See Jennings v. SSM Health Care St. Louis*, 355 S.W.3d 526, 537–38 (Mo. Ct. App. 2011) (applying Rule 55.15 to fraudulent misrepresentation claim but not negligent misrepresentation claim). The lack of specificity in Plaintiff's allegations of misrepresentations does not doom Plaintiff's negligence claims under Missouri's pleading standards.

That leaves the question of whether Plaintiff's generalized references to scientific studies are sufficient to establish a "reasonable possibility" that Mackey was aware of such studies in promoting the Enfamil products. The court finds that they are. As Plaintiff has observed, Mackey's prior sworn testimony establishes her awareness of studies "touch[ing] on" the risks of NEC from Enfamil products. (Mackey Trial Test. [25-5] at 97:8–19.) In light of this supplemental

testimony, the court finds that there is a "reasonable possibility" that Plaintiff can establish that Mackey was aware of studies that established a connection between NEC and Enfamil products.

### 4. Conclusory Allegations of Mackey's Knowledge

Mead Johnson's final argument is that Plaintiff fails to establish Mackey's knowledge regarding the correlation between NEC and the Enfamil products, and as a result, the falsity of the representations regarding the product's risks and benefits. (*See* Notice of Removal ¶¶ 22–23.) As Mead Johnson notes, Plaintiff's clearest statement in this regard is the allegation that "Ms. Mackey knew or reasonably should have known at the time of marketing, sale, and/or distribution of Mead Johnson's cow's milk-based infant products that they significantly increased the risk of NEC, serious injury, and death." (Pet. ¶¶ 76, 85.) Mead Johnson argues this allegation alone is "conclusory" and insufficient as a matter of law.

Mead Johnson mainly relies on *Owens v. Bos. Science Corp.*, 642 F. Supp. 3d 907 (E.D. Mo. 2022) for its argument here. (*See* Notice of Removal ¶ 26; Opp'n at 13–14.) In *Owens*, the court found that a sales representative was fraudulently joined to an action against a medical device manufacturer. 642 F. Supp. 3d at 916. Specifically, the court found that the "key allegation" in plaintiff's petition that "[the defendant] knew or . . . should have known of the following dangerous conditions of the [medical device]" was not supported by any "allegations of specific facts." *Id*. at 912. The court found that the allegation that the defendant had actual or constructive knowledge of the product's defects was "nothing more than formulaic recitations of an element needed to support [plaintiff's] negligence claim" and "conclusory." *Id*. (quotations omitted). "Thus, in evaluating her theories for why the Court should hold [the sales representative] liable, the Court must ignore her bare, conclusory allegation that [the sales representative] 'knew or should have known' about those defects." *Id*.

The parties dispute whether *Owens* applied the correct standard for evaluating plaintiff's claim for the purposes of fraudulent joinder,[13] but the court finds that *Owens* is distinguishable from these circumstances because—unlike the plaintiff in *Owens*—Plaintiff has alleged specific facts that support her allegation of Mackey's knowledge. Specifically, Plaintiff has alleged that studies, scientific reports, and public advisements established "scientific consensus among experts" regarding the risk that Mead Johnson's products may cause NEC. (*See* Pet. ¶¶ 17–24, 29–30.) Plaintiff has also alleged that Mackey's role was to "provide information about Mead Johnson's products to hospital personnel," presumably dealing regularly with Enfamil products. (*See* Pet. ¶ 41.) For her part, Mackey acknowledges in her declaration that she has "reviewed scientific studies regarding Mead Johnson's products." (Mackey Decl. ¶ 10.) In the state court trial in *Watson v. Mead Johnson*, No. 2021-L-1032 (Ill. Cir. Ct.), Mackey (who was not a named defendant) testified that Mead Johnson provided her with the materials she shared with health care professionals, and that she had never communicated information not approved by Mead Johnson. (Mackey Trial Test., Defs.' Ex. B [31-2], at 2524:1–9.) She further testified that "I also have my master's in public health, and I am a registered dietitian and licensed as well," going so far to say that "we [licensed dietitians] consider ourselves nutrition experts." (Mackey Trial Test., Pl.'s Ex. 5 [25-2] at 95:15–24.)

Taken together, Plaintiff's Petition provides more than a "bare, conclusory allegation" of Mackey's actual or constructive knowledge, but raises a factual question regarding whether Mackey would have been apprised of these studies, and thus aware of the risks of Mead

---

[13] Plaintiff argues that *Owens* improperly applied the Rule 8 pleading standard in judging whether the plaintiff had a sufficient claim against the forum defendant. (*See* Mot. to Remand at 11.) Indeed, *Owens* applied the Eighth Circuit rule that "the same [rule 8 and 12(b)(6)] pleading standards apply to allegations used to oppose a claim of fraudulent joinder." 642 F. Supp. 3d at 911 (citing *Henson v. Union Pac. R.R. Co.*, 3 F.4th 1075, 1080 (8th Cir. 2021)). The Seventh Circuit does not appear to adhere to this standard. Though this claim was transferred from the Eastern District of Missouri, "for cases transferred by the JPML to an MDL proceeding, the transferee court applies the law of the circuit in which it sits to decide issues of federal procedure like those presently before the Court." *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proc.*, 164 F. Supp. 3d 1040, 1044 (N.D. Ill. 2016).

Johnson's products.  Indeed, Plaintiff has attached, as exhibits to her motion to remand, copies of decisions from Missouri courts holding allegation of actual and constructive knowledge like these sufficient to survive a motion to dismiss under Missouri law.  (*See* Ex. 2 to Mot. to Remand [25–2], Order at 2–3, *Miller v. Mead Johnson & Co.*, No. 2322-CC00535 (Mo. 22nd Jud. Cir. Aug. 31, 2023); Ex. 3 to Mot. to Remand [25–3], Order at 2–3, *Irby v. Mead Johnson & Co.*, No. 2222-CC10023 (Mo. 22nd Jud. Cir. Aug. 31, 2023).  Mead Johnson does not identify factual distinctions between these state cases and the claims here, instead contending that the Missouri trial courts did not consider the argument that Mackey owed no duty to Plaintiff.  But Mead Johnson does not dispute that the Missouri courts found that allegations similar to Plaintiff's "adequately pleaded the actual or constructive knowledge of [] sales representatives."  (*See* Opp'n at 12.)  As such knowledge gives rise to a duty under Missouri law, the court finds the Missouri trial court's decisions, while not binding, instructive as to the "reasonable possibility" of Plaintiff's claims against Mackey under Missouri law.

## II.    Fees and Costs

Plaintiff seeks fees and costs for its efforts in obtaining this remand order.  (Mot. to Remand at 14.)  Such awards are available under 28 U.S.C. § 1447(c) "only where the removing party lacked an objectively reasonable basis for seeking removal."  *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 141 (2005).  The court is unable to conclude that Plaintiff has no possibility of success against Mackey but does not find Mead Johnson's position objectively unreasonable.  As Mead Johnson notes, Mackey is sparsely mentioned in Plaintiff's Petition compared to Mead Johnson.  (*See* Notice of Removal ¶ 24 ("[T]hough the Petition's 'Factual Allegations' section is replete with references to Mead Johnson, Ms. Mackey is mentioned only three times.").)  Moreover, as this opinion illustrates, the circumstances of this case raise several questions of unresolved Missouri case law, including whether the learned intermediary doctrine applies to products like Enfamil, whether sales representatives owe a generalized duty to the public, and whether the availability of scientific consensus can serve as the basis for establishing constructive

23

knowledge. Mead Johnson has not met the heavy burden to demonstrate fraudulent joinder, but the case is close enough that an award of fees and costs is not appropriate.

## CONCLUSION

Plaintiff's decision to include Mackey as a defendant in this action and not other cases arising from Missouri may well be, in Plaintiff's counsel's words, "strategic" and for "jurisdictional" reasons. But the court's analysis under fraudulent joinder is an objective one, looking only to whether Plaintiff has a "reasonable possibility of success" against the non-diverse defendant. Further developments in this litigation, such as a failure by Plaintiff to prosecute the case against Mackey, may provide a new basis for a finding of fraudulent joinder. *See In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 07-MD-1871, 2014 WL 2011597, at *2–3 (E.D. Pa. May 15, 2014). For now, for the reasons stated above, Plaintiff's motion to remand this case to Missouri state court [25] is granted. Plaintiff's motion for an award of fees and costs is denied.

ENTER:

Dated: July 3, 2025

_____
REBECCA R. PALLMEYER
United States District Judge

24